2023-1602

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

**UNITED WATER CONSERVATION DISTRICT,**

*Plaintiff-Appellant*

v.

**UNITED STATES,**

*Defendant-Appellee*

Appeal from the United States Court of Federal Claims
in No. 1:22-cv-00542-CFL, Senior Judge Charles F. Lettow.

# PLAINTIFF-APPELLANT'S OPENING BRIEF

FRANK S. MURRAY
FOLEY & LARDNER LLP
3000 K Street, N.W., Suite 600
Washington D.C. 20007-5143
(202) 295-4163
fmurray@foley.com

*Counsel for Plaintiff-Appellant United Water Conservation District*

July 14, 2023

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2023-1602

**Short Case Caption** United Water Conservation District v. US

**Filing Party/Entity** Plaintiff-Appellant United Water Conservation District

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 07/14/2023

Signature: /s/ Frank S. Murray

Name: Frank S. Murray

**FORM 9. Certificate of Interest** **Form 9 (p. 2)**
**March 2023**

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| United Water Conservation District | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Michael P. Calabrese<br>Foley & Lardner, LLP | David T. Ralston, Jr.<br>Foley & Lardner, LLP | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☑ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

## TABLE OF CONTENTS


STATEMENT OF RELATED CASES ........ 1

STATEMENT OF JURISDICTION ........ 1

STATEMENT OF THE ISSUES ........ 2

STATEMENT OF THE CASE ........ 3

I. United's Property Right to Beneficial Use of Water under California Law ........ 3

II. Designation of the Steelhead Trout Population in the Santa Clara River Region as an Endangered Species ........ 5

III. NMFS Office of Law Enforcement Letter Threatens ESA Enforcement Action Unless United Reduced Diversion of Santa Clara River Water It Otherwise Has the Right to Divert and Put to Beneficial Use ........ 7

IV. The NMFS-Imposed Restrictions on United's Diversion of Santa Clara River Water at the Freeman Diversion Take United's Property Right to Appropriate and Put to Beneficial Use Santa Clara River Water ........ 12

V. Procedural Background ........ 13

SUMMARY OF THE ARGUMENT ........ 16

ARGUMENT ........ 21

I. Standard of Review ........ 21

II. United Has a Compensable Private Property Right Under California Law in the Beneficial Use of Santa Clara River Water That It Is Authorized to Appropriate and Divert at the Freeman Diversion ........ 23

III. United Alleged a Governmental Appropriation of Its Vested Beneficial-Use Property Right, Which Controlling Supreme Court Precedent Establishes Must Be Analyzed as a *Per Se* Physical Taking........27

A. The Government-Imposed Restriction on United's Diversion of Santa Clara River Water Appropriates, Rather Than Merely Limits the Use of, the Relevant Property Right: Beneficial Use of Santa Clara River Water ................................................................31

B. The Trial Court's Finding That Water Must Have Already Entered and Subsequently Been Released from a Property Owner's Facilities for a Physical Taking to Have Occurred Ignores the Usufructuary Nature of the Property Right at Issue and Controlling Supreme Court Takings Jurisprudence.....................38

IV. The Government's Appropriation of Santa Clara River Water for the Benefit of Fish Survival Has Already Impinged on United's Right to Beneficial Use of Santa Clara River Water, Making United's Takings Claim Ripe for Adjudication .......................................................................50

CONCLUSION AND RELIEF SOUGHT ...........................................................52

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acceptance Ins. Cos. v. United States*,
583 F.3d 849 (Fed. Cir. 2009) ........................................................................23

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....................................................................................22

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ....................................................................................22

*Bennett v. Spear*,
520 U.S. 154 (1997) ................................................................................8, 47

*Cary v. United States*,
552 F.3d 1373 (Fed. Cir. 2009) ......................................................................22

*Casitas Mun. Water Dist. v. United States*,
543 F.3d 1276 (Fed. Cir. 2008) ............... 21, 27, 32, 33, 37, 38, 39, 41, 42, 46, 48

*Casitas Mun. Water Dist. v. United States*,
708 F.3d 1340 (Fed. Cir. 2013) ..................... 21, 23, 24, 26, 27, 28, 31, 44, 50, 51

*Cedar Point Nursery v. Hassid*,
141 S. Ct. 2063 (2021)........................................................ 25, 26, 28, 30, 31, 50

*Cedars-Sinai Med. Ctr. v. Watkins*,
11 F.3d 1573 (Fed. Cir. 1993) ........................................................................22

*Crow Creek Sioux Tribe v. United States*,
900 F.3d 1350 (Fed. Cir. 2018) ......................................................................22

*CRV Enterprises, Inc. v. United States*,
626 F.3d 1241 (Fed. Cir. 2010) ......................................................................37

*Dugan v. Rank*,
372 U.S. 609 (1963) ............................................................................... 28, 40

*Estate of Hage v. United States*,
687 F.3d 1281 (Fed. Cir. 2012) ............................................................ 28, 32, 43

*Estes Express Lines v. United States*,
739 F.3d 689 (Fed. Cir. 2014) .................... 22, 51

*Horne v. Dep't of Agric.*,
576 U.S. 350 (2015) .................... 27, 31, 34

*Howard W. Heck and Assocs., Inc. v. United States*,
134 F.3d 1468 (Fed. Cir. 1998) .................... 21

*Int'l Paper Co. v. United States*,
282 U.S. 399 (1931) .................... 28, 41, 42

*Lingle v. Chevron U.S.A. Inc.*,
544 U.S. 528 (2005) .................... 28

*Loretto v. Teleprompter Manhattan CATV Corp.*,
458 U.S. 419 (1982) .................... 31, 34

*Lucas v. S.C. Coastal Council*,
505 U.S. 1003 (1992) .................... 28

*Peabody v. United States*,
231 U.S. 530 (1913) .................... 40

*San Luis & Delta-Mendota Water Auth. v. Salazar*,
638 F.3d 1163 (9th Cir. 2011) .................... 47

*Tahoe-Sierra Preservation Council, Inc. v. Tahoe Reg'l Plan, Agency*,
535 U.S. 302 (2002) .................... 29

*United States v. Gerlach Live Stock Co.*,
339 U.S. 725 (1950) .................... 26, 28, 39

*United States v. State Water Res. Control Bd.*,
182 Cal. App. 3d 82 (1986) .................... 24, 25, 51

*Washoe Cnty., Nev. v. United States*,
319 F.3d 1320 (Fed. Cir. 2003) .................... 28, 34, 35, 36, 37

*Wishtoyo Found. v. United Water Conservation Dist.*,
No. 16-CV-03869-DOC (PLAx), 2018 WL 7571315 (C.D. Cal. Dec. 1, 2018),
*aff'd*, 795 F. App'x 541 (9th Cir. 2020) .................... 11, 12

**Statutes**

16 U.S.C. §§ 1531-1544 ....................5, 25

16 U.S.C. §§ 1540(a) and (b) ....................8

28 U.S.C. § 1295(a)(3) ....................2

28 U.S.C. § 1491 ....................2

28 U.S.C. §1491(a) ....................1

28 U.S.C. § 1491(b)(1) ....................2

CAL. WATER CODE § 1242.5 ....................24

CAL. WATER CODE § 1254 ....................24

U.S. Const. amend. V, cl. 4 ....................27

**Rules**

Fed. R. Civ. P. 12(b)(6) ....................22

Federal Circuit Rule 47.5 ....................1

Rule of the Court of Federal Claims 12(b)(1) .................... 14, 15, 22

**Regulations**

CAL. CODE REGS. tit. 23, § 659 (2023) ....................24

CAL CODE REGS. tit. 23, § 661 (2023) ....................24

CAL. CODE REGS. tit. 23, § 670 (2023) ....................24

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Plaintiff-Appellant United Water Conservation District ("United") states:

(a) No appeal in or from the same proceeding was previously before this or another appellate court; and

(b) United is unaware of another pending case in this or any other court that will directly affect or be affected by this Court's decision in the pending appeal.

## STATEMENT OF JURISDICTION

Appellant United filed a Complaint in the United States Court of Federal Claims seeking just compensation under the Fifth Amendment of the United States Constitution for the government's physical taking of the beneficial use of Santa Clara River water to which United was entitled under its California water license. Appx018-042. The Court of Federal Claims had jurisdiction over United's takings claim under 28 U.S.C. §1491(a).

The trial court dismissed United's Complaint on January 26, 2023, holding that United's takings claim was not ripe for adjudication and that United had therefore failed to state a viable claim. Appx001-014. The trial court entered final judgment against United on January 26, 2023. Appx015. United appeals that final judgment.

United timely filed a notice of appeal on March 10, 2023. Appx111. This Court has exclusive jurisdiction over this appeal under 28 U.S.C. § 1295(a)(3).

The Court of Federal Claims had jurisdiction to consider United's Complaint under 28 U.S.C. § 1491, as the Complaint represented and asserted a claim against the United States for a taking of property without just compensation, in violation of the U.S. Constitution. 28 U.S.C. § 1491(b)(1).

## STATEMENT OF THE ISSUES

The appeal presents the question of whether the Court of Federal Claims properly dismissed United's Complaint for presenting a controversy not yet ripe for judicial adjudication. That question is resolved entirely by the determination whether the asserted government taking is considered a physical, versus a regulatory, taking. Accordingly, the issues are:

(1) Whether the United States effected a physical taking of a California water district's property right to beneficial use of Santa Clara River water when the government appropriated the Santa Clara River water for the United States' own use—namely, an increase in the flow of water in the Santa Clara River for the public purpose of fish preservation—by preventing the water district from diverting the Santa Clara River water into the water district's own facilities where it could be put to the district's beneficial use.

(2) Whether United's Complaint alleging that the Santa Clara River water the government appropriated by reducing the amount of Santa Clara River water that United could divert at the Vern Freeman Diversion dam ("Freeman Diversion") and put to United's beneficial use, as permitted under United's California water license and permit, sufficiently alleged a physical taking of a portion of United's California water rights.

(3) Whether the governmental action at issue here, when examined as a physical taking, is ripe for adjudication and within the subject matter jurisdiction of the trial court based on United's uncontroverted allegation that the governmental action appropriated a portion of United's property right to beneficial use of Santa Clara River water beginning in 2017.

## STATEMENT OF THE CASE

### I. United's Property Right to Beneficial Use of Water under California Law

United is a California water conservation district, established under and in accord with California law to serve as the water management agency for the Santa Clara River and the Oxnard coastal plain that surrounds the coastal portion of the Santa Clara River. Appx002, Appx018, Appx023 (Compl. ¶¶ 1, 13). California's State Water Resources Control Board ("SWRCB") issued United a license in 1958 and a subsequent permit in 1983 granting United the right to appropriate and divert Santa Clara River water, via the Freeman Diversion, for United's own beneficial use

and, in its capacity as trustee, for the beneficial use of the lands in and inhabitants of United's district, and United's constituent groundwater users. Appx002, Appx018, Appx023.

Specifically, through United's California SWRCB License 10173 (issued in 1956) and Permit 18908 (issued in 1983), United holds water rights to appropriate and divert up to an instantaneous rate total of 375 cubic feet per second of Santa Clara River water at the Freeman Diversion. Appx023 (Compl. ¶ 14). The Freeman Diversion is a 1,200-foot-wide concrete diversion dam that United uses to divert Santa Clara River water into United's Freeman Diversion Canal. Appx024, Appx026. (Compl. ¶ 15, ¶ 24). The Freeman Diversion was completed in 1991, with funding provided by the U.S. Bureau of Reclamation ("Reclamation"). Appx024.

On an annual basis, United's California water license and permit entitle United to appropriate and divert 144,630 acre-feet per year at the Freeman Diversion (119,000 acre-feet for use as groundwater and 25,630 acre-feet for use as surface water). Appx023 (Compl. ¶ 14). United beneficially uses the Santa Clara River water it diverts at the Freeman Diversion for three overarching beneficial uses/purposes. United uses the diverted water for groundwater aquifer recharging of United's underground water basins, thereby (1) preventing/combatting seawater intrusion into those coastal aquifers, which would degrade the water quality of the groundwater aquifers, rendering it unpotable and unfit for agricultural use, and (2)

providing a supply of water for the use of United and United's constituent ground water users. Appx019, Appx025. Separately, United uses diverted water for surface water facilities, such as pipelines, to supply water for irrigation directly to United's agricultural users. Appx019, Appx025.

## II. Designation of the Steelhead Trout Population in the Santa Clara River Region as an Endangered Species

In 1997, years after the 1991 completion of the Freeman Diversion, the U.S. National Oceanic and Atmospheric Administration's National Marine Fisheries Service ("NMFS") designated the Southern California steelhead trout an endangered species under the Endangered Species Act of 1973 ("ESA"), 16 U.S.C. §§ 1531-1544. Appx003, Appx027. The designation of Southern California steelhead trout as endangered species encompassed fish populations in the Santa Clara River region. Appx027 (Compl. ¶ 26).

For years after the NMFS 1997 designation of Southern California steelhead trout as endangered, United continued to operate the Freeman Diversion in accordance with its 1985 Permit 18908, including the bypass flows to the fish ladder required by the permit, and other direction from NMFS. Appx027-028. Because Reclamation provided funding for the construction of the Freeman Diversion, ESA compliance was initially a federal obligation, and in 2005 Reclamation brought a proceeding under Section 7 of the ESA concerning United's ongoing operation of the Freeman Diversion. Appx004, Appx028.

On July 23, 2008, as part of the Section 7 proceeding, NMFS issued a proposed Biological Opinion ("BiOp") to Reclamation that identified two categories of reasonable and prudent alternatives ("RPAs") designed to enhance fish survival to be implemented by Reclamation, and thus by United, at the Freeman Diversion. Appx028. The BiOp included RPAs to mitigate the "take" of steelhead trout under the ESA, and RPA 2 addressed bypass flow criteria for steelhead migration. Appx028-029. RPA 2A addressed bypass flows for adult steelhead migration at the Freeman Diversion, and RPA 2B addressed bypass flows for juvenile steelhead migration. Appx028-029.

"Bypass flow" refers to a flow of water that United would allow to bypass the Freeman Diversion Canal and thereby remain in the river to facilitate fish migration, which obviously prevents United from appropriating and putting to its own beneficial use the "bypassed" water. RPA 2 included certain ramping rates governing the bypass flows and triggers for when the bypass flows mandated in RPA 2 would apply. Appx028. A "ramping rate" is the gradual reduction in bypass flows to mimic the natural receding limb of the hydrograph. Appx034.

In December 2008, Reclamation elected to terminate the ESA Section 7 process, asserting that it was precluded from taking the Section 7 federal action because it neither owned nor operated the Freeman Diversion. Appx029. Reclamation's action effectively ended Reclamation's role concerning Freeman

Diversion operations, and the 2008 proposed BiOp was concomitantly mooted by Reclamation's decision to terminate the ESA Section 7 process. Appx029.

Notwithstanding the mooting of the 2008 proposed BiOP due to Reclamation's termination of the ESA Section 7 process, starting in late 2008, United voluntarily implemented certain limited aspects of the BiOp as United interpreted them. Appx029. United's interpretation was also consistent with provisions agreed to in a 2009 settlement agreement with California Trout, Inc. ("CalTrout") that resolved an ESA enforcement private right of action, and United faithfully followed the CalTrout agreement from 2009 to 2016. Appx029-030.

## III. NMFS Office of Law Enforcement Letter Threatens ESA Enforcement Action Unless United Reduced Diversion of Santa Clara River Water It Otherwise Has the Right to Divert and Put to Beneficial Use

On June 9, 2016, the NMFS Office of Law Enforcement sent United a letter (the "NMFS Enforcement Letter") warning that United would face an enforcement action under the ESA if it did not adopt NMFS's stricter interpretation of the restrictions imposed under RPA 2 of the BiOp on diversions of Santa Clara River water at the Freeman Diversion. Appx031, Appx053-055. The NMFS Enforcement Letter identified itself as authored by the NMFS office specifically "responsible for enforcement of the Endangered Species Act (ESA)" (Appx053) and notified United that NMFS had determined "United's operation of the Freeman Diversion has annually resulted in take of [Southern California] steelhead through death, capture

and significant impairment of essential behavioral patterns." Appx054. Thus, according to the NMFS office charged with enforcing the ESA, United's continued operation of the Freeman Diversion in accord with the CalTrout settlement was deemed "unlawful" under the ESA. Appx053.

The NMFS Enforcement Letter underscored that position in its second paragraph, where the NMFS Office of Law Enforcement (i) stated that, under the ESA, "it is unlawful for any person to 'take' endangered species" and (ii) asserted that "a significant issue regarding ongoing *take* of endangered southern California (SC) steelhead exists at the Vern Freeman Diversion Dam (Freeman Diversion), which United owns and operates." Appx053 (emphasis added).

In a section bearing the heading "Notification," the NMFS Enforcement Letter formally notified United of the NMFS Office of Law Enforcement's conclusion that, "[b]ecause United does not have any authorization for the take of [Southern California] steelhead, all such takes *are in violation* of Section 9 of the ESA." Appx054 (emphasis added). Any person who knowingly "takes" an endangered or threatened species in violation of Section 9 of the ESA is subject to substantial civil and criminal penalties. 16 U.S.C. §§ 1540(a) and (b) (authorizing civil fines of up to $25,000 per violation and criminal penalties of up to $50,000 and imprisonment for one year); *see also Bennett v. Spear*, 520 U.S. 154, 170 (1997). The NMFS Enforcement Letter further stated that "NMFS believes that United must commit to

implementing interim operating measures that are consistent with the operational criteria set forth in the RPA (i.e., elements 2(a) and 2(b)) and appurtenant terms and conditions (i.e., 1(a), 2(a-c), and 4(a-c)) of the 2008 Biological Opinion. In order to be effective in protecting [Southern California] steelhead during the 2017 migration season and subsequent migration seasons pending issuance of an incidental take permit, these measures must be in place before December 1, 2016." Appx055 (underlining in original); Appx032.

NMFS's Office of Law Enforcement then stated its intention to take legal action against United under the ESA *unless* United began to restrict its diversions of Santa Clara River water as ordered by NMFS in the letter, no later than December 1, 2016:

> Absent a firm commitment by United to timely implement the RPA criteria and measures, combined with timely and accurate monitoring of implementation, *NMFS intends to pursue legal options available under the ESA* to ensure that adequate interim operating measures are in place to minimize the impending take of SC steelhead at the Freeman Diversion pending NMFS's evaluation of United's incidental take permit application. I encourage United in the *strongest terms possible* to immediately institute the operational criteria and measures of the RPA.

Appx055 (emphases added); Appx032. NMFS's Office of Law Enforcement closed the letter by requesting a response from United "by August 8, 2016, regarding your plans to implement these interim operating measures consistent with the operational criteria set forth in the RPA." Appx055. The June 9, 2016 NMFS Enforcement

Letter was issued in the context of an environmental interest group having initiated just one week prior its own private enforcement action against United's operations at the Freeman Diversion and, by implication, threatened to throw the weight of the federal government behind those enforcement efforts if United did not accede to NMFS's demands. Appx031, Appx033.

Facing the prospect of significant civil and even criminal penalties under the ESA Section 9 enforcement action threatened by the NMFS Enforcement Letter, United ultimately capitulated to the operational restrictions at the Freeman Diversion demanded by NMFS in the NMFS Enforcement Letter and implemented the NMFS interpretations of RPA 2A *and* 2B by December 1, 2016. Appx033.

In addition to the June 9, 2016 threat by NFMS's Office of Law Enforcement to initiate its own enforcement action against United under the ESA, the Wishtoyo Foundation filed a private right of action against United under the ESA in the U.S. District Court for the Central District of California (the "District Court") on June 2, 2016. Appx033-034. The Wishtoyo Foundation sought a federal court decision that United's operation of the Freeman Diversion in the absence of an ESA Section 10 incidental take permit results in an unauthorized, and therefore unlawful, take of steelhead trout under the ESA. Appx033-034. The U.S. government could have

been a party to the *Wishtoyo* litigation, but instead resisted being joined as a party to the case.[1] Appx034.

On September 23, 2018, the District Court rendered a verdict in the *Wishtoyo* litigation, ruling that, in the absence of a Section 10 incidental take permit, United's operation and maintenance of the Freeman Diversion constituted an unauthorized take of Southern California steelhead trout in violation of ESA Section 9. Appx034. The District Court's September 23, 2018 order included a permanent injunction, which was amended on December 1, 2018. *Wishtoyo Found. v. United Water Conservation Dist.*, No. 16-CV-03869-DOC (PLAx), 2018 WL 7571315 (C.D. Cal. Dec. 1, 2018), *aff'd*, 795 F. App'x 541 (9th Cir. 2020). The District Court's December 1, 2018 Amended Judgment and Permanent Injunction provided:

> Commencing on **October 22, 2018.** United shall continue to adhere to the water diversion operating rules set forth in Reasonable and Prudent Alternative ("RPA") 2 of National Marine Fisheries Service ("NMFS")'s 2008 Biological Opinion for [the Freeman Diversion], pursuant to NMFS's interpretation of RPA 2A such that the ramping rates apply whether or not United initiates diversion procedures at, above, or below 750 cubic feet per second ("cfs"), until such time as United secures incidental take authorization from NMFS for the maintenance and operation of [the Freeman Diversion] with respect to Steelhead, or unless the parties move for relief from those operating rules and the Court approves the motion.

---

[1] The U.S. Attorney General has the authority to intervene on behalf of the United States as a matter of right in a private right of action to enforce the ESA.

*Wishtoyo*, 2018 WL 7571315, at *1; Appx034. As of the effective date of the *Wishtoyo* injunction, United had already been operating the Freeman Diversion subject to the NMFS-imposed restrictions referenced in the injunction for two full annual steelhead migration seasons (*i.e.*, 2017 and 2018), as required by the NMFS Office of Law Enforcement in the June 9, 2016 NMFS Enforcement Letter. Appx033, Appx054 (noting that "Steelhead migration in the Santa Clara River principally occurs from January through May").

## IV. The NMFS-Imposed Restrictions on United's Diversion of Santa Clara River Water at the Freeman Diversion Take United's Property Right to Appropriate and Put to Beneficial Use Santa Clara River Water

United's implementation of NMFS's interpretation of RPA 2A and 2B, as set forth in the NMFS Enforcement Letter, increased the amount of Santa Clara River water used as bypass flow via the Freeman Diversion fish ladder or remaining in the Santa Clara River for the downstream benefit of the steelhead trout by forcing United to decrease its diversion and appropriation of Santa Clara River water at the Freeman Diversion. Appx035. Had United been able to continue operating the Freeman Diversion pursuant to the CalTrout settlement parameters in effect prior to the NMFS Enforcement Letter's threat of an ESA enforcement action for unlawful "take" of steelhead, United would have diverted substantially more Santa Clara River water for its own beneficial use under its License 10173 and Permit 18908. Appx035. From the period of 2017 through 2021, United's compliance with RPA 2

of the BiOp as interpreted by NMFS in the NMFS Enforcement Letter has caused United to lose an estimated 49,800 acre-feet of water that United would have otherwise been permitted to divert and appropriate from the Santa Clara River for its beneficial use and that of its constituent groundwater users. Appx035.

United forever lost the beneficial use of that Santa Clara River water, as its beneficial use was appropriated by NMFS for the public purpose of fish species protection through the government's use of the appropriated water flowing downstream of the Freeman Diversion and then into the Pacific Ocean to enhance conditions for fish migration. Appx035. The government has not compensated United or its lands, inhabitants and constituent groundwater users for that permanent loss of beneficial use of Santa Clara River water resulting from United's implementation of NMFS's interpretation of RPA 2 of the BiOp, as demanded by NMFS in the NMFS Enforcement Letter. Appx037. The current fair market value of the Santa Clara River water lost since 2017 due to compliance with NMFS's interpretation of RPA 2 of the BiOp is in excess of $40 million. Appx037.

## V. Procedural Background

On May 17, 2022, United filed its Complaint in the Court of Federal Claims asserting a claim for just compensation under the Fifth Amendment of the U.S. Constitution for the government's taking of Santa Clara River water that United otherwise would have diverted and put to beneficial use as permitted by its California

water rights. Appx037-039. United alleged that the implementation of the Freeman Diversion operating criteria demanded by NMFS in the NMFS Enforcement Letter had, since 2017, reduced by at least 49,800 acre-feet the amount of Santa Clara River water United had been able to divert and appropriate at the Freeman Diversion and put to beneficial use as compared to the amount it otherwise would have been able to divert, appropriate, and put to beneficial use under the terms of United's California water license and permit. Appx035, Appx038. United further alleged that the government had taken and used that at least 49,800 acre-feet of Santa Clara River water for the public purpose of protection of an endangered fish species. Appx0039. United's Complaint characterized the government's taking as a physical taking of United's beneficial-use water rights. Appx039.

The government filed a motion to dismiss United's Complaint under Rule 12(b)(1) of the Court of Federal Claims, contending that United's claim is not ripe for adjudication. Appx043. The government, largely ignoring that United's Complaint specifically alleged a physical taking of its property right, argued that United's Complaint alleged a regulatory taking under the ESA. *See, generally*, Appx046-052. Citing only precedents involving regulatory takings, the government argued that a regulatory taking claim is not ripe without "a final agency action that is capable of determining any rights or obligations." Appx046. Because the 2016 NMFS Enforcement Letter did not, in the government's view, constitute "a final

agency action," the government contended that a regulatory taking claim by United is premature and should be dismissed without prejudice as not ripe for adjudication. Appx052.

United opposed the government's motion to dismiss, pointing out that United had expressly alleged a *physical* taking or appropriation of United's water rights, *not* a regulatory taking. Appx075-081. United noted the government's motion had not contested the essential jurisdictional factual allegations in the Complaint, but had instead attempted to recast those allegations as having alleged a regulatory taking, rather than a physical taking in furtherance of the government's argument that the takings claim was not yet ripe. Appx062.

The trial court heard argument of counsel on the government's motion to dismiss on December 2, 2022.

On January 26, 2023, the trial court issued an Opinion and Order granting the government's motion to dismiss United's takings claim under Rule 12(b)(1), concluding that United's claim "is not yet viable for adjudication." Appx013-014. The trial court reached that result based on its conclusion that "the claim should be analyzed under the regulatory takings doctrine." Appx013. The trial court offered the following explanation for its conclusion that United's claim could not be considered a physical taking: "*Because United does not allege that it had to return water it had already diverted,* it has not stated a physical takings claim. United's

allegation that its right to appropriate and divert water (or use water) was restricted by the 2016 OLE letter's 'ESA requirement' should be analy[z]ed as a regulatory taking." Appx013 (emphasis added) (citation omitted).

The trial court found that a *regulatory* taking claim arising under the ESA is not ripe until the claimant has applied for and been denied an incidental-take permit under Section 10 of the ESA. Appx013-014. Because United had not yet applied for an ESA Section 10 incidental-take permit at the Freeman Diversion, the trial court dismissed as premature United's claim that ESA-based restrictions on its operation of the Freeman Diversion had resulted in a taking of United's water rights. Appx013-014.

The Court of Federal Claims promptly entered judgment dismissing United's Complaint in accordance with the trial court's January 26, 2023 Opinion and Order. Appx015.

On March 10, 2023, United filed its Notice of Appeal. Appx111.

## SUMMARY OF THE ARGUMENT

The outcome of this appeal, and the propriety of the trial court's dismissal of United's Complaint, turns on a single question: is the taking of United's California beneficial-use water right alleged in United's Complaint properly analyzed as a *physical* taking or a *regulatory* taking? The answer to that question is dispositive of the ripeness issue. If considered a physical taking, as U.S. Supreme Court precedent

dictates, then United's claim is unquestionably ripe for adjudication, and the trial court's judgment should be reversed and the case remanded for further proceedings. On the other hand, were the trial court correct in treating United's claim as a regulatory taking, then the claim is not ripe.[2]

The sole basis cited by the trial court for its conclusion that United had not stated a claim for a physical taking of its water rights was the court's conclusion that a physical taking of water rights would require an allegation "that [United] had to return water it had already diverted." Appx013. In concluding a physical taking would require that United (i) first divert Santa Clara River water into its facilities so as to actually possess the water, and then (ii) return that possessed, diverted water to the river, the trial court ignored that the governmental action at issue here unquestionably had the purpose and effect of *appropriating* to the federal government the beneficial *use* of Santa Clara River water to which United otherwise had a vested usufructuary property right under its California license and permit. That the government accomplished the appropriation by preventing United from diverting

[2] United did not contest below, and does not contest in this appeal, that its Complaint does not state a *regulatory* takings claim that is ripe for adjudication. Appx077 ("Defendant baldly asserts that the Complaint, as pled, fails to assert a ripe claim for a regulatory taking—a point United would not dispute[.]"). United *does* contest, however, the trial court's erroneous conclusion that the taking claim alleged in United's Complaint should be analyzed as a regulatory, rather than a physical, takings claim.

Santa Clara River water into United's facilities in the first instance is no less an appropriation of United's property right to the beneficial *use* of the water than would be a governmental directive that United return already-diverted water to the river. In both instances, the federal government obtains the beneficial use of Santa Clara River that United would otherwise be entitled to possess and use.

There is no dispute on the record before the Court that United has a compensable property right in the beneficial use of Santa Clara River water it diverts and appropriates at the Freeman Diversion—a property right this Court has previously recognized as subject to a compensable taking when impinged by ESA-imposed restrictions on water diversion. Nor has the government contested United's factual allegation that, beginning in 2017, the NFMS action mandating increased bypass flows at the Freeman Diversion has served to appropriate to the federal government United's beneficial-use property right, thereby reducing the amount of Santa Clara River water United has been able to put to beneficial use by at least 49,800 acre-feet. It is beyond cavil that the government appropriated the beneficial use of that 49,800 acre-feet of Santa Clara River water for the federal public purpose of fish preservation, as that federal public purpose was plainly stated in the very letter through which NMFS imposed the restriction on United, upon threat of civil or criminal liability under the ESA.

Thus, United's Complaint alleges the facts necessary to state a physical takings claim under the Fifth Amendment of the U.S. Constitution. Because it has suffered a physical taking, United is entitled to compensation as of the date it first experienced a loss of beneficial use of Santa Clara River water based on the government's appropriation of the Santa Clara River water for fish preservation purposes. Accordingly, the claim is ripe for adjudication, and the trial court's dismissal of United's Complaint for lack of subject matter jurisdiction must be reversed.

In contrast to United's claim, a regulatory taking claim generally does not assert a government *appropriation* of a property right for a public purpose, but rather asserts that the government has imposed a restriction on the owner's ability to use its property that is deemed to go "too far" and warrants takings compensation. By alleging that the government has appropriated the use of at least 49,800 acre-feet of Santa Clara River water that United had the vested property right to divert, appropriate, and put to its own beneficial use, United has stated a claim for a *per se* physical taking, not a regulatory taking. United does not have the same amount of water it can put to beneficial use *after* the government action as it would have had *absent* the government action. Thus, the government action is not a use *restriction* that otherwise leaves United's property right undisturbed, as is the case in a regulatory taking claim. Instead, the government action at issue in this appeal is a

use *confiscation*—an appropriation by the federal government of United's usufructuary property right under color of federal regulation.

The government here has *taken* the use of the 49,800 acre-feet of Santa Clara River water for the federal public purpose of endangered species protection. The government action at issue in this case denied United access to 49,800 acre-feet of Santa Clara River water it was otherwise entitled to divert, appropriate and put to beneficial use, and United therefore has lost *forever* its property right to put that 49,800 acre-feet of Santa Clara River water to beneficial use. United can never recover the usufructuary property right in that water that the government has taken, because that 49,800 acre-feet of Santa Clara River water is gone forever.

The U.S. Supreme Court has emphasized that the government's appropriation of a property right is a *per se* physical taking, notwithstanding that the government invokes a statute or regulation as the authority for the appropriation. That is precisely what United alleged occurred here: NMFS appropriated for the public purpose of fish survival at least 49,800 acre-feet of Santa Clara River water that United had the vested property right to put to beneficial use under its California water license and permit. The government's appropriation of United's beneficial-use right to those 49,800 acre-feet of water constitutes a *per se* physical taking that is compensable and ripe for adjudication. To hold otherwise would upend Fifth Amendment takings and California water law jurisprudence, including decisions of

the U.S. Supreme Court and this Court, by effectively entitling the federal government to commandeer the beneficial use of California river water without compensation to those parties with preexisting and superior beneficial-use rights to the water appropriated by the government. Accordingly, this Court should reverse the trial court's judgment that United's claim is a regulatory taking claim that is not yet ripe for adjudication and remand the case for further proceedings.

## ARGUMENT

### I. Standard of Review

This Court reviews the legal conclusions of a Court of Federal Claims judge *de novo* and factual findings for clear error. *Casitas Mun. Water Dist. v. United States*, 708 F.3d 1340, 1351 (Fed. Cir. 2013) ("*Casitas II*").[3] The question of whether the Court of Federal Claims properly dismissed a complaint for lack of subject matter jurisdiction is a question of law that this Court reviews *de novo*. *Id.*; *Howard W. Heck and Assocs., Inc. v. United States*, 134 F.3d 1468, 1471 (Fed. Cir. 1998).

[3] This Court decided two appeals in the course of litigation of the same takings claim asserted by Casitas Municipal Water District. The trial court used "*Casitas I*" as shorthand to refer to this Court's 2008 decision, *Casitas Mun. Water Dist. v. United States*, 543 F.3d 1276 (Fed. Cir. 2008), and "*Casitas II*" to refer to the Court's 2013 decision. For the sake of consistency with the trial court's references, we adopt the same shorthand references to distinguish between reference to the Court's 2008 and 2013 decisions.

When a Rule 12(b)(1) motion challenges the court's subject matter jurisdiction based on the sufficiency of the pleading's allegations—referred to as a "facial" attack on the pleading—the pleading's allegations are taken as true and construed in a light most favorable to the complainant. *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583 (Fed. Cir. 1993); *Estes Express Lines v. United States*, 739 F.3d 689, 692 (Fed. Cir. 2014).

The U.S. Supreme Court's "plausibility" requirement for facial challenges to claims under Fed. R. Civ. P. 12(b)(6), as set out in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), also applies to facial challenges to subject matter jurisdiction under Rule 12(b)(1). *Crow Creek Sioux Tribe v. United States*, 900 F.3d 1350, 1354-55 (Fed. Cir. 2018). Under that requirement, a complaint must contain sufficient factual matter that would plausibly establish jurisdiction if accepted as true. *Id.* at 1355 (quoting *Iqbal*, 556 U.S. at 678).

Whether a taking without just compensation under the Fifth Amendment to the U.S. Constitution has occurred is a question of law with factual underpinnings. *Cary v. United States*, 552 F.3d 1373, 1376 (Fed. Cir. 2009). When evaluating whether governmental action constitutes a Fifth Amendment taking, a two-part test applies. First, the court determines whether the claimant has identified a cognizable property interest that is asserted to be the subject of the alleged taking. Second, if

the claimant has identified a cognizable property interest, the court determines whether that property interest was taken. *Acceptance Ins. Cos. v. United States*, 583 F.3d 849, 854 (Fed. Cir. 2009).

## II. United Has a Compensable Private Property Right Under California Law in the Beneficial Use of Santa Clara River Water That It Is Authorized to Appropriate and Divert at the Freeman Diversion

As this Court has recognized, a California water district possesses a compensable private property right in the beneficial use of water authorized under the terms of its license issued by the California SWRCB. *Casitas II*, 708 F.3d at 1357-58. By virtue of its SWRCB-issued license and permit, United holds the right under California law to appropriate and divert 144,630 acre-feet of Santa Clara River water per year at the Freeman Diversion and to put the amount of water diverted to beneficial use. Appx003, Appx023-024 (Compl. ¶ 14). United's license therefore includes a property right to the beneficial use of the entire volume of Santa Clara River water it is authorized by the terms of its license and permit to divert at the Freeman Diversion.[4]

[4] The trial court recognized this important distinction between the water rights held by United under its license and permit and the water rights held by the Casitas Municipal Water District, as set forth in *Casitas II*. *See* Appx009 n.13 ("unlike in *Casitas II*, United does not represent that either the permit or license distinguished between the amount it could appropriate and divert and the amount it could put to beneficial use"). In *Casitas II*, the water district held a license right to divert a significantly greater volume of water (107,800 acre-feet per year) than it was entitled to put to beneficial use (28,500 acre-feet per year). *Casitas II*, 708 F.3d at 1355.

Between 1991 and 2014, annual diversions of Santa Clara River water by United at the Freeman Diversion averaged nearly 71,000 acre-feet, with an average of 54,500 acre-feet annually applied to groundwater recharging and the balance applied to the beneficial use of irrigation for surface water agricultural users. Appx026 (Compl. ¶ 21). United's diversion of water at the Freeman Diversion for the purpose of groundwater recharging preserves water quality by preventing seawater intrusion into the downstream freshwater coastal aquifers. Appx025, Appx033 (Compl. ¶ 20, ¶ 46). The diversion of water to underground storage to preserve the quality of water in coastal aquifers by preventing seawater intrusion is a "water quality use" that constitutes a "beneficial use" of the water under California law. CAL. WATER CODE § 1242.5 (2023); CAL. CODE REGS. tit. 23, §§ 659, 670 (2023). The use of water as irrigation for agricultural users is also a beneficial use of water under California law. CAL. WATER CODE § 1254 (2023); CAL CODE REGS. tit. 23, § 661 (2023).

United's right to the beneficial use of the full volume of Santa Clara River water it is authorized by its state license and permit to divert and appropriate at the Freeman Diversion constitutes a vested private property right under California law. *Casitas II*, 708 F.3d at 1353-54. *See United States v. State Water Res. Control Bd.*,

---

United, in contrast, has the right to put to beneficial use the entire volume of water it is authorized to divert under the terms of its license and permit. Appx023-024.

182 Cal. App. 3d 82, 101 (1986) ("It is equally axiomatic that once rights to use water are acquired, they become vested property rights. As such, they cannot be infringed by others or taken by governmental action without due process and just compensation."). California law entitles the holder of an appropriative water right "to judicial protection against infringement, e.g., actions for quiet title, nuisance, wrongful diversion or inverse condemnation." *Id.* at 104.

The trial court recognized that "[a] compensable taking can occur if a government action under the ESA limits water use rights acquired before the ESA." Appx013 n.24. At other points in its decision, however, the trial court uses language implying that it considers United's state property rights to somehow be "subject to" or limited by the ESA. *See* Appx002 ("The water rights at issue in this action are governed by the Fifth Amendment of the U.S. Constitution and the Endangered Species Act ('ESA'), 16 U.S.C. §§ 1531-44"), Appx010 ("United's beneficial-use rights are subject to the ESA"; "the court must consider the limitations that the ESA puts on the rights involved[.]"). To the extent the trial court based its conclusions on an interpretation that ESA restrictions somehow "limit" or supersede United's vested property right in the beneficial use of water under California law, the trial court committed an error of law.

The Supreme Court and this Court have acknowledged that private property rights in general, and California water rights in particular, are governed by *state law*.

*See Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2075-76 (2021) ("As a general matter, it is true that the property rights protected by the Takings Clause are creatures of state law"); *United States v. Gerlach Live Stock Co.*, 339 U.S. 725, 742-55 (1950) (examining claimant's water rights as established under California state law, in assessing claim that governmental action appropriated claimant's riparian water rights); *Casitas II*, 708 F.3d at 1353-58 (looking to California law, not the ESA, to define the scope of the water district's compensable property right). Moreover, the Supreme Court has emphasized that private property interests are subject to a compensable physical taking under a governmental regulatory regime, such that the private property rights cannot be characterized as "subject to" a regulation or statute in the sense that the government can appropriate private property pursuant to a regulation without paying just compensation: "Whenever a regulation results in a physical appropriation of property, a *per se* taking has occurred[.]" *Cedar Point Nursery*, 141 S. Ct. at 2072.

Indeed, if the trial court were correct that California water rights are "subject to . . . limitations that the ESA puts on the rights involved," then no California water rights holder could ever state a claim for a taking of its water rights—whether physical or regulatory—due to a federal action based on the ESA. That position would squarely run afoul of this Court's holdings in *Casitas I* and *Casitas II* that a California water district can state a claim for a compensable taking of its right to

beneficial use of water due to ESA-related requirements.[5] *See Casitas I*, 543 F.3d at 1294 (recognizing that diversions of water needed to comply with ESA restrictions should be analyzed as physical takings of the water district's water rights); *Casitas II*, 708 F.3d at 1359 (recognizing that Casitas could raise a takings claim in the future if an ESA-based restriction "impinges on Casitas's right to beneficial use" of water).

## III. United Alleged a Governmental Appropriation of Its Vested Beneficial-Use Property Right, Which Controlling Supreme Court Precedent Establishes Must Be Analyzed as a *Per Se* Physical Taking

The Fifth Amendment prohibits the taking of private property "for public use, without just compensation." U.S. Const. amend. V, cl. 4. The Supreme Court has held that the Takings Clause of the Fifth Amendment "protects 'private property' without any distinction between different types." *Horne v. Dep't of Agric.*, 576 U.S. 350, 358 (2015). As private property rights, usufructuary water rights are subject to protection under the Fifth Amendment, and a governmental action appropriating

[5] If the trial court meant by its "subject to the ESA" reference simply that United's vested property right in the beneficial use of water under California state law is "subject to" the ESA in the same sense that a landowner's fee simple estate is "subject to" the sovereign's power of eminent domain, that observation is unremarkable. United has not disputed that the United States can leverage the authority of the ESA to appropriate United's vested property right in the beneficial use of Santa Clara River water for the public purpose of endangered species preservation. United has only insisted that the United States, as required by the terms of the Fifth Amendment and controlling Supreme Court precedent, pay just compensation to United for doing so, rather than forcing United alone to bear the cost that the Constitution requires be borne by the public at large. *See* Appx010, Appx104 (Hr'g Tr. 25:10-18).

privately held water rights for a public purpose entitles the rights holder to just compensation. *Int'l Paper Co. v. United States*, 282 U.S. 399 (1931); *Gerlach Live Stock Co.*, 339 U.S. 725; *Dugan v. Rank*, 372 U.S. 609 (1963); *Casitas II*, 708 F.3d 1340; *Estate of Hage v. United States*, 687 F.3d 1281, 1290 (Fed. Cir. 2012).

The U.S. Supreme Court has recognized two types of governmental takings: physical takings and regulatory takings. *Id.* at 1286; *Washoe Cnty., Nev. v. United States*, 319 F.3d 1320, 1326 (Fed. Cir. 2003). A physical taking—the "paradigmatic taking requiring just compensation"—involves "a direct government appropriation or physical invasion of private property." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005). A governmental appropriation of a property right for a public purpose constitutes a *per se* taking for which the property owner is entitled to compensation. Physical appropriations of private property by the government "constitute the 'clearest sort of taking,' and [a court must] assess them using a simple, *per se* rule: The government must pay for what it takes." *Cedar Point Nursery*, 141 S. Ct. at 2071 (citation omitted). Compensation is required for a physical taking "no matter how minute the intrusion, and no matter how weighty the public purpose behind it." *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015 (1992).

A regulatory taking, on the other hand, occurs "[w]hen the government, rather than appropriating private property for itself or a third party, instead imposes

regulations that restrict an owner's ability to use his own property." *Id.* A textbook regulatory taking claim would be the assertion that the government owes a landowner compensation for an ESA-imposed restriction on harvesting the timber on the landowner's property, for the protection of spotted owl habitat. In that circumstance, the government is not itself harvesting the timber or taking the timber from the landowner; the landowner at all times retains, undiminished, its property right in the timber and the underlying land—the landowner is merely restricted in its ability to use its property as it would prefer. In evaluating a taking claim, a court must not misapply rules or precedents involving regulatory takings to an allegation that the government has *appropriated* for a public purpose, rather than merely limited the potential private uses of, a property right: "This longstanding distinction between acquisitions of property for public use, on the one hand, and regulations prohibiting private uses, on the other, makes it inappropriate to treat cases involving physical takings as controlling precedents for the evaluation of a claim that there has been a 'regulatory taking,' and vice versa." *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Reg'l Plan, Agency*, 535 U.S. 302, 323 (2002) (footnote omitted).

In this appeal, the government invoked the regulatory scheme of the ESA as the basis for its appropriation of the Santa Clara River water United otherwise had the vested property right under California law to divert and appropriate at the Freeman Diversion and put to United's own beneficial use. The Supreme Court has

emphasized, however, that the government's invocation of a regulation or statute as the basis for an appropriation of a property right does not serve to convert a *per se* physical taking into a regulatory taking, as the trial court apparently and erroneously concluded below. In *Cedar Point Nursery*, the Supreme Court cautioned against making precisely the error the trial court committed in this case of mischaracterizing a physical taking as a regulatory taking because of the regulatory means used to effect the physical taking:

> Our cases have often described use restrictions that go "too far" as "regulatory takings." But that label can mislead. Government action that physically appropriates property is no less a physical taking because it arises from a regulation. That explains why we held that an affirmative reserve requirement compelling raisin growers to physically set aside a percentage of their crop for the government constituted a physical rather than a regulatory taking. The essential question is not, as the Ninth Circuit seemed to think, whether the government action at issue comes garbed as a regulation (or statute, or ordinance, or miscellaneous decree). It is whether the government has physically taken property for itself or someone else—by whatever means—or has instead restricted a property owner's ability to use his own property. Whenever a regulation results in a physical appropriation of property, a *per se* taking has occurred, and *Penn Central* has no place.

141 S. Ct. at 2072 (citations omitted).

In evaluating the taking alleged in United's Complaint, therefore, this Court must examine the actual character and nature of the governmental action and its impact on the relevant property right. The Court cannot assume, as the trial court

apparently did, that the taking must necessarily be regulatory rather than physical due to the regulatory justification the government invoked to appropriate for a public purpose United's private property right in the beneficial use of Santa Clara River water. NMFS's ESA-predicated restrictions on United's diversion of Santa Clara River water at the Freeman Diversion served to appropriate for a federal public purpose United's underlying property right to beneficial use of the foregone water, and that governmental action—as the Supreme Court recognized in *Cedar Point Nursery*—effects a *per se* physical taking requiring just compensation.

### A. The Government-Imposed Restriction on United's Diversion of Santa Clara River Water Appropriates, Rather Than Merely Limits the Use of, the Relevant Property Right: Beneficial Use of Santa Clara River Water

A physical appropriation deprives the owner of the rights to possess, use, and dispose of the property. *Horne*, 576 U.S. at 360 (citing *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982)). Indeed, in *Horne* the Supreme Court cited the property owner's loss of "the rights to possess, use and dispose of" the property appropriated by the government as evidence that the taking at issue was a "clear physical taking," rather than the regulatory taking alleged by the government. *Horne*, 576 U.S. at 361-62.

In this appeal, the relevant property interest for the takings analysis is United's usufructuary right to beneficial use of the Santa Clara River water it diverts at the Freeman Diversion. *Casitas II*, 708 F.3d at 1357 ("It is the holder's rights (as limited

by beneficial use) that represent the property interest subject to a potential government taking"). United has a vested property right to put to beneficial use the full volume of water it is authorized to divert and appropriate at the Freeman Diversion under the terms of United's state water license and permit. Appx009, Appx037 (Compl. ¶¶ 61-62).

The 2016 restrictions imposed by NMFS's Office of Law Enforcement on United's operation of the Freeman Diversion resulted in a decrease in the volume of water United was able to appropriate and put to beneficial use, beginning in 2017, as compared to the amount it otherwise was authorized to divert, appropriate, and put to beneficial use under the terms of its license and permit. Appx036-038 (Compl. ¶¶ 55-56, 64). This Court has recognized that a water rights holder cannot put to beneficial use water to which it is denied access. *See Estate of Hage*, 687 F.3d at 1290 (recognizing that a governmental act that prevents a water rights holder from accessing water to which it owned rights would constitute a physical taking); *Casitas I*, 543 F.3d at 1294 n.15 (recognizing that the water district's right to use water the government compelled it to divert back into the Ventura River is "gone forever" and cannot be made up in subsequent years). Thus, it can hardly be disputed that United was denied its vested right to put to beneficial use any volume of water it was prevented from diverting into its facilities, or forced to use as bypass flow through

the fish ladder, due to the fish-protection operating conditions imposed by NMFS through the 2016 NMFS Enforcement Letter.

NMFS identified the purpose of its imposition of these restrictions on United's diversion of water at the Freeman Diversion as the federal public purpose of improving the conditions for steelhead migration in the Santa Clara River. Appx054. As a result of being compelled to allow the foregone Santa Clara River water to flow downstream from the Freeman Diversion for the benefit of fish migration, United forever loses its right to put the foregone water to beneficial use. Appx038 (Compl. ¶ 65); *See Casitas I*, 543 F.3d at 1296 (recognizing that water that is diverted away from the rights holder's facilities "is permanently gone" and that the rights holder "will never, at the end of any period of time, be able to get that water back").

That United is unable—and will *never* be able—to put the foregone water to any type of beneficial use at all conclusively establishes that the NMFS-imposed mandate reducing United's diversion of water at the Freeman Diversion constitutes a physical *appropriation* by the government of United's beneficial-use right, as opposed to a mere *use restriction* on United's beneficial-use right. As this Court recognized in *Casitas I*, the government's appropriation of the use of California river water for the benefit of downstream fish survival "is not temporary, and it does not leave the right in the same state it was before the government action. The water, and [the California water district's] *right to use that water*, is forever gone." *Id.*

(emphasis added). This is not a situation in which United's beneficial-use right itself is unimpaired, and the governmental action at issue merely constrains United from putting the water at issue to United's *preferred* beneficial use. NMFS has effectively, *de facto*, confiscated the use of the foregone Santa Clara River water for the public at large, for the federally-determined public purpose of enhancing fish migration, thereby reducing the amount of water that United can put to its own beneficial use.

The government's appropriation of United's property right in the use of the foregone Santa Clara River water, as demanded in the NMFS Enforcement Letter, parallels the U.S. Department of Agriculture's demand in *Horne* that raisin growers turn over a portion of their raisin crops. In *Horne*, the Supreme Court found such a demand to turn over property for the government's control and use to be "of such a unique character that it is a taking without regard to other factors that a court might ordinarily examine." 576 U.S. at 362 (quoting *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. at 432).

This Court has recognized that a decrease in the amount of water accessible to a water rights holder constitutes a physical, rather than regulatory, taking of water rights: "In the context of water rights, courts have recognized a physical taking where the government has physically diverted water for its own consumptive use *or decreased the amount of water accessible by the owner of the water rights*." *Washoe*

*Cnty., Nev.*, 319 F.3d at 1326 (emphasis added). The *Washoe County* case provides a useful illustration of the distinction between physical and regulatory takings of a right to beneficial use of water. In that case, the plaintiffs alleged that the government's denial of a right-of-way for a pipeline that would allow plaintiffs to transport their water for one specific type of beneficial use—municipal and industrial use—had effected a taking of the plaintiffs' water rights. *Id.* at 1323. Nevada water rights are usufructuary in nature and are therefore parallel to the California water rights at issue in United's appeal. *Id.*

This Court considered whether the taking claim asserted in *Washoe County* constituted a physical taking and concluded that the plaintiffs in that case had not met the legal requirements for a physical taking claim. The Court reasoned that, because the government action at issue in *Washoe County* did not reduce t*he amount of water* the plaintiffs were able to use, but merely resulted in plaintiffs' inability to put that water to plaintiffs' *preferred* beneficial use, the governmental action did not constitute a physical taking: "the government did not prevent Appellants from accessing their water rights. Because the government neither physically diverted or reduced the amount of water accessible by Appellants nor denied all meaningful access to their water rights, it did not effect a physical taking." *Id.* at 1327.

The Court also found that the plaintiffs in *Washoe County* had failed to state a regulatory takings claim, because the government had not acted in its regulatory

capacity in denying the right-of-way permit. *Id.* at 1327-28. *Washoe County* nonetheless provides a helpful illustration of the distinction between a government-imposed restriction on the *types* of beneficial use to which a water rights holder can put its water and a governmental appropriation of the water that reduces the *amount* of water the rights holder can put to beneficial use. The former would arguably be a regulatory taking, but the latter is unquestionably a physical taking, as it denies the rights holder its property right to *use* of the water appropriated by the government.

Here, the governmental action is not a restriction on United's use of the water it is authorized to divert and appropriate at the Freeman Diversion; rather, it is a federal *appropriation* of United's right to use the Santa Clara River water that the NMFS-imposed operating conditions at the Freeman Diversion prevent United from appropriating and putting to United's beneficial use. NMFS is not allowing United to divert and appropriate the same volume of Santa Clara River water as United is authorized to divert, appropriate, and put to beneficial use under its license, thereby reducing the volume of water that United has been able to put to beneficial use by at least 49,800 acre-feet since 2017. Were the NMFS action at issue here merely a *use restriction*, as opposed to an *appropriation* of United's beneficial-use right, the NMFS-imposed operating restrictions at the Freeman Diversion would have continued to allow United to divert and appropriate that 49,800 acre-feet of Santa Clara River water, and would have merely limited the beneficial uses to which

United could put that 49,800 acre-feet, such as by preventing United from using the water for the beneficial use of irrigation, but permitting other beneficial uses of the water. That is manifestly not the case here: the government took the 49,800 acre-feet of water for its own beneficial use (the federal public purpose of fish preservation), and United forever lost its right to put even a single drop of that 49,800 acre-feet of Santa Clara River water to United's own beneficial use.

The government action at issue in this appeal therefore does not constitute a use *restriction* reflective of a regulatory taking claim; instead, it constitutes a governmental *appropriation* of the 49,800 acre-feet of Santa Clara River water for the federal public purpose of species protection. *See, e.g., CRV Enterprises, Inc. v. United States*, 626 F.3d 1241, 1247-48 (Fed. Cir. 2010) (citing *Washoe County* as support for proposition that a physical taking involves a reduction of the quantity of water available for the claimant's use, such that a physical taking does not occur when the property owner "'still retained the right to use the water' but simply could not use the water for its preferred purpose"). Similar to this Court's observation in *Casitas I*, here the ESA-based reduction in the amount of Santa Clara River United can put to beneficial use "has permanently taken that water away" from United and "does not leave the right in the same state it was before the government action." 543 F.3d at 1296. The nature of the government action at issue here therefore amounts

to a federal appropriation of United's vested property right in the beneficial use of the Santa Clara River water that must be analyzed under the physical takings rubric.

### B. The Trial Court's Finding That Water Must Have Already Entered and Subsequently Been Released from a Property Owner's Facilities for a Physical Taking to Have Occurred Ignores the Usufructuary Nature of the Property Right at Issue and Controlling Supreme Court Takings Jurisprudence

The trial court identified a single basis for its decision to designate United's claim as a regulatory, rather than physical, taking: "Because United *does not allege that it had to return water it had already diverted*, it has not stated a physical takings claim, unlike in *Casitas* or *International Paper Co.* United's allegation that its right to appropriate and divert water (or use water) was restricted by the 2016 OLE letter's 'ESA requirement' should be analy[z]ed as a regulatory taking." Appx013 (emphasis added, internal citation omitted). Thus, the trial court imposed a prerequisite for the assertion of a physical takings claim involving California water rights that the water at issue must have already entered the property owner's facilities before the governmental appropriation at issue. There is no legal support for imposing such a prerequisite requirement; to the contrary, such a requirement flies in the face of Supreme Court precedent and this Court's prior decisions on Fifth Amendment takings claims involving the beneficial use of water. Indeed, the trial court appears to have misread *International Paper*, one of the two cases it cited in defense of its conclusion that a physical taking requires that the water rights holder

must be able to demonstrate that it was required to *return* water it had already diverted into its facilities.

The trial court's decision establishing a predicate requirement of a property owner "ha[ving] to return water it had already diverted" to establish a physical taking (Appx013) fails to account for, or even *acknowledge*, two of the Supreme Court precedents cited by this Court in *Casitas I* as having recognized that governmental appropriations of California water rights are considered physical takings. In *Gerlach Live Stock Co.*, 339 U.S. 725, the water rights subject to the taking claim were riparian water rights for irrigation of grasslands. The claimants in *Gerlach* alleged that the government's erection of the Friant Dam upstream from their land constituted a compensable taking of their California water rights. As this Court observed in *Casitas I*, "[t]he Supreme Court analyzed the government's action [in *Gerlach*] as a physical taking." 543 F.3d at 1290.

In *Gerlach*, the Supreme Court had no difficulty concluding that a physical taking analysis should apply, notwithstanding that the claimants were only denied access to the water they wanted to use, as opposed to being forced to return water they had already diverted. That result makes perfect sense, given that the property right at issue is a usufructuary right, and denial of access to water—whether from erection of a dam upstream as in *Gerlach* that prevents any water from reaching claimant's facilities, or from a government-imposed restriction on the diversion of

water into the claimant's facilities as in the instant case—denies the claimant the right to *use* the water so withheld.

*Dugan*, 372 U.S. 609, another Supreme Court precedent involving California water rights examined by this Court in *Casitas I*, addressed a takings claim predicated on the government's appropriation of San Joaquin River water rights through denial of access to water by downstream water rights holders as a result of the construction of the Friant Dam. In *Dugan*, the government's impoundment of San Joaquin River water behind the Friant Dam left insufficient river water downstream of the dam to supply the claimants' preexisting water rights. The Supreme Court expressly found that the governmental action at issue in *Dugan* constituted "an appropriation of property"—a textbook *per se* physical taking:

> Therefore, when the Government acted here "with the purpose and effect of subordinating" the respondents' water rights to the Project's uses "whenever it saw fit," "with the result of depriving the owner of its profitable use, (there was) the imposition of such a servitude (as) would constitute an appropriation of property for which compensation should be made."

372 U.S. at 625 (quoting *Peabody v. United States*, 231 U.S. 530 (1913)).

While the trial court in the instant case cited the Supreme Court's *International Paper* decision as purportedly supporting the trial court's predicate that water must have been already in, and then diverted out of, the claimant's facilities to constitute a physical taking, the trial court apparently misread the facts

of *International Paper*, as they run directly contrary to the trial court's position. In *International Paper*, the Supreme Court found that a physical taking of water rights had occurred *even though the water appropriated by the government had not yet entered the plaintiff's facilities*. The petitioner in that case was a paper company that had property rights in the use of Niagara River water that the paper company was able to draw from a canal operated by the Niagara Falls Power Company and put to use in the paper company's mill. After the United States entered World War I, the Secretary of War requisitioned all of the water in the Power Company's canal for the governmental purpose of allowing the Power Company to maximize its power production to assist the war effort. 282 U.S. at 405-06. The result of this requisition was that the paper company lost all use of the canal water, as none of the requisitioned water was allowed to enter into the paper company's mill. *Id.* at 406 (referring to "the shutting off of the water from the petitioner's mill").

Unlike the trial court in this case, this Court, in summarizing the underlying facts of the *International Paper* decision in *Casitas I*, plainly understood that the government's requisition of all the canal water for the power company's use *prevented* the paper company's diversion of water into its mill, rather than requiring the paper company to *return* water it had already diverted into its mill: "The United States did not take over the operations of either Niagara Power or International Paper, nor did it physically direct the flow of the water. Instead, the United States

*caused Niagara Power to stop International Paper from diverting water to its mill* so that the water would instead be available for third party use[.]" *Casitas I*, 543 F.3d at 1289 (emphasis added). On the facts before it in *International Paper*, the Supreme Court unequivocally found the government's appropriation of water *that the government prevented from reaching the paper company's facilities* constituted a physical taking of the paper company's property right to use of the Niagara River water: "The petitioner's right was to the use of the water; and when all the water it used was withdrawn from petitioner's mill and turned elsewhere by government requisition for the production of power it is hard to see what more the Government could do to take its use." 282 U.S. at 407.

Under binding Supreme Court authority, therefore, the taking of the right to *use* water constitutes a physical taking, even where the governmental action prevented the water from entering the property owner's facilities in the first instance: "Our conclusion upon the whole matter is that the Government intended to take and did take *the use* of all the water power in the canal . . . ." *Id.* at 408 (emphasis added). The trial court's conclusion here that the government does not effect a physical taking of usufructuary water rights unless the rights holder is forced to return water it has already diverted cannot be squared with the Supreme Court's consistent finding of a physical taking of the right to use water whenever the government action at issue prevents the rights holder from accessing water it has the right to use.

This Court, too, has framed the denial of access to water as sufficient to constitute a physical taking, even when the claimant is not required to "return" water it has already diverted. In *Estate of Hage*, this Court recognized that the government's *denial of access* to water in which the plaintiff owns property rights can constitute a physical taking that would entitle the property owner to compensation: "We agree with the [plaintiffs] that the government could not prevent them from accessing water to which they owned rights without just compensation. The government, for example, could not entirely fence off a water source, such as a lake, and prevent a water rights holder from accessing such water. Assuming the other criteria for a Fifth Amendment taking were met, such fencing could be a taking." *Estate of Hage*, 687 F.3d at 1290.

In short, it is impossible to reconcile the trial court's imposition of a predicate requirement of "return[ing] water it had already diverted" (Appx013) with the takings jurisprudence of the Supreme Court or this Court. That jurisprudence establishes that denial of access to water, or reduction of the amount of water available to the claimant, can effect a physical taking of the right to beneficial use of water, even if the water at issue is prevented from reaching the plaintiff's property. United's claim readily satisfies *that* standard: the NMFS-imposed restrictions on diversion of water at the Freeman Diversion have reduced the amount of water United can put to beneficial use by at least an estimated 49,800 acre-feet. Appx035.

In treating the diversion of water into United's Freeman Diversion Canal as dispositive of whether United can state a claim for a physical taking, the trial court also ignored the usufructuary nature of the property right at issue in United's claim. As this Court made clear in *Casitas II*, the mere entry of water into a water district's diversion canal does not necessarily equate to beneficial use. 708 F.3d at 1356. The relevant property right for United's takings claim is not a possessory right in the water in the Freeman Diversion Canal, but rather the right to put that water to beneficial use: "a party having a right to use a given amount of California surface water does not have a possessory property interest in the corpus or molecules of the water itself." *Id.* at 1354.

While United initially diverts that Santa Clara River water into the Freeman Diversion Canal (Appx024), United's beneficial use of the water does not occur in the canal itself. Instead, the beneficial use of diverted water for groundwater recharge occurs at one of United's groundwater recharge facilities, and the beneficial use of irrigation for agriculture occurs at the agricultural sites on the Oxnard Plain. Appx025. Thus, for both United *and* Casitas, the governmental appropriation occurred *prior to* the district's ability to put the taken water to beneficial use. Casitas's temporary physical possession of the water molecules appropriated by the government ultimately made no difference in the analysis performed by the Court in *Casitas II* to determine whether Casitas had established a physical taking.

Thus, there is no meaningful distinction, from a usufructuary property rights perspective, whether the government requires United to return water to the Santa Clara River from the Freeman Diversion Canal, or instead imposes restrictions on United's ability to divert Santa Clara River water into the Freeman Diversion Canal in the first instance. In both scenarios, the government prevents United from exercising its usufructuary property right to put to beneficial use the water that it was forced to send downstream and lose forever. The distinction drawn by the trial court and treated as dispositive is immaterial from both a factual and legal perspective.

The only arguably substantive difference between (i) the physical takings claim held to have been properly pled in *Casitas I* and (ii) United's takings claim here that the trial court held to be not a physical takings claim and therefore not ripe for adjudication is that Casitas had actual physical possession of the water molecules at issue prior to the federal takings action, while United did not. The distinction drawn by the trial court, therefore, is based entirely on a *possessory* interest that this Court found in *Casitas II* to be irrelevant to the takings analysis, and not on the *usufructuary* interest that is the relevant property right for the underlying takings claim. From the perspective of impact on their respective *usufructuary* rights in the lost water, the underlying facts in this case and in *Casitas I* are indistinguishable.

The beneficial use appropriated by the United States is identical in both cases, and in neither case did the United States take actual physical possession of the water.

The trial court below recognized that fact, citing in footnote 17 of its decision this Court's conclusion in *Casitas I* that "[t]he fact that the government did not itself divert the water is of no import." Appx011 n.17 (citing *Casitas I*, 543 F.3d at 1293). Both claimants—United and Casitas—asserted loss of beneficial use, and United actually has made a facially stronger showing that the governmental action impacted its vested property right in beneficial use of Santa Clara River water, because the record establishes that United has the right to put to beneficial use *all* of the water it diverts and appropriates at the Freeman Diversion. Appx037. In other words, any reduction in the volume of Santa Clara River water United is allowed to divert and appropriate at the Freeman Diversion establishes a corresponding governmental appropriation of United's beneficial-use property right.

The *Casitas I* Court found that the government "play[ed] an active role" in the appropriation of Casitas's water rights, and the government played just as "active" a role in the takings claim asserted by United. In both cases, the government appropriated the use of California river water for the benefit of endangered species, invoking its enforcement authority under the ESA as the cudgel to force the water district to reduce its diversion and appropriation of water it was otherwise entitled to divert, appropriate, and put to beneficial use under the terms of its California water license. The Supreme Court has recognized the "powerful coercive effect" and, indeed, "virtually determinative effect" of the RPAs in an agency's biological

opinion under the ESA's Section 9 enforcement regime. *See Bennett*, 520 U.S. at 169-70 (finding that recipients of Klamath Project water have Article III standing to challenge a biological opinion due to the "virtually determinative effect" of the opinion on the operation of a water project in light of the "substantial civil and criminal penalties, including imprisonment" a person would face if it disregarded the terms and conditions imposed under the biological opinion). The United States Court of Appeals for the Ninth Circuit, too, has recognized that the government's "ability to enforce the no-take provision in ESA § 9 has a 'determinative or coercive effect'" on the operation of a water project, and it is precisely that enforcement mechanism that NMFS invoked against United here to appropriate at least 49,800 acre-feet of Santa Clara River water for the benefit of steelhead trout. *San Luis & Delta-Mendota Water Auth. v. Salazar*, 638 F.3d 1163, 1172 (9th Cir. 2011).[6] To use the language of *Casitas I*, "[t]he active hand of the government was also at play" in United's claim, through the NFMS Enforcement Letter's threat of ESA Section 9 liability for United and its staff if United did not accede to NMFS's demand for the

[6] The "determinative or coercive effect" attendant to the threat of an ESA Section 9 enforcement action is not diminished by the fact that NMFS did not ultimately institute its own ESA enforcement suit against United. As the Ninth Circuit has observed, "In *Bennett*, as here, the fact that enforcement was *not* imminent arguably exemplifies the determinative or coercive effect of the Service's enforcement power. The Service might never enforce ESA § 9 precisely because the Bureau is keenly aware of the consequences of violating the no-take provision." *Id.* at 1171.

appropriation of Santa Clara River water for the benefit of steelhead migration. 543 F. 3d at 1292.

Because there is no substantive distinction between the takings claims pled by United and Casitas when examined through the lens of the relevant usufructuary property right alleged to have been taken and the government's role in taking that right, the trial court erred in treating *Casitas I*'s holding that such claims must be analyzed under the physical takings rubric as not controlling here. But even if the trial court could correctly treat *Casitas I* as *distinguishable* from United's claim, due solely to the legally immaterial temporary possession Casitas had over the water whose use was appropriated by the government, the trial court would still have committed reversible error in treating *Casitas I* as holding that *any* taking of California water rights not all all-fours with Casitas's claim *must be* analyzed as a regulatory taking. *Casitas I* did not so hold, nor could it in light of the three controlling Supreme Court precedents the *Casitas I* Court discussed, each of which characterized a government action denying access to water rights as constituting a physical taking.

The standard for physical takings applied by the trial court below, if allowed to stand, would lead to a host of results inconsistent with controlling Fifth Amendment takings jurisprudence and California water law. Under the erroneous standard announced by the trial court in this appeal, the government could impound

or redirect the flow of the Santa Clara River upstream of the Freeman Diversion, preventing *any* water from reaching the Freeman Diversion, and that action would not constitute a physical taking because United would not be able to "allege that it had to return water it had already diverted." Appx013. But such a finding would flatly contradict the precedent of *Gerlach* and *Dugan*.

Applying the trial court's standard for a physical taking, United could not assert a claim for a physical taking even if a NMFS employee, for the purpose of maximizing the amount of Santa Clara River water available for migrating steelhead, locked or otherwise physically disabled the gate used by United to divert water into the Freeman Diversion Canal. Even though such an action would prevent United from diverting, appropriating, and putting to beneficial use *any* water at the Freeman Diversion, under the trial court's reasoning, that action could not give rise to a physical taking claim, because United would not be able to "allege that it had to return water it had already diverted." Appx013. Those results are illogical and contrary to the established precedent discussed above.

To the extent the trial court decision imposes a heightened standard for a physical taking of California water rights when the government action at issue is taken under the authority of the ESA regulatory structure, the Supreme Court's decision in *Cedar Point Nursery* precludes such a heightened-standard approach. As *Cedar Point Nursery* instructs, a governmental appropriation of a property right is a

physical taking irrespective of "whether the government action at issue comes garbed as a regulation (or statute, or ordinance, or miscellaneous decree)." 141 S. Ct. at 2072. If denial of access to water in which a claimant has a usufructuary right constitutes a physical taking when the government action denying access is in furtherance of some public water project, as in the case of *Dugan* and *Gerlach*, then denial of access to water likewise constitutes a physical taking when the government action is based on the ESA's regulatory scheme. *Cedar Point Nursery* establishes that there is not and cannot be a special rule or heightened standard for physical appropriations effected by regulations: "Whenever a regulation results in a physical appropriation of property, a *per se* taking has occurred . . . ." *Id.*

The trial court's conclusion thus constitutes an error of law mandating reversal of its conclusion that United failed to allege a physical taking of its right to beneficial use of Santa Clara River water.

## IV. The Government's Appropriation of Santa Clara River Water for the Benefit of Fish Survival Has Already Impinged on United's Right to Beneficial Use of Santa Clara River Water, Making United's Takings Claim Ripe for Adjudication

Analyzed as a physical taking, as it must be, United's taking claim as pled in the Complaint is ripe for adjudication. This Court has held that a claim for the physical taking of California water rights accrues when the governmental appropriation of water "impinges on [the water district's] right to beneficial use." *Casitas II*, 708 F.3d at 1359. The uncontroverted factual allegations in United's

Complaint, which the Court must accept as true for purposes of this appeal, *Estes Express Lines*, 739 F.3d at 692, establish that the alleged taking impinged on United's compensable property interest in the beneficial use of Santa Clara River water beginning in 2017.

United has the vested property right to put to beneficial use all of the water it diverts at the Freeman Diversion. Appx037; *Casitas II*, 708 F.3d at 1353-54 (right to beneficial use of water is a vested property right under California law); *State Water Res. Control Bd.*, 182 Cal. App. 3d at 100-01 (same). The restrictions imposed by NMFS on United's diversion and appropriation of Santa Clara River water at the Freeman Diversion have resulted in United's loss of the beneficial use of at least an estimated 49,800 acre-feet of water for the period from 2017 through 2021. Appx035 (Compl. ¶ 53).

Absent those government-imposed restrictions, imposed for the public purpose of endangered species protection, United could have diverted, appropriated and put to beneficial use a larger volume of Santa Clara River water, pursuant to the terms of its California water license and permit. Appx035 (Compl. ¶ 52). The NMFS-imposed restrictions on United's diversion, appropriation, and beneficial use of water diverted at the Freeman Diversion have resulted in a reduction in water deliveries by United. Appx036 (Compl. ¶ 55); *see Casitas II*, 708 F.3d at 1358 (noting trial court's conclusion that impact on water deliveries would be evidence of

encroachment on rights holder's beneficial use). Reflective of the impact of the NMFS restrictions on United's right to beneficial use of water beginning in 2017, United has been forced to incur expenses and undertake studies designed to mitigate the impacts on United and its members of the loss of beneficial use of water that has resulted. Appx036-037 (Compl. ¶ 56).

Based on the uncontroverted factual allegations in the Complaint, United's claim for a physical taking of its property right in the beneficial use of Santa Clara River water began accruing in 2017. Therefore, United's takings claim is ripe for adjudication, and the trial court erred in dismissing United's Complaint as unripe. The trial court has subject matter jurisdiction over United's takings claim, and its judgment dismissing United's Complaint should be reversed accordingly.

## CONCLUSION AND RELIEF SOUGHT

For the reasons stated above, United requests this Court reverse the judgment of the trial court, hold that United has alleged a physical taking of its compensable property right in the beneficial use of Santa Clara River water sufficient to afford the trial court subject matter jurisdiction over United's takings claim, and remand this matter to the Court of Federal Claims for further proceedings consistent with the Court's ruling on United's appeal.

Respectfully submitted,

/s/ Frank S. Murray

FRANK S. MURRAY
FOLEY & LARDNER LLP
3000 K Street, N.W., Suite 600
Washington D.C. 20007-5143
Telephone 202.295.4163
Email: fmurray@foley.com
*Counsel for Plaintiff-Appellant*

July 14, 2023

# ADDENDUM

# In the United States Court of Federal Claims

No. 22-542

(Filed:_January 26, 2023)

| | |
|---|---|
| **UNITED WATER CONSERVATION DISTRICT,**<br><br>Plaintiff,<br><br>**v.**<br><br>**UNITED STATES,**<br><br>Defendant. | Complaint alleging a physical taking of water rights; government's counter contention of inchoate regulatory action; ripeness; no final agency action |

Frank S. Murray, Foley & Lardner LLP, Washington, D.C. for plaintiff United Water Conservation District. With him on the pleadings and at the hearing were David T. Ralston, Jr. and Julia Di Vito, Of Counsel, Foley & Lardner LLP, Washington, DC.

Peter Brocker, Trial Counsel, Natural Resources Section, Environment & Natural Resources Division, United States Department of Justice, Washington, D.C. for the United States. With him at the hearing were Brian Herman, Trial Counsel, United States Department of Justice, Washington, D.C. and Christopher Keifer, Attorney Advisor, Southwest Section, Office of the General Counsel, National Oceanic and Atmospheric Administration, Long Beach, California.

## OPINION AND ORDER

LETTOW, Senior Judge.

Plaintiff, United Water Conservation District ("United"), has filed suit against defendant, United States ("the government"), for just compensation for a physical taking under the Fifth Amendment of the U.S. Constitution. Compl. ¶¶ 65-68, ECF No. 1. United alleges that the National Marine Fishery Service ("NMFS") took its water rights for a public purpose. Compl. ¶ 67. More specifically, it argues that NMFS's Office of Legal Enforcement ("OLE") in a letter dated June 9, 2016 caused United to implement measures to protect Southern California steelhead trout that resulted in its loss of beneficial use of water from the Santa Clara River. *See* Compl. ¶ 68. The government counters that plaintiff's claim is not ripe for adjudication because there has been no final agency action. Def.'s Mot. to Dismiss ("Def.'s Mot.") at 4, ECF No. 9. Accordingly, the government seeks to dismiss the complaint for lack of subject-matter jurisdiction under Rule 12(b)(1) of the Court of Federal Claims ("RCFC"). *See id.* at 3-4. It characterizes the alleged taking as regulatory in nature. *Id.* at 4-5. Plaintiff responds that the court has jurisdiction over its claim because it alleges a ripe physical taking, which does not

require final agency action. Pl.'s Resp. in Opp'n to Def.'s Mot. to Dismiss ("Pl.'s Opp'n") at 14, 18, ECF No. 12. After completion of briefing, *see* Def.'s Reply Mem. in Support of Mot. to Dismiss ("Def.'s Reply"), ECF No. 13, the court held a hearing on December 2, 2022. *See* Hr'g Tr. 1:12 (Dec. 2, 2022). The motion is ready for disposition.

## BACKGROUND[1]

### *A. Legal Framework*

The water rights at issue in this action are governed by the Fifth Amendment of the U.S. Constitution and the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-44.

### *B. United and the Vern Freeman Diversion Dam*

United is a California water conservation district, created under California law to serve as the water management agency for the Santa Clara River and the Oxnard coastal plain. Compl. ¶¶ 1, 13. The California State Water Resources Control Board ("State Board") issued United a license in 1958 (License 10173) and a permit in 1983 (Permit 18908), granting it the right to appropriate and divert water from the Santa Clara River for its beneficial use. Compl. ¶ 1. In 1987, United's permit was amended to allow for the construction of the Vern Freeman Diversion dam ("Diversion dam"). Compl. ¶ 22.[2] The Bureau of Reclamation provided United with federal funds to build the Diversion dam. *See* Compl. ¶ 30.

The Diversion dam is a concrete dam that diverts water from the Santa Clara River into United's Freeman Diversion Canal. Compl. ¶ 15. The diverted water is passed through a fish screen and into the Freeman Diversion Canal. Compl. ¶ 17. The water that passes through the Freeman Diversion Canal is used to recharge groundwater aquifers, deliver surface water to groundwater users, and stabilize the riverbed. Compl. ¶ 15.

Water that the Diversion dam does not divert into United's Freeman Diversion Canal remains in the Santa Clara River and flows into the Pacific Ocean. *See* Compl. ¶ 18. Some of this water is first passed through a fish ladder or roller gate. *Id.*[3] "Bypass flow water used for the fish ladder or flowing into the roller gate does not enter the Freeman Diversion Canal." Compl. ¶ 18. Based on a California state study of the steelhead trout in the lower Santa Clara River, the 1987 state permit amendment that authorized the construction of the Diversion dam required the dam to include a fish ladder and water bypass flows that protect steelhead trout's migration upriver to spawn. Compl. ¶¶ 22-24.

---

[1] The recitations that follow do not constitute findings of fact but rather are recitals attendant to the pending motion and reflect matters drawn from the complaint, the parties' motion and briefs, documents attached to the briefs, and the hearing.

[2] The license, permit, and amendment to the permit were not provided to the court.

[3] Water flowing into the fish ladder and remaining in the Santa Clara River is bypass flow. *See* Compl. ¶ 4.

Under its State Board-issued license and permit, United was allowed to appropriate and divert water for its beneficial use. Compl. ¶ 14. Specifically, it was permitted "to appropriate and divert up to an instantaneous rate total of 375 cubic feet per second ('cfs') of water at the [Diversion dam]." *Id.* "On an annual basis, United is permitted to appropriate and divert 144,630 acre-feet per year at the [Diversion dam] (119,000 [acre-feet] for groundwater and 25,630 [acre-feet] for surface water)." Compl. ¶ 14. On average, between 1991 and 2014 United diverted 71,000 acre-feet of water yearly. Compl. ¶ 21.[4]

### *C. Endangered Species Act and the Steelhead Trout*

In 1997 NMFS designated the Southern California steelhead trout in the Santa Clara River as an endangered species under the ESA. *See* Compl. ¶ 26. This was six years after the dam was completed in 1991. *See* Compl. ¶¶ 16, 26. Section 9 of the ESA prohibits taking species that are designated as endangered or threatened under the Act. *See* 16 U.S.C. § 1538(a)(1)(B). Taking is defined in the ESA as "harass[ing], harm[ing], pursu[ing], hunt[ing], shoot[ing], wound[ing], kill[ing], trapp[ing], captur[ing], collect[ing]" or attempting to do so. *See* 16 U.S.C. § 1532(19). Harm means "an act which actually kills or injures fish or wildlife. Such an act may include significant habitat modification or degradation which actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including, breeding, spawning, rearing, migrating, feeding[,] or sheltering." 50 C.F.R. § 222.102.

The government may authorize a taking otherwise prohibited by the ESA by granting an exemption under Section 7 of the ESA, 16 U.S.C. § 1536. The government may also allow a taking otherwise prohibited by the ESA by issuing a permit under Section 10 of the ESA, 16 U.S.C. § 1539(a). A Section 10 incidental-take permit can be issued "if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." *See* 16 U.S.C. § 1539(a)(1)(B). "[T]he Secretary shall issue the permit . . . contain[ing] such terms and conditions as the Secretary deems necessary or appropriate to carry out the purposes of this paragraph" if the Secretary finds five criteria are met and "has received such other assurances as he may require that the plan will be implemented." 16 U.S.C. § 1539(a)(2)(B).[5]

---

[4] At the hearing on the government's motion to dismiss, counsel for the government averred that "the status quo for 1997 to 2008 . . . was that the Vern Freedom Diversion Dam was being operated by United Water and may or may not have been operating in such a way as to amount to a taking of steelhead." Hr'g Tr. 44:5-9.

[5] The Section 10 incidental-take permit provisions of the ESA require that the Secretary find that "(i) the taking will be incidental; (ii) the applicant will, to the maximum extent practicable, minimize and mitigate the impacts of such taking; (iii) the applicant will ensure that adequate funding for the plan will be provided; (iv) the taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild; and (v) the measures, if any, required under subparagraph (A)(iv) will be met." 16 U.S.C. § 1539(a)(2)(B).

### *D. Bureau of Reclamation, ESA Section 7 Proceeding, and NMFS's 2008 Biological Opinion*

Because NMFS designated the Southern California steelhead trout as endangered and because the Bureau of Reclamation provided funding to United for the construction of the Diversion dam and fish ladder, the Bureau brought a proceeding under Section 7 of the ESA in 2005 to enable United's ongoing operation of the Diversion dam. *See* Compl. ¶ 30. Under Section 7 of the ESA, a federal agency must ensure that actions it "authorized, funded, or carried out . . . [are] not likely to jeopardize the continued existence of any endangered species . . . unless such agency has been granted an exemption" under the Act. *See* 16 U.S.C. § 1536(a)(2). United represents that it supported the Bureau throughout the Section 7 proceeding. *See* Compl. ¶ 30.[6]

On July 23, 2008, after considering the Bureau's request, NMFS issued a proposed Biological Opinion ("BiOp") that would expire in December 2011. Compl. ¶ 31; Def.'s Reply at 3. The 2008 BiOp "resulted in a jeopardy finding by NMFS," Def.'s Mot. Ex. A, at 2, and included two reasonable and prudent alternatives ("RPA"s) to be implemented, *see* Compl. ¶ 31. RPA 1 related to fish passage and RPA 2 related to bypass flow; RPA 2 discussed both adult steelhead trout migration downstream of the dam ("RPA 2A") and juvenile steelhead trout migration downstream of the dam ("RPA 2B"). Compl. ¶ 31. In December 2008, the Bureau ended its involvement with the Diversion dam and terminated its Section 7 proceeding. *See* Compl. ¶ 33; Def.'s Mot. at 2. United represents that the Bureau reasoned that it was unable to take Section 7 action because it did not own or operate the Diversion dam. Compl. ¶ 33. United also represents that it implemented RPA 2A by 2016, but not RPA 2B because United determined that RPA 2B could be harmful to steelhead trout migration. *See* Compl. ¶ 32.[7] The government counters that United failed to implement the 2008 BiOp's RPAs. *See* Def.'s Mot. at 2-3.

### *E. The Wishtoyo Foundation Action*

On June 2, 2016, Wishtoyo Foundation ("Wishtoyo"), Ventura Coastkeeper, and Center for Biological Diversity filed suit against United, arguing that it was in violation of Section 9 of the ESA because it did not have a Section 10 incidental-take permit. Compl. ¶¶ 12-14, 89, 91; *Wishtoyo Found. v. United Water Conservation Dist.*, No. 2:16-CV-03869 (C.D. Cal., June 2, 2016); *see also* Compl. ¶ 47; Def.'s Mot. at 3. Following a trial, on September 23, 2018, the

---

[6] Referring to this proceeding, a letter from the NMFS OLE in 2016 states that "United initially sought incidental take authorization under Section 7 of the ESA with the Bureau of Reclamation." Def.'s Mot. Ex. A, at 2.

[7] In 2009, California Trout ("Cal-Trout") filed suit against United, arguing that it was in violation of Section 9 of the ESA because it did not have a Section 10 incidental-take permit and because the Bureau of Reclamation had terminated its Section 7 proceeding. *See* Compl. ¶ 35. That action was settled in August 2009, with United agreeing to implement aspects of RPA 2A from the BiOp, as well as other measures. *See* Compl. ¶ 36. United represents that it implemented measures to comply with the settlement between 2009 and 2016. *See* Comp. ¶ 37.

district court held that because United did not have a Section 10 incidental-take permit, "United's operation and maintenance of the [Diversion dam], including the existing . . . fish ladder and . . . water diversion to the Freeman Canal and United facilities," Compl. ¶ 49, was an unauthorized take and therefore violated Section 9 of the ESA, *Wishtoyo Found.*, 2018 WL 6265099 at *77 (C.D. Cal. Sept. 23, 2018), *aff'd*, 745 Fed. Appx. 541 (9th Cir. 2020). The district court issued a permanent injunction on December 1, 2018, which was affirmed by the Ninth Circuit in 2020. *Wishtoyo Found.*, 2018 WL 7571315 (C.D. Cal. Dec. 1, 2018), *aff'd*, 745 Fed. Appx. 541 (9th Cir. 2020); *see also* Compl. ¶¶ 50-51.[8]

The *Wishtoyo* permanent injunction requires that United implement RPA 2 from the 2008 BiOp, including both RPA 2A and RPA 2B, until either United receives a Section 10 incidental-take permit or the district court reaches a different holding. *See* Compl. ¶ 50. The district court held that United must

> complete forthwith the necessary studies to evaluate all reasonable alternatives to the existing fish ladder, select a preferred alternative, and submit complete regulatory authorization requests to NMFS, the U.S. Fish and Wildlife Service ("USFWS"), the U.S. Army Corps of Engineers . . . [and] [b]y no later than June 30, 2020, United shall submit completed regulatory applications for the following: i. ESA section 10 incidental take permit and multi-species habitat conservation plan ("MSHCP") to NMFS and the USFWS for operation and maintenance of [the Diversion dam] and United's Diversion at the [dam] . . . . Nothing in this judgment precludes United from seeking incidental take authorization . . . through a section 7 federal consultation between a federal agency . . . and NMFS or the USFWS.

*Wishtoyo Found.*, 2018 WL 7571315, at *2-3.

### *F. NMFS' Office of Legal Enforcement's 2016 Letter to United*

On June 9, 2016 NMFS's OLE issued a letter to United "to notify . . . United . . . that a significant issue regarding ongoing take of endangered southern California . . . steelhead [trout] exists at the [Diversion] Dam . . . , which United owns and operates." Def.'s Mot. Ex. A, at 1. That letter stated, in part:

> NMFS staff is of the opinion that United's operation of the Freeman Diversion has annually resulted in take of SC steelhead through death, capture[,] and significant impairment of essential behavioral patterns. Furthermore, without specific modifications, operation of the Freeman Diversion will certainly continue to result in take of SC steelhead [trout] on an annual basis. Because United does not have any authorization for the take of SC steelhead, all such takes are in violation of Section 9 of the ESA.

---

[8] The district court initially issued a judgment and permanent injunction on September 27, 2018, *Wishtoyo Found.*, No. 2:16-CV-03869 (C.D. Cal. Sept. 27, 2018), but this was amended by the order of December 2018.

> . . .
>
> United's cooperation to date in pursuing long term incidental take authorization through Section 10, while encouraging, has not included sufficient interim protection for SC steelhead. Given United's current, multi-year schedule for obtaining an incidental take permit, and the dwindling number of adult SC steelhead returning to the Santa Clara River, NMFS believes that United must commit to implementing interim operating measures that are consistent with the operational criteria set forth in the RPA (i.e., elements 2(a) and 2(b)) and appurtenant terms and conditions (i.e., 1(a), 2(a-c), and 4(a-c)) of the 2008 Biological Opinion. In order to be effective in protecting SC steelhead during the 2017 migration season and subsequent migration seasons pending issuance of an incidental take permit, these measures must be in place before December 1, 2016.
>
> Absent a firm commitment by United to timely implement the RPA criteria and measures, combined with timely and accurate monitoring of implementation, NMFS intends to pursue legal options available under the ESA to ensure that adequate interim operating measures are in place to minimize the impending take of SC steelhead at the Freeman Diversion pending NMFS's evaluation of United's incidental take permit application. I encourage United in the strongest terms possible to immediately institute the operational criteria and measures of the RPA.
>
> . . . We request the courtesy of your response by August 8, 2016, regarding your plans to implement these interim operating measures consistent with the operational criteria set forth in the RPA.

Def.'s Mot. Ex. A, at 2-3. United responded by August 8, 2016 to OLE stating it would implement NMFS's interpretation of RPA 2A but not RPA 2B. It requested a discussion with NMFS about RPA 2B. *See* Compl. ¶ 44. OLE replied in September 2016 indicating that it took United's letter to indicate that it would implement both RPA 2A and RPA 2B by December 1, 2016. *See* Compl. ¶ 45. United represents that it complied, implementing NMFS's interpretations of RPA 2A and RPA 2B. *See* Compl. ¶ 46.

### *G. United's Implementation of RPA 2A and RPA 2B*

In implementing NMFS's interpretations of RPA 2A and 2B, United represents that it "increase[d] . . . bypass flow through the [Diversion dam] fish ladder and then to the Pacific Ocean." Compl. ¶ 46; *see also* Compl. ¶ 64. It argues that because its implementation of the 2016 OLE letter increased water flowing to the fish ladder remaining in the Santa Clara River, less water was available to be diverted to the Freeman Diversion Canal. *See* Compl. ¶¶ 4, 46, 52. Based on its modeling, United estimates that between 2017 and 2021 it "los[t]" 49,800 acre-feet of water that would have been diverted to the Freeman Diversion Canal. *See* Compl. ¶ 53. It states that its compliance has caused a loss of beneficial use of water including "a reduction in

water deliveries" and changes in water allocation to "its lands, inhabitants[,] and constituent groundwater users." Compl. ¶ 55.

### *H. United has not Applied for an ESA Section 10 Permit*

United has not applied for a Section 10 incidental-take permit under the ESA,[9] but avers that it has started the internal process of applying for a Section 10 incidental-take permit, Compl. ¶ 34, including coordinating with NMFS on the development of a conservation plan, Def.'s Mot. Ex. A, at 2. In the 2016 OLE letter, NMFS states that "[d]espite eight years of effort, take authorization, and the accompanying criteria and measures for the operation of the Freeman Diversion to reduce take of SC steelhead [trout]," any incidental-take authorization by United "appear[s] to be several years off." Def.'s Mot. Ex. A, at 2.

### *I. Parties' Positions*

United filed its complaint initiating this action on May 17, 2022, seeking 40 million dollars in just compensation for a physical taking. Compl. ¶ 58. The government responded by filing this motion to dismiss on September 16, 2022, claiming the court does not have subject-matter jurisdiction because there is not final agency action. Def.'s Mot. at 2-3.

## STANDARDS FOR DECISION

### *A. Rule 12(b)(1) — Lack of Subject-Matter Jurisdiction*

The Tucker Act provides this court jurisdiction over "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). The Tucker Act does not, however, provide substantive rights. *See United States v. Testan*, 424 U.S. 392, 398 (1976). To establish this court's jurisdiction under the Tucker Act, United must "identify a substantive right for money damages against the United States separate from the Tucker Act." *Todd v. United States*, 386 F.3d 1091, 1094 (Fed. Cir. 2004). The Takings Clause of the Fifth Amendment of the U.S. Constitution can provide such a substantive right. *See* U.S. Const. amend. V. However, the claim must be ripe for adjudication for the court to have subject-matter jurisdiction over the claim. *Schooner Harbor Ventures, Inc. v. United States*, 92 Fed. Cl. 373, 378-79 (2010).

United, as plaintiff, must establish jurisdiction by a preponderance of the evidence. *See Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011) (citing *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988)). When ruling on the government's motion to dismiss for lack of jurisdiction, the "court must accept as true all

---

[9] At the hearing, United's counsel advised that "United has been working actively to pursue an incidental take permit." Hr'g Tr. 48:6-7. Notice of applications for Section 10 incidental-take permits are required to be published in the Federal Register. 50 C.F.R. § 17.32(b)(1)(ii). To date, notice has not been published.

undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." *Trusted Integration, Inc.*, 695 F3d at 1163 (citing *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995)). When the parties dispute alleged facts bearing upon jurisdiction, the court "may weigh relevant evidence." *Labruzzo v. United States*, 144 Fed. Cl. 456, 470 (2019) (quoting *Mildenberger v. United States*, 643 F.3d 938, 944 (Fed. Cir. 2011)). "If a court lacks jurisdiction to decide the merits of a case, dismissal is required as a matter of law." *Gray v. United States*, 69 Fed. Cl. 95, 98 (2005) (citing *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868); *Thoen v. United States*, 765 F.2d 1110, 1116 (Fed. Cir. 1985)); RCFC 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

## ANALYSIS

### *A. Jurisdiction*

The government contends that this court lacks jurisdiction over the case on regulatory-takings grounds. *See* Def.'s Mot. at 4-5. The Tucker Act, 28 U.S.C. § 1491(a)(1), grants this court jurisdiction over non-tort claims against the government for money damages. Claims in the Court of Federal Claims are subject to a six-year statute of limitations. 28 U.S.C. § 2501. By contrast, United avers that this court has jurisdiction because its claim for a physical taking arises under the Takings Clause of the Fifth Amendment, which permits just compensation, or money damages. *See* Compl. ¶ 7. United contends that its claim accrued after the 2016 OLE letter, which discussed protecting the Santa Clara River steelhead trout, and therefore was filed within the six-year statute of limitations. *See* Compl. ¶ 8; Def.'s Mot. Ex. A, at 1-3.[10] The government argues that the taking was not a physical taking but instead a regulatory taking, and therefore its motion contests the court's subject-matter jurisdiction on the basis of ripeness. *See* Def.'s Mot. at 4-5. The government avers that United's claim is not yet ripe because United's water rights are subject to a permit process under the ESA and United has not yet applied for a permit. *See* Def.'s Mot. at 9-10; Def.'s Reply at 5-9. Because the case and controversy clause of the Constitution requires a ripe controversy for a federal court to hear a case, *see* U.S. Const. art. III, § 2, the court must address the context in which United's claim arises to satisfy itself that jurisdiction exists. *See Shinnecask Indian Nation v. United States*, 782 F.3d 1345, 1348 (Fed. Cir. 2015), citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).

### *B. Water Rights*

The government argues that United's water rights are not categorical but instead are subject to the ESA. Water rights, including both approrpriative and riparian rights, are usufructary under California law. *See Casitas Mun. Water Dist. v. United States*, 708 F.3d 1340, 1353-54 (Fed. Cir. 2013) (*Casitas II)*. Under California law, appropriative rights are private

---

[10] United filed its complaint on May 17, 2022. *See* Compl. The government argues that the 2016 OLE letter, to which plaintiff tethers its claim, was not final agency action. *See* Def.'s Mot. at 4-5. Final agency action is relevant in the analysis of regulatory takings and certain physical takings. *See* Def.'s Reply at 7-8.

property rights, but those rights are limited to the beneficial use of water; the only compensable right "is a right to beneficial use." *Id.* ("[T]he holder of an appropropriated water right, in other words, receives nothing more than this right to beneficial use and possesses no legal entitlement to water that is diverted but never beneficially used.") (quoting and upholding *Casitas Mun. Water Dist. v. United States*, 102 Fed. Cl. 443, 455 (2011)). In *Casitas II*, plaintiff argued that the right to divert and store an amount of water in turn meant it had a right to beneficially use that amount of water. The court rejected this argument. *Casitas II*, 708 F.3d at 1355.[11] The court also held that diverting and storing water were not in and of themselves beneficial uses. *Id.* at 1356.

*International Paper Co. v. United States*, 282 U.S. 399, 407 (1931) also recognizes the right to use water. In that case, International Paper Company had a conveyance and lease to divert 730 cfs of water from the 10,000 cfs of water that Niagara Falls Power Company was entitled by New York state to divert via a canal. *See id.* at 404-05. When the President "place[d] an order . . . and . . . requisition[ed] the total quantity and output of the electrical power which [was] capable of being produced and/or delivered . . . through the use of all waters diverted or capable of being diverted through [an] intake canal," *id.* at 405, the Court held that the taking of power included the taking of water rights, specifically, the right to *use* the water, *id.* at 407.

Both United and the government recognize the beneficial-use standard for water rights. *See* Compl. ¶¶ 62, 65, 67; Def.'s Mot. at 9-10.[12] United claims that under its license and permit, it has the right to appropriate and divert up to an instantaneous rate of 375 cfs of water, or 144,630 acre-feet of water per year, Compl. ¶ 61, and that it "has a cognizable property interest to put . . . water diverted, up to its limits, to beneficial use." Compl. ¶ 62.[13] United uses the diverted water to recharge groundwater aquifers, deliver surface water to groundwater users, and stabilize the riverbed, putting it to beneficial use. *See* Compl. ¶ 15; Hr'g Tr. 29:8 to 30:23.

Nonetheless, United and the government interpret differently the limits on United's right to beneficially use the water. United suggests the right to beneficial use is categorical while the government claims it is limited by the ESA. United contends that the 2016 OLE letter caused it to implement NMFS's interpretation of RPA 2, therefore "increas[ing] the volume of bypass flow water to the [Diversion dam's] fish ladder and/or downstream of the [Diversion dam] for ESA purposes." *See* Compl. ¶¶ 62-65. It avers that this water otherwise would have been

[11] In rejecting the argument, the court noted that the pertinent license stated that Casitas could divert 107,800 acre-feet of water per year but "expressly limited the amount 'placed to beneficial use' at only 28,500 acre-feet per year." *Casitas II*, 708 F.3d at 1355.

[12] The government indirectly recognizes the beneficial use standard stating, "As a result, to the extent that the ESA will require United to divert water that it would otherwise have put to beneficial use, that claim is not yet ripe." Def.'s Mot. at 9; *see also* Hr'g Tr. 14:24 to 15:3; Hr'g Tr. 37:9-18.

[13] As noted previously, the parties did not submit United's permit, license, or amendment to the permit to the court. However, unlike in *Casitas II*, United does not represent that either the permit or license distinguished between the amount it could appropriate and divert and the amount it could put to beneficial use. *See Casitas II*, 708 F.3d at 1355.

"appropriated, diverted[,] and put to beneficial use, as authorized by" its license and permit. Compl. ¶ 65. At the hearing on the government's motion to dismiss, counsel for United stated that its "license had a categorical right for it to be able to divert up to the maximum that it's allowed," and that at the time of the license, the ESA did not restrict this right. Hr'g Tr. 25:1-7.[14] The government focuses on when the government action enforcing ESA limitations on water rights occurs, including the Act's permit procedures statutorily laid out. *See* Def.'s Reply at 8-9; Hr'g Tr. 49:22 to 50:13. United's beneficial-use rights are subject to the ESA. *See* 16 U.S.C. § 1538 (applying to the take of any designated species "within the United States"). Although United recognizes that the government can repurpose the use of water under the ESA, the court must consider the limitations that the ESA puts on the rights involved.

### *C. Takings Law*

The parties disagree about whether United's claim should be analyzed under the physical takings doctrine or the regulatory takings doctrine. The Takings Clause of the Fifth Amendment states that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V. To establish a taking under the Fifth Amendment, a party must prove that it had "a property interest for purposes of the Fifth Amendment" at the time of the alleged taking. *See Caquelin v. United States*, 140 Fed. Cl. 564, 572 (2018) (quoting *Members of the Peanut Quota Holders Ass'n v. United States*, 421 F.3d 1323, 1330 (Fed. Cir. 2005)); *Wyatt v. United States*, 271 F.3d 1090, 1096 (Fed. Cir. 2001) ("[O]nly persons with a valid property interest at the time of the taking are entitled to compensation."). A party also must prove that the government's actions "amounted to a compensable taking of that property interest." *Caquelin*, 140 Fed. Cl. at 572 (quoting *American Pelagic Fishing Co. v. United States*, 379 F.3d 1363, 1372 (Fed. Cir. 2004)). A taking can be either a physical taking or a regulatory taking. *Caquelin*, 140 Fed. Cl. at 573.[15] A physical taking occurs when the government directly appropriates property or "engages in the functional equivalent of a practical ouster of [the owner's] possession." *Katzin v. United States*, 908 F.3d 1350, 1361 (Fed. Cir. 2018) (quoting *Washoe Cnty. v. United States*, 319 F.3d 1320, 1326 (Fed. Cir. 2013) (internal quotations omitted); *see also Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 537 (2005). Although property can be regulated without giving rise to a Fifth Amendment taking, a regulatory taking occurs when a regulation goes too far. *Caquelin*, 140 Fed. Cl. at 576-577. Three different circumstances lead to regulatory takings; the first two result in *per se* regulatory takings. The first circumstance occurs when government regulation causes a person "to suffer a permanent physical invasion of [their] property." *See Katzin*, 908 F.3d at 1361 (quoting *Casitas Mun.*

---

[14] Counsel for United continued to state, "this is a new development that is impinging upon . . . the amount . . . that it can divert up to its property rights." Hr'g Tr. 25:4-7. United's counsel noted, however, that "the government . . . ha[s] the ability under the ESA to repurpose the use of the water for its own public purpose . . . but . . . if they are going to do that, they have to compensate United for the lost beneficial use it had of the water." Hr'g Tr. 25:8-16. "[T]he [g]overnment has to bear that externality of the ESA." Hr'g Tr. 25:16-18.

[15] A physical taking or regulatory taking can be either categorical or non-categorical and can be either temporary or permanent. *Caquelin*, 140 Fed. Cl. at 573.

*Water Dist. v. United States*, 543 F.3d 1276, 1289 (Fed. Cir. 2008) ("*Casitas I*")); *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 438-441 (1982) (holding that installation of cable television wires was a permanent physical invasion of the owner's property and was a regulatory taking requiring just compensation under the Fifth Amendment). The second circumstance occurs when government regulation "denies [an owner] all economically beneficial or productive use" of their property. *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015-16 (1992). The third circumstance, which is analyzed under a multi-factor balancing test, occurs when a regulation restricts the owner's use of their property to an extent that is compensable under the Fifth Amendment. *See Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978). When determining if a taking was physical or regulatory, a court should focus on the character of the government action. *See Casitas I*, 543 F.3d at 1290.

Both *Casitas* and *International Paper Co.* involve an alleged taking of a water right. In both cases, the alleged taking was physical in nature. *See Casitas I*, 543 F.3d at 1296; *International Paper Co.*, 282 U.S. at 407. In *Casitas*, Casitas had the right to divert water from the Ventura River into the Robles-Casitas Canal for its beneficial use. *See Casitas I*, 543 F.3d at 1286-1287. In 1997 NMFS listed the West Coast steelhead trout as an endangered species under the ESA. *Id.* at 1282. The government in turn required Casitas to build a fish ladder and divert water to it. *See id.* at 1281-82, 1290-92. [16] The Federal Circuit held that "the government['s] requirement that Casitas build the fish ladder and divert water to it [for the public purpose of protecting the West Coast steelhead trout] should be analyzed under the *physical takings* rubric." *Id.* at 1293, 1296 (emphasis added). It reasoned that although government action restricted Casitas's use of its right like in some regulatory takings cases, here, in contrast to regulatory takings cases, the government "actively caused water to be physically diverted away from Casitas *after the water had left the Ventura River and was in the Robles-Casitas Canal*." *Id.* at 1294 (emphasis added).[17] The court emphasized that some water had already left the Ventura River and was in the Robles-Casitas Canal when it was diverted. *Id.* at 1291-92 ("[T]he government did not merely require some water to remain in stream, but instead actively caused the physical diversion of water away from the Robles-Casitas Canal—after the water had left the Ventura River and was in the Robles-Casitas Canal—and towards the fish lader, thus reducing Casitas'[s] water supply.").[18] The court in *Casitas* also discussed the physical taking in

[16] For purposes of summary judgment, the government "conceded that Casitas has a valid property right in the water in question" and adopted the plaintiff's stated scope of its property interest. *See Casitas I*, 543 F.3d at 1288. The government also admitted that "it required Casitas to build the fish ladder facility," *id.* at 1290, and that "Casitas was forced by the [Bureau of Reclamation]'s adoption of the BiOp to build the fish ladder and divert the water," *id.* at 1293.

[17] "The fact that the government did not itself divert the water is of no import." *Casitas I*, 543 F.3d at 1292-93.

[18] In *Casitas*, "the government admits that the operation of the fish ladder includes closing the overshot gate . . . which is located *in* the Robles-Casitas Canal, and that the closure of this gate causes water that would have gone into the Casitas Reservoir via the Robles-Casitas Canal to be divereted into the fish ladder." *Casitas I,* 543 F.3d at 1291 (emphasis added).

*International Paper Co*. *Id.* at 1292.[19] According to the Federal Circuit in *Casitas I*, the Supreme Court in *International Paper* focused on the active role of the government. *Id.* It also specifically considered the fact that the water from the canal was already within International Paper Company's mill when the government issued its requisition. *See id.* When discussing the taking, the Court said, "The petitioner's right was to the use of the water; and when all the water that it used *was withdrawn from the petitioner's mill* and turned elsewhere by government requisition for the production of power it is hard to see what more the [g]overnment could do to take the use." *International Paper Co.,* 282 U.S. at 407 (emphasis added).

In contending that a physical taking occurred, United draws parallels between its case and *Casitas*,[20] in which the court held that the physical takings doctrine applied. United avers that in both cases, the plaintiff was required "to reduce its diversion of water to avoid liability under ESA." Pl.'s Opp'n at 14.[21] United also compares its claim to that in *International Paper Co.*, stating that in both cases, the government's restriction, which appropriated the use of water for a public purpose, decreased the amount of water the plaintiff could access for its use. *See* Hr'g Tr: 22:21 to 24:21. At the hearing, United emphasizes that in *International Paper Co.* "the [g]overnment directed a power company to divert water away from a paper company that had a right to use the water." Hr'g Tr: 23:11-21.[22]

In contending the alleged taking should be analyzed under the regulatory taking doctrine the government distinguishes the physical takings in *Casitas* and *International Paper Co.* from the case at hand. It states that these cases were analyzed under the physical takings doctrine because plaintiffs had to "return water [they] had *already removed* from the river." *See* Def.'s Reply at 6-7. Here, the government contends that NMFS "at most" required water to stay in the river. *See id.* at 7.

In the factual circumstances at hand, United's claim should be analyzed under the regulatory takings doctrine. Unlike *Casitas* and *International Paper Co.*, United does not allege that water that was already diverted into its diversion canal was required to be returned to the river. Instead, United states that, to comply with the ESA and protect the endangered steelhead trout, water it *otherwise could have diverted* under its license and permit was used "as bypass

[19] The Federal Circuit in *Washoe Cnty.* also recognized that *International Paper Co.* involved a physical taking of water rights by the government. *Washoe Cnty.*, 319 F.3d at 1326.

[20] United alleges that its claim is "nearly identical" to the claim in *Casitas*. Pl.'s Opp'n at 14.

[21] United acknowledges that Casitas was required to "return water that had been diverted into the Ventura River Project to the Casitas fish ladder and the Ventura River," but does not directly address the significance of this fact. *See* Pl.'s Opp'n at 14.

[22] In drawing the comparison, counsel for plaintiff quoted *International Paper Co.*, stating that in that case, water was "withdrawn from [International Paper Company's] mill." Hr'g Tr: 24:8-14 (quoting *Intertional Paper Co.*, 282 U.S. at 407).

flow into the [Diversion dam] fish ladder and/or remained in the river." *See* Compl. ¶ 6.[23] Because United does not allege that it had to return water it had already diverted, it has not stated a physical takings claim, unlike in *Casitas* or *International Paper Co*. United's allegation that its right to appropriate and divert water (or use water) was restricted by the 2016 OLE letter's "ESA requirement," Pl.'s Opp'n at 19, should be analyed as a regulatory taking. Therefore, the court turns to the permitting scheme under the ESA to determine if the regulatory takings claim is ripe for adjudication.

### *D. Ripeness*

The parties disagree about whether United's claim is ripe for adjudication. For a regulatory taking claim to ripen, there must be final agency action. "[A] claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." *Schooner Harbor Ventures, Inc. v. United States*, 569 F.3d 1359, 1365 (Fed. Cir. 2009) (quoting *Williamson Cnty. Reg'l Plan. Comm'n v. Hamilton Bank*, 473 U.S. 172, 186 (1985), *overruled on other grounds by Knick v. Township of Scott,* 139 S.Ct. 2162 (2019)). With respect to a regulatory taking claim that arises under the ESA, a plaintiff (that is eligible to apply under Section 10) must have applied for and been denied an incidental-take permit for their claim to ripen. *See Doyle v. United States*, 129 Fed. Cl. 147, 156 (2016). "[A]bsent denial of the permit, only an extraordinary delay in the permitting process can give rise to a compensable taking." *See Boise Cascade Corp. v. United States*, 296 F.3d 1339, 1349 (Fed. Cir. 2002). *Boise Cascade* recognizes that "delay is inherent in complex regulatory schemes," and that the existence of a permitting requirement alone is not sufficient.[24] *See id*. (quoting *Wyatt*, 271 F.3d at 1098).

To reiterate the parties' basic positions, United argues that its claim is ripe for adjudication because it alleged a physical taking, not a regulatory taking, *see* Pl.'s Opp'n at 14-20, while the government argues that the claim is not ripe for adjudication because United alleged a regulatory taking and has not yet applied for and been denied an incidental-take permit under Section 10 of the ESA. *See* Def.'s Reply 8-9.

United's claim is not yet viable for adjudication. Because the claim should be analyzed under the regulatory takings doctrine, *see supra*, at 10-12, United must follow the ESA's

---

[23] Counsel for the government emphasized that "United Water's complaint makes clear that the water it claims to have a right to use has remained at all times in the Ventura River and that United has merely let the water flow by." Hr'g Tr. 8:15-18, 12:17 to 13:1. Counsel for United demurred, stating that he "would not concede that . . . none of the water entered into the diversion canal or into the facility at the [Diversion dam]." Hr'g Tr. 17:7-22. In support, he suggested that diverted water could have first entered the diversion canal or the facility if an auxiliary pipe existed. He did not aver in the pleadings or at the hearing that an auxiliary pipe existed. *See* Hr'g Tr. 17:7-22; *see generally* Compl.; Pl.'s Opp'n.

[24] The ESA applies retroactively to licenses and permits, for example, that were entered before the ESA was passed in 1973. A compensable taking can occur if a government action under the ESA limits water use rights acquired before the ESA. *See Casitas*, 102 Fed. Cl. at 455.

permitting scheme for its claim to ripen. United has not yet applied for an incidental-take permit under Section 10. *See supra*, at 10. If United applies for an incidental-take permit and the government does not act in a timely fashion in response to its application, United might have a claim that agency action was unreasonably withheld, *see Boise Cascade Corp.,* 296 F.3d at 1349-50; however, those facts are not before the court at this time.

## CONCLUSION

For the reasons stated, the government's motion to dismiss pursuant to RCFC 12(b)(1) is GRANTED.

The Clerk shall dismiss plaintiff's complaint for failure to state a viable claim.

No costs.

It is so **ORDERED**.

s/ Charles F. Lettow
Charles F. Lettow
Senior Judge

# In the United States Court of Federal Claims

**No. 22-542 L**
**Filed: January 26, 2023**

**UNITED WATER CONSERVATION DISTRICT**
**Plaintiff**

**v.** **JUDGMENT**

**THE UNITED STATES**
**Defendant**

Pursuant to the court's Opinion and Order, filed January 26, 2023, granting defendant's motion to dismiss,

IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that plaintiff's complaint is dismissed for failure to state a viable claim. No costs.

Lisa L. Reyes
Clerk of Court

By: s/ Debra L. Samler

Deputy Clerk

NOTE: As to appeal to the United States Court of Appeals for the Federal Circuit, 60 days from this date, see RCFC 58.1, re number of copies and listing of all plaintiffs. Filing fee is $505.00.

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2023-1602

**Short Case Caption:** United Water Conservation District v. US

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- [x] the filing has been prepared using a proportionally-spaced typeface and includes 12,912 words.
- [ ] the filing has been prepared using a monospaced typeface and includes ______ lines of text.
- [ ] the filing contains ______ pages / ______ words / ______ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. ______).

Date: 07/14/2023

Signature: /s/ Frank S. Murray

Name: Frank S. Murray