No. 23-1602

UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

UNITED WATER CONSERVATION DISTRICT,
*Plaintiff/Appellant*,

v.

UNITED STATES,
*Defendant/Appellee*.

Appeal from the United States Court of Federal Claims
No. 1:22-cv-00542 (Hon. Charles F. Lettow)

# ANSWERING BRIEF FOR THE UNITED STATES

TODD KIM
*Assistant Attorney General*
TAMARA ROUNTREE
*Attorney*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 514-1174
tamara.rountree@usdoj.gov

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ iii

STATEMENT OF RELATED CASES ........ viii

INTRODUCTION ........ 1

STATEMENT OF THE ISSUES ........ 3

STATEMENT OF THE CASE ........ 4

A. Statutory background ........ 4

B. Factual background ........ 6

1. United and its Diversion Dam ........ 6

2. The Bureau of Reclamation's Section 7 ESA consultation proceeding and NMFS's 2008 Biological Opinion ........ 8

3. The Wishtoyo lawsuit against United alleging take of steelhead in violation of the ESA ........ 10

4. NMFS's Recommendation Letter to United and United's initial refusal to satisfy all the recommendations in that Letter ........ 11

C. Proceedings in the CFC ........ 14

SUMMARY OF ARGUMENT ........ 16

STANDARD OF REVIEW ........ 19

ARGUMENT ........ 20

THE CFC CORRECTLY DISMISSED UNITED'S COMPLAINT ........ 20

I. NMFS's Recommendation Letter does not give rise to any category of Fifth Amendment taking. ........ 20

II. Even if NMFS's Recommendation Letter imposed a binding obligation on United, the CFC properly dismissed the Complaint because the allegations in the Complaint do not state a physical takings claim. ........ 26

A. United does not have an ownership interest in the River water it alleges was taken. ........ 28

B. Even assuming United had a possessory interest in any water, the Complaint alleges no facts showing that the Government caused the "ouster" of that water, another requisite element of a physical taking. ........ 32

C. United's arguments fail to establish that the allegations in its Complaint can be properly construed as asserting a physical takings claim. ........ 36

III. Even if NMFS's Recommendation Letter imposed a binding obligation on United, dismissal was appropriate because United's Complaint is properly construed as asserting a regulatory takings claim that is unripe. ........ 44

CONCLUSION ........ 49

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Cases

*A-1 Cigarette Vending, Inc. v. United States*,
49 Fed. Cl. 345 (2001) .......................................................................... 24

*A & D Auto Sales, Inc. v. United States*,
748 F.3d 1142 (Fed. Cir. 2014) .......................................................... 20

*Am. Pelagic Fishing Co., L.P. v. United States*,
379 F.3d 1363 (Fed. Cir. 2004) .......................................................... 29, 31

*Banks v. United States*,
741 F.3d 1268 (Fed. Cir. 2014) .......................................................... 19

*Biotics Rsch. Corp. v. Heckler*,
710 F.2d 1375 (9th Cir. 1983) ........................................................... 24

*Boise Cascade Corp. v. United States*,
296 F.3d 1339 (Fed. Cir. 2002) .......................................................... 29, 46, 48

*Brubaker Amusement Co. v. United States*,
304 F.3d 1349 (Fed. Cir. 2002) .......................................................... 24

*Casitas Mun. Water Dist. v. United States*,
543 F.3d 1276 (Fed. Cir. 2008) ("*Casitas I*") .................... 15, 32, 33, 35, 36, 38, 41

*Casitas Mun. Water Dist. v. United States*,
708 F.3d 1340 (Fed. Cir. 2013) ("*Casitas II*") .................................... 29, 30

*Cavin v. United States*,
956 F.2d 1131 (Fed. Cir. 1992) .......................................................... 29

*Cedar Point Nursery v. Hassid*,
141 S. Ct. 2063 (2021) ....................................................................... 27, 45, 47

*Crow Creek Sioux Tribe v. United States*,
900 F.3d 1350 (Fed. Cir. 2018) .......................................................... 29

*CRV Enterprises, Inc. v. United States*,
626 F.3d 1241 (Fed. Cir. 2010) .......................................................... 39, 40, 41

*Dugan v. Rank*,
372 U.S. 609 (1963) ........................................................................39, 40, 41

*Eddy v. Simpson*,
3 Cal. 249 (1853) ..........................................................................................29

*Estate of Hage v. United States*,
687 F.3d 1281 (Fed. Cir. 2012).........................................................19, 43

*Fidelity & Guar. Ins. Underwriters, Inc. v. United States*,
805 F.3d 1082 (Fed. Cir. 2015).....................................................................19

*Horne v. Dept of Agric.*,
576 U.S. 350 (2015)........................................................42, 43, 45, 47, 48

*International Paper Co. v. United States*,
282 U.S. 399 (1931).........................................................................36, 37, 38

*Jarbough v. Att'y Gen. of U.S.*,
483 F.3d 184 (3d Cir. 2007).........................................................................27

*Katzin v. United States*,
908 F.3d 1350 (Fed. Cir. 2018)...............................................27, 28, 31, 36

*Keystone Bituminous Coal Ass'n v. DeBenedictis*,
480 U.S. 470 (1987).......................................................................47, 48

*Lingle v. Chevron U.S.A., Inc.*,
544 U.S. 528 (2005)......................................................................................28

*Lucas v. S.C. Coastal Council*,
505 U.S. 1003 (1992)....................................................................................27

*Martin v. United States*,
894 F.3d 1356 (Fed. Cir. 2018).....................................................................19

*Morris v. United States*,
392 F.3d 1372 (Fed. Cir. 2004).....................................................................19

*Pennsylvania Coal v. Mahon*,
260 U.S. 393 (1922)......................................................................................45

*Schooner Harbor Ventures, Inc. v. United States*,
569 F.3d 1359 (Fed. Cir. 2009)....................................................................46

*St. Bernard Parish Gov't v. United States*,
887 F.3d 1354 (Fed. Cir. 2018)....................................................................20

*Stearns Co. v. U.S.*,
396 F.3d 1354 (Fed. Cir. 2005)....................................................................45

*Stephens v. United States*,
884 F.3d 1151 (Fed. Cir. 2018)....................................................................19

*Swafford v. McDonald*,
664 F. App'x 937 (Fed. Cir. 2016) ...............................................................27

*United States v. Central Eureka Mining Co.*,
357 U.S. 155 (1958)....................................................................................45

*United States v. Gerlach Live Stock Co.*,
339 U.S. 725 (1950)........................................................................39, 40, 41, 42

*Washoe Cnty., Nev. v. United States*,
319 F.3d 1320 (Fed. Cir. 2003)....................................................................43

*Williamson Cnty. Reg'l Plan. Comm'n v. Hamilton Bank*,
473 U.S. 172 (1985)....................................................................................46

*Wishtoyo Foundation v. United Water Conservation Dist.*,
2018 WL 6265099 (C.D. Cal. Sept. 23, 2018),
*aff'd,* 795 F. App'x 541 (9th Cir. 2020)...............................................4, 8, 10, 25

*Wishtoyo Found. v. United Water Conservation Dist.*,
2018 WL 7571315 (C.D. Cal. Dec. 1, 2018),
*aff'd,* 795 F. App'x 541 (9th Cir. 2020) ("*Wishtoyo II*")..................................10, 11

**Statutes and Court Rules**

Endangered Species Act

16 U.S.C. § 1531-1544 ....................4

16 U.S.C. § 1532(13) ....................9

16 U.S.C. § 1532(19) ....................4

16 U.S.C. § 1536(a) ....................5

16 U.S.C. § 1536(a)(2) ....................5, 8

16 U.S.C. § 1538(a)(1) ....................6

16 U.S.C. § 1538(a)(1)(B) ....................4

16 U.S.C. § 1536(b) ....................8

16 U.S.C. § 1536(b)(3)(A) ....................6, 9

16 U.S.C. § 1538(a)(1)(B) ....................9

16 U.S.C. § 1538(o) ....................6

16 U.S.C. § 1539 ....................6

16 U.S.C. § 1539(a)(1)(B) ....................6

**Federal Regulations**

50 C.F.R. § 17.32(b)(1)(ii) ....................14

50 C.F.R. § 222.101(a) ....................4

50 C.F.R. § 222.102 ....................4, 5

50 C.F.R. § 402.01(b) ....................5

50 C.F.R. § 402.02 ....................5

50 C.F.R. § 402.12 ..................................................................................5

50 C.F.R. § 402.13 ..................................................................................5

50 C.F.R. § 402.14 ..................................................................................5

50 C.F.R. § 402.14(h)(2)..........................................................................6

50 C.F.R. § 402.14(h)(iv)..........................................................................5

## STATEMENT OF RELATED CASES

No other appeal in this action has been before this Court or any other appellate court, and counsel is unaware of any pending related cases within the meaning of Circuit Rule 47.5.

## INTRODUCTION

The Court of Federal Claims ("CFC") correctly dismissed the Complaint of Plaintiff-Appellant United Water Conservation District ("United"), which alleges a Fifth Amendment physical taking of water that the Complaint asserts United had a right to put to beneficial use. The government letter that United identifies as the basis of its takings claim is not capable of effecting any category of taking, let alone a physical taking. The CFC's dismissal can be affirmed on that ground alone. In any event, United acknowledges that it possesses no ripe regulatory takings claim, and United does not allege any of the requisite elements of a physical takings claim.

United is a California water conservation district that operates the Vern Freeman Diversion Dam ("Diversion Dam" or "Dam"), which diverts surface water from the Santa Clara River into the Dam's canal. In 2008, the National Marine Fisheries Service ("NMFS" or the "Government") issued a biological opinion under the Endangered Species Act ("ESA"), concluding that operation of the Dam was likely to jeopardize the continued existence of the endangered Southern California steelhead and identifying measures to prevent such harm.

Years later, NMFS's Office for Law Enforcement sent United the letter that is the basis of United's takings claim. The letter explained the agency's understanding of the Dam's operations as of that time, including that it appeared

United was several years off in implementing measures to protect steelhead. The letter offered “recommendations” for United to implement to provide the necessary protections, and the letter cautioned United that NMFS anticipated pursuing legal options if United continued operating the Dam without implementing the requirements identified in the 2008 biological opinion. United represents that it satisfied those requirements and, thereafter, could not divert as much water to United’s facilities for beneficial use. United brought a Fifth Amendment claim against the United States alleging NMFS’s letter (the “Recommendation Letter” or “Letter”) caused a physical taking requiring just compensation.

The CFC correctly dismissed United’s Complaint. The Recommendation Letter constituted no mandate, order, directive, or conclusive determination by NMFS. Indeed, United itself failed to perceive the Letter as such, having initially refused to follow one of its recommended measures. Consequently, the Letter is not capable of effecting a taking. But even assuming the Letter could give rise to a taking, the CFC correctly rejected United’s contention that its Complaint states a physical takings claim, where United alleged no facts showing that the Government required United to relinquish water that United had already diverted into its canal. The court correctly held that, based on the facts alleged, United’s claim should be analyzed as a regulatory taking, and that such a claim is not ripe

for adjudication. United did not, and does not, dispute that it has no ripe regulatory taking claim.

The CFC's judgment should be affirmed.

## STATEMENT OF THE ISSUES

1. Whether NMFS's letter to United could cause a Fifth Amendment taking, given that the letter merely offered opinions of agency staff and "recommendations" that United could implement to prevent the take of steelhead, and cautions of NMFS's intention to pursue legal options available under the ESA if United continued its non-compliance with the Act.

2. Even assuming the Recommendation Letter imposed a binding obligation on United:

a. Whether United stated a physical takings claim where the facts in United's Complaint do not allege that United had to relinquish any water in its possession; and

b. Whether United's takings claim is a regulatory takings claim that is unripe, given that the facts alleged in United's Complaint state that the NMFS letter caused United to limit the ways in which it used water from the Santa Clara River.

## STATEMENT OF THE CASE

### A. Statutory background

The ESA establishes a framework for the protection of species that have been determined to be either threatened or endangered. *See* 16 U.S.C. §§ 1531-1544. As relevant in this case, the Secretary of Commerce is generally responsible for marine species, including the Southern California steelhead at issue here, and the Secretary discharges that responsibility through NMFS. *See* 50 C.F.R. § 222.101(a).

In 1997, NMFS listed the steelhead as an endangered species under the ESA for fish populations in areas including the Santa Clara River region. Appx027 at ¶ 26.[1] Section 9 of the ESA provides that it is unlawful to take any species listed as endangered under the Act. *See* 16 U.S.C. § 1538(a)(1)(B). To "take" means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). The term "harm," in turn, means "an act which actually kills or injures fish or wildlife." 50 C.F.R. § 222.102. Harm "may include significant habitat modification or degradation which actually kills or injures fish or wildlife by significantly impairing essential

---

[1] Steelhead are born in freshwater, can migrate to the ocean to mature, and return to freshwater as adults to spawn. *See Wishtoyo*, 2018 WL 6265099, at *2. After spawning, steelhead can return to the ocean, and come back again to freshwater to spawn. *Id.*

behavioral patterns, including, breeding, spawning, rearing, migrating, feeding or sheltering." *Id.* Section 9 applies to the actions of federal agencies as well as private entities.

Section 7 of the Act directs federal agencies to ensure that "any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species." 16 U.S.C. § 1536(a)(2); *see* 50 C.F.R. § 402.02 (defining "jeopardize"). To satisfy that obligation, the federal agency planning to undertake an activity itself or fund the activity of some other entity must evaluate the potential effects of the proposed action on any listed species. 16 U.S.C. § 1536(a); 50 C.F.R. § 402.12. If an agency concludes that the proposed action may affect a listed species or its critical habitat, the agency must initiate consultation with the appropriate consulting agency, which, in this case, is NMFS.[2] 50 C.F.R. §§ 402.13 & 402.14.

Section 7 consultation concludes when NMFS issues a biological opinion, in which it determines, in relevant part, whether the proposed action is likely to "jeopardize the continued existence of" any listed species 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(h)(iv). If the biological opinion concludes that jeopardy is

---

[2] NMFS and the Fish & Wildlife Service are the consulting agencies that share responsibilities for administering the ESA, depending on the species involved. 50 C.F.R. § 402.01(b). As we have indicated, NMFS, under the authority of the Secretary of Commerce, is the relevant administering agency in this case.

likely, NMFS must identify "reasonable and prudent alternatives" to the action that would minimize such harm. 16 U.S.C. § 1536(b)(3)(A); *see* 50 C.F.R. § 402.14(h)(2).

Section 10 of the ESA provides private entities a limited exemption from Section 9's prohibitions. *See* 16 U.S.C. § 1539. As relevant here, an entity may apply to NMFS for an incidental take permit that would allow "any taking otherwise prohibited by section 1538(a)(1)(B) [Section 9] … if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B). Incidental take that occurs under an incidental take permit does not violate the ESA. 16 U.S.C. §§ 1538(a)(1); 1536(o).

### B. Factual background

#### 1. United and its Diversion Dam

United is a water conservation district created under California law. Appx002; Appx018, ¶ 1, Appx023, ¶13. United holds a state license and permit issued by the California State Water Resources Control Board granting United the right to appropriate a certain maximum amount of water from the Santa Clara River by diverting it from the River for United's beneficial use. Appx002; Appx018, ¶ 1. The Board amended United's state license and permit in 1987 to allow for the construction of United's Diversion Dam. Appx002; Appx018, ¶ 1;

Appx026, ¶ 22.[3] The funds United used to construct the dam included federal funds from the United States Bureau of Reclamation. Appx002; Appx024, ¶ 16. United completed the Dam in 1991. Appx024, ¶ 16. The Dam is a 1,200-foot wide diversion dam that is part of United's water management operations. Appx002; Appx024, ¶ 15.

"United uses its water diversion right, in relevant part, to appropriate and divert lower Santa Clara River water into proximate United facilities." Appx019, ¶ 1. United accomplishes this by using the Dam to divert Santa Clara River water into United's Freeman Diversion Canal ("Canal"). Appx024, ¶ 15. The water passes through United's Canal and is then directed to United's other operational facilities, including a distribution system that transports the water to other locations that are serviced by United. Appx002; Appx024, ¶¶ 15, 17.

If the River water is not diverted by the Dam into United's Canal, the water flows down the Santa Clara River and into the Pacific Ocean. Appx002; Appx020, ¶ 4; Appx024, ¶ 18. Some of that water first passes through a fish ladder, which is designed to provide passage for steelhead that are migrating in the Santa Clara River to up-river spawning locations. Appx024, ¶ 18; Appx026, ¶ 24.[4] United calls

---

[3] United's Complaint generally refers to the Diversion Dam with the acronym "VFD."

[4] In the upper Santa Clara River watershed, the tributaries to the Santa Clara River provide spawning and rearing habitat for steelhead. *Wishtoyo Foundation, et al. v. United Water Conservation Dist.*, 2018 WL 6265099, at *2 (C.D. Cal. Sept. 23,

water that remains in the River, including water that flows into the fish ladder and down the River, "bypass flow" to indicate that it does not enter into United's Canal. Appx002; Appx024, ¶ 18.

### 2. The Bureau of Reclamation's Section 7 ESA consultation proceeding and NMFS's 2008 Biological Opinion

The Bureau of Reclamation, having provided funds for United's construction of the Diversion Dam, commenced Section 7 ESA consultation proceedings with NMFS in 2005 to ensure the Dam was "not likely to jeopardize the continued existence of any endangered species." 16 U.S.C. § 1536(a)(2); Appx004. In July 2008, as part of the consultation process, NMFS issued a Biological Opinion regarding the operation of United's Dam ("2008 BiOp" or "BiOp"). Appx004; 16 U.S.C. § 1536(b). In the BiOp, NMFS found that the Dam's operations were likely to jeopardize continued existence of steelhead. NMFS identified two categories of "reasonable and prudent alternatives" ("RPA") for the

---

2018), *aff'd,* 795 F. App'x 541 (9th Cir. 2020); *see infra* at 15. As juveniles, steelhead migrate downstream by either passing over the top of the crest of the Diversion Dam or through the Dam via, among other things, a bypass flow pipe. *Id.* United's diversion of water out of the River into the Dam reduces the availability of water downstream for juvenile steelhead migration. *Id.* As adults migrating back upstream, steelhead cannot reach the upper Santa Clara River without passing through the Dam, via a fish ladder that steelhead must climb and exit, and then swimming upstream above the Dam toward the spawning habitat. *Id.* at *2-3.

Dam's operations that would not violate the ESA. Appx004; Appx028, ¶ 31; 16 U.S.C. § 1536(b)(3)(A).

The first alternative— "RPA 1"—involves the Dam's fish passage facility. Appx004; Appx028, ¶ 31. The second alternative—"RPA 2"—involves the bypass flow and consists of two subcomponents: "RPA 2A" and "RPA 2B". Appx004; Appx028, ¶ 31. RPA 2A addresses bypass flows for adult steelhead migration downstream of the Dam). Appx004; Appx028, ¶ 31. RPA 2B addresses bypass flows for juvenile steelhead migration downstream of the Dam. Appx004; Appx028, ¶ 31.

In November 2008, the Bureau of Reclamation ended its association with the Dam. Because the Bureau no longer had any ongoing involvement with the Dam's operation or ownership, the agency also terminated its ESA consultation proceeding with NMFS. Appx004; Appx024, ¶ 16, Appx028, ¶ 31; Appx029, ¶ 33.[5]

---

[5] United's Statement of the Case alleges that when the Bureau ended its consultation and involvement with the Diversion Dam the BiOp "was concomitantly mooted." Br. 6-7. The ESA, however, provides that "it is unlawful for any person subject to the jurisdiction of the United States to … take any [endangered] species," 16 U.S.C. § 1538(a)(1)(B), and the Act defines "person" not only as an "instrumentality of the Federal Government" but also as "an individual, corporation, partnership, trust, association, or any other private entity," 16 U.S.C. § 1532(13). Thus, United was not excused from its independent obligations to comply with the ESA by the Bureau ending its involvement with the Dam and the ESA consultation based on that involvement. See Appx029, ¶ 34; Appx030, ¶ 35.

### 3. The Wishtoyo lawsuit against United alleging take of steelhead in violation of the ESA

In June 2016, Wishtoyo Foundation and other environmental groups filed a complaint against United alleging violations of the ESA based on United's operation of the Diversion Dam and impacts to steelhead. *Wishtoyo Foundation, et al. v. United Water Conservation Dist.*, 2018 WL 6265099 (C.D. Cal. Sept. 23, 2018), *aff'd,* 795 F. App'x 541 (9th Cir. 2020) ("*Wishtoyo*"); Appx023, ¶¶ 13-14; Appx033-Appx035, ¶¶ 47-51; Appx004-Appx005.

Following a bench trial, the district court granted declaratory and injunctive relief, holding that, in the absence of a Section 10 permit, United's operation and maintenance of the Dam constituted an unauthorized take of steelhead in violation of the ESA. Appx034, ¶ 49; *Wishtoyo*, 2018 WL 6265099 at *77.[6] In a subsequent order resolving all pending claims, the district court issued a permanent injunction that was affirmed on appeal. *See Wishtoyo Found. v. United Water Conservation Dist.*, 2018 WL 7571315 (C.D. Cal. Dec. 1, 2018), *aff'd*, 795 F. App'x 541 (9th Cir. 2020) ("*Wishtoyo II*"); Appx034-Appx035, ¶¶ 50-51.

The *Wishtoyo* permanent injunction remains in place and requires United to implement both RPA 2A and RPA 2B from the 2008 BiOp. Appx034, ¶ 50. The

---

[6] The district court's *Wishtoyo* decision describes in detail the history of United's interactions with NMFS, recounting among other things that United had spent nearly a decade in negotiations with NMFS over the RPA. *See, e.g.,* 2018 WL 6265099, at *15-*17, *29-*30.

injunction also requires that "[b]y no later than June 30, 2020," United shall apply for an ESA section 10 incidental take permit for its operation of the Dam. *Wishtoyo II,* 2018 WL 7571315, at *3. The district court's injunction established the duration of United's required compliance, ordering that "United shall continue to adhere to the water diversion operating rules set forth in [RPA 2 of the 2008 BiOp] … until such time as United secures incidental take authorization from NMFS for the maintenance and operation of [the Dam] with respect to Steelhead." *Wishtoyo II*, 2018 WL 7571315, at *1.

#### 4. NMFS's Recommendation Letter to United and United's initial refusal to satisfy all the recommendations in that Letter

On June 9, 2016, shortly after the *Wishtoyo* plaintiffs filed their lawsuit, NMFS's Office of Law Enforcement sent United a letter regarding the Diversion Dam's operation and the take of steelhead, and including recommendations of measures for United to implement. Appx053-Appx056. The Recommendation Letter explained, in relevant part, that NMFS was issuing the letter to "notify" United that "a significant issue regarding ongoing take of endangered southern California (SC) steelhead exists at the Vern Freeman Diversion Dam." Appx053.

The Letter has three parts: "Background," "Notice," and Recommendation." In the "Background" section, the Letter stated that the Dam "is not designed or operated in a way to account for the migratory behavior of SC steelhead" and that

"take authorization" under Section 10 of the ESA, "and the accompanying criteria and measures for the operation of the [Dam] to reduce take of SC steelhead, *appear to be* several years off." Appx053 (emphasis added).

Under the heading of "Notification," the Letter explained that

> *NMFS staff is of the opinion* that United's operation of the [Dam] has annually resulted in take of SC steelhead through death, capture and significant impairment of behavioral patterns …. Because United does not have any authorization for the take of SC steelhead, all such takes are in violation of Section 9 of the ESA.

Appx054 (emphasis added).[7]

Under the final heading of "Recommendation," the Letter stated that "NMFS believes that United must commit to implementing interim operating measures that are consistent with the operational criteria set forth in the RPA…and appurtenant terms and conditions…of the 2008 Biological Opinion." Appx055. Under that same heading, the Letter explained that these measures "must be in place before December 1, 2016" "[i]n order to be effective in protecting SC steelhead during the

---

[7] United erroneously contends in its Statement of the Case that, in the Recommendation Letter, NMFS "notified United that NMFS had *determined* 'United's operation of the Freeman Diversion has annually resulted in take of [Southern California] steelhead through death, capture, and significant impairment of essential behavioral patterns." Br. 7-8 (citing Appx054). But the Letter does not state that NMFS had reached such a "determination" about the operation of United's Dam. Rather, the Letter states expressly only that NMFS staff was of an "opinion" as to the Dam's operation. *See* Appx054; *supra* (quoting Appx054). United also wrongly contends that in the Letter, United's operation of the Diversion "was deemed '*unlawful*' under the ESA." Appx053 (emphasis added). The Letter states no such determination.

2017 migration season." *Id.* The Recommendation portion of the Letter further explains that:

> Absent a firm commitment by United to timely implement the RPA criteria and measures, combined with timely and accurate monitoring of implementation, NMFS intends to pursue legal options available under the ESA to ensure that adequate interim operating measures are in place to minimize the impending take of SC steelhead at the [Dam] pending NMFS's evaluation of United's incidental take permit application. I *encourage* United in the strongest terms possible to immediately institute the operational criteria and measures of the RPA.

Appx055 (emphasis added).

The Letter concludes by explaining "[w]e *request the courtesy of your response* by August 8, 2016, regarding your plans to implement these interim operating measures consistent with the operational criteria set forth in the RPA." *Id.* (emphasis added).

United responded to NMFS's Recommendation Letter in writing and stated that United "refused to comply" with RPA 2B and, "instead requested a further discussion with NMFS about RPA 2B requirements." Appx032, ¶ 44. United told NMFS that it would comply with RPA 2A. Appx032, ¶ 44. Notwithstanding its objections, United chose to operationally implement both RPA 2A and 2B in early 2017. Appx020, ¶ 5.

United has not applied for a Section 10 incidental take permit for the Diversion Dam's operations. Appx007 n.9. Notice of applications for

Section 10 incidental take permits must be published in the Federal Register. 50 C.F.R. § 17.32(b)(1)(ii). Such notice "ha[d] not been published" as of the date of the CFC's Opinion and Order in this case. Appx007 n.9.

### C. Proceedings in the CFC

On May 17, 2022, United filed a complaint against the United States seeking just compensation for an alleged Fifth Amendment taking of Santa Clara River water that United had a right to divert into its facilities for beneficial use. In the Complaint, United alleged that NMFS's Recommendation Letter was a "mandate" and that United ultimately responded to the Letter's "demand" by implementing NMFS's interpretations of RPA 2A and 2B. Appx020, ¶ 4; Appx033, ¶46; Appx035, ¶ 52. United alleged that, because of the actions it took, it could not appropriate, divert, and put to beneficial use as much water from the Santa Clara River. Appx020, ¶¶ 4-5; Appx022, ¶ 11. Instead, it was "compelled" to allow greater volumes of river water to pass as "bypass flow," thus remaining in the River or flowing into the fish ladder and down the River. Appx019, ¶ 2; Appx020, ¶ 4; Appx021, ¶ 6; Appx024, ¶18; Appx033, ¶ 46; Appx035, ¶ 52. United asserted that between 2017 and 2021, it "los[t]" 49,800 acre-feet of water and that those alleged losses constituted a "physical" taking under the Fifth Amendment for which United seeks just compensation in the amount of $40,000,000. Appx035, ¶¶ 52, 53; Appx037, ¶ 58; Appx021, ¶ 6; Appx038, ¶ 67.

The Government moved to dismiss on the ground that United's claim was not ripe. The Government argued that, despite labeling the claim a physical taking, the facts alleged in the Complaint stated a regulatory takings claim, and that to establish a ripe regulatory taking, United had to identify a final agency action. The Government argued that the Recommendation Letter did not constitute final agency action. The Government further argued that a regulatory taking claim involving the ESA is not ripe until the claimant seeks, and is denied, an incidental take permit, and that United had not applied for (much less been denied) a permit.

After oral argument, the CFC granted the Government's motion. Appx001-Appx014. The CFC rejected United's argument that its claim should be analyzed under the rubric of a physical taking, distinguishing *Casitas Mun. Water Dist. v. United States*, 543 F.3d 1276 (Fed. Cir. 2008) ("*Casitas I*"), a case from this Court on which United relied heavily. The court pointed out that in *Casitas I*, this Court determined that the case was properly analyzed as a physical takings claim, as opposed to a regulatory takings claim, because the government in that case "did not merely require some water to remain in stream, but instead actively caused the physical diversion of water away from the [taking claimant's] Canal—after the water had left the Ventura River and was in the [claimant's] Canal—and towards the fish ladder, thus reducing [the claimant's] water supply." Appx011 (quoting *Casitas I*, 543 F.3d at 1291-92). The court determined that, unlike the claimant in

*Casitas I*, United had not alleged that the Government required it to relinquish water that United had already diverted for use. Appx012.

Analyzing United's claim as a regulatory takings claim, the CFC held that, for a regulatory taking claim to ripen, there must be a final agency action by the responsible government agency and, for a regulatory taking claim that arises under the ESA to ripen, the claimant must have applied for and been denied an incidental take permit under Section 10 of the ESA. Appx013. The court concluded that "United's claim is not yet viable for adjudication" because United has not yet applied for an incidental-take permit. Appx013-Appx014.[8]

## SUMMARY OF ARGUMENT

The CFC correctly held that United has not alleged a viable Fifth Amendment takings claim.

1. The government action underpinning United's takings claim is a letter sent by NMFS to United offering opinions of agency staff and recommendations of measures that United could implement at its Diversion Dam to protect the endangered Southern California steelhead. NMFS's Recommendation Letter

---

[8] The CFC's Opinion and Order expressly grants the Government's motion to dismiss "pursuant to RCFC 12(b)(1)." Appx014. The CFC, however, orders that "[t]he Clerk shall dismiss plaintiff's complaint for failure to state a viable claim," which would be pursuant to RCFC 12(b)(6). *Id.* This appears to be an unintended error given that the CFC's Opinion and Order makes no reference to RCFC 12(b)(6), and the court unequivocally found United's claim to be unripe, which requires dismissal under RCFC 12(b)(1).

contained no demand with which United was mandated to comply; it did not commit or bind NMFS to taking any agency action; and it did not profess to be an action of agency enforcement. Equally important, United itself confirmed that it did not perceive the Letter as compulsory or as a demand with which it must comply. United responded to NMFS's Letter explaining that United "refused" to implement one of the measures recommended in the Letter. Because NMFS's Letter was non-binding, non-committal, and expressly offered only "recommendations" that United could refuse to implement, it cannot serve as the basis for a Fifth Amendment takings claim, either physical or regulatory, and this Court should affirm on that basis alone.

2. Even if the government had taken an action that imposed a binding obligation on United, the CFC correctly rejected United's argument that its Complaint states a physical takings claim. A physical taking occurs when the government engages in the *ouster* of property the claimant *possesses*. United's Complaint fails to allege either of these requisite elements of a physical taking. First, the facts alleged do not establish that United possessed the water it contends was taken. To the contrary, United concedes that, as the holder of an appropriative, usufructuary right, it does not own the water in the Santa Clara River. And under United's own factual allegations, the water allegedly taken "remained" in the River. Second, even if United had a possessory property interest in the water it

may appropriate from the Santa Clara River, United has alleged no government-required ouster or dispossession of such water. Until United has diverted water from the River into its Canal, it has no possessory right of any kind, and the government cannot "take" that which United does not possess in the first place.

3. Even if NMFS's Recommendation Letter could effect a taking, the CFC correctly held that United's takings claim is properly construed as alleging a regulatory taking (not a physical taking as United urges) and that any such claim is unripe. A regulatory taking occurs when a government action restricts a property owner's ability to use its own property. The facts alleged in United's Complaint assert that United is the holder of water use rights in the Santa Clara River. United further alleges that NMFS's Recommendation Letter mandated that United implement certain measures at its Dam and that the execution of those measures required United to leave a greater amount of Santa Clara River water in the River, thus restricting United's use of water from the River. On those facts, United's grievance rests with the regulation of its use of water. That is properly construed as a regulatory taking claim. But the claim is not ripe for judicial review as it is untethered to any final agency action, a fact that United does not dispute.

The judgment of the CFC should be affirmed.

## STANDARD OF REVIEW

The Court reviews de novo the CFC's determination that a takings claim is not ripe for review. *Martin v. United States*, 894 F.3d 1356, 1360 (Fed. Cir. 2018). The CFC "is without jurisdiction to consider takings claims that are not ripe." *Id.* at 1360-61 (citing *Estate of Hage v. United States*, 687 F.3d 1281, 1285 (Fed. Cir. 2012); *Morris v. United States*, 392 F.3d 1372, 1375 (Fed. Cir. 2004)). A party invoking the jurisdiction of the Court of Federal Claims has the burden of establishing jurisdiction by a preponderance of the evidence. *Fidelity & Guar. Ins. Underwriters, Inc. v. United States*, 805 F.3d 1082, 1087 (Fed. Cir. 2015).

"When reviewing a motion to dismiss for lack of subject matter jurisdiction, a court accepts only uncontroverted factual allegations as true for purposes of the motion." *Banks v. United States*, 741 F.3d 1268, 1277 (Fed. Cir. 2014). The CFC's determination of jurisdictional facts is subject to review for clear error. *Stephens v. United States*, 884 F.3d 1151, 1155 (Fed. Cir. 2018).[9]

---

[9] In its Opening Brief, United includes a standard of review for the issue of "[w]hether a taking without just compensation under the Fifth Amendment to the U.S. Constitution *has occurred*." Br. 22-23 (emphasis added). That question is a merits question of takings liability that the CFC properly did not reach, having concluded that it lacked subject matter jurisdiction and dismissing United's Complaint. Thus, as we explain in greater detail below, the merits of this case, including the fact-bound question whether a taking has occurred, is not before this Court.

## ARGUMENT

## THE CFC CORRECTLY DISMISSED UNITED'S COMPLAINT

The threshold issue on appeal is whether NMFS's Recommendation Letter can give rise to a taking under the Fifth Amendment. The answer is no. An examination of the Recommendation Letter and United's response yields only one conclusion: the letter is an advisory document from NMFS staff that is not capable of effecting either a regulatory or physical taking. The CFC therefore lacked subject matter jurisdiction and dismissal was proper.

Even assuming the Letter could effect a taking, the CFC properly concluded that the facts alleged in United's Complaint should be construed as asserting a regulatory takings claim, which requires final agency action (indisputably absent here), and not a physical takings claim as United suggests.

### I. NMFS's Recommendation Letter does not give rise to any category of Fifth Amendment taking.

The Just Compensation Clause of the Fifth Amendment provides that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V. The United States can be held liable for just compensation only for actions taken by the federal government. *See, e.g.*, *St. Bernard Parish Gov't v. United States*, 887 F.3d 1354, 1362 (Fed. Cir. 2018); *A & D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1153-57 (Fed. Cir. 2014).

United relies on NMFS's June 9, 2016, Recommendation Letter as the sole government action underlying its takings claim. United alleges (1) that the Letter "mandated" and "demanded" that United implement all components of the RPA from the 2008 BiOp; and (2) that the actions United took thereafter caused it to reduced the volume of Santa Clara River water that United diverted into its Canal and other subsequent operational facilities and thus lessened the volume of water available for United's beneficial use. *See e.g.,* Appx020, ¶ 4 (characterizing the Letter as a "*demand* for United's full implementation of the BiOp RPA[]") (emphasis added)); Appx021, ¶ 6 (alleging that, "in compliance with the NMFS *mandate* [in the Recommendation Letter], Santa Clara River water that United could have otherwise lawfully diverted to United's facilities was instead used as bypass flow into the VFD fish ladder and/or remained in the river" (emphasis added)); Appx032, ¶ 42 (the "Letter *demanded* that United 'must commit' to "implementing interim operating measures that are consistent with the operational criteria set forth in the RPA" (emphasis added)); Appx020, ¶ 5 ("As required by the *demands* of the [NMFS] Letter, United … put into place the technical provisions necessary for implementation of the draft BiOp's RPAs"); *see also* Appx019, ¶ 2 Appx020, ¶ 4; Appx033, ¶ 46; Appx038, ¶ 63 (alleging the Government "compelled" United to act).

Contrary to United's characterization, NMFS's Recommendation Letter—by its own terms—cannot be construed as "mandating" or "demanding" any action by United, let alone an action that caused a taking. The Letter provides NMFS's beliefs about circumstances at the Diversion Dam at the time the Letter was written and seeks United's cooperation in rectifying the take of steelhead caused by the Dam's operations. On those facts, the Letter, standing alone, could not work a Fifth Amendment taking.

Specifically, in the "Background" section of the Letter, NMFS explains its understanding that United's "take authorization" under Section 10 of the ESA, "and the accompanying criteria and measures for the operation of the [Dam] to reduce take of SC steelhead, *appear to be* several years off." Appx053 (emphasis added). NMFS then offers the "opinion" of its "staff" that the Dam's operations are causing the take of steelhead and explains that all take that occurs without authorization violate the ESA. *See* Appx054 ("*NMFS staff is of the opinion* that United's operation of the [Dam] has annually resulted in take of SC steelhead through death, capture and significant impairment of behavioral patterns…. Because United does not have any authorization for the take of SC steelhead, all such takes are in violation of Section 9 of the ESA" (emphasis added)). These statements—offered in the express context of staff opinions—refute the notion that the Letter is a viable basis for a takings claim.

The last section of the Letter entitled "Recommendation" does just that: it provides recommendations for United. First, this section of the Letter identifies the actions NMFS "believed" United should undertake in light of United's schedule for obtaining an incidental take permit and the decreasing number of steelhead returning to the Santa Clara River:

> Given United's current, multi-year schedule for obtaining an incidental take permit, and the dwindling number of adult SC steelhead returning to the Santa Clara River, *NMFS believes* that United must commit to implementing interim operating measures that are consistent with the operational criteria set forth in the RPA (i.e., elements 2(a) and 2(b)) and appurtenant terms and conditions (i.e., 1(a), 2(a-c), and 4(a-c)) of the 2008 Biological Opinion.

Appx055 (emphasis added).

Second, the Recommendation section provides a date by which NMFS believed the measures would need to be in place to effectively protect steelhead during the upcoming migration season:

> *In order to be effective in protecting SC steelhead* during the 2017 migration season and subsequent migration seasons pending issuance of an incidental take permit, these measures must be in place before December 1, 2016.

*Id.* (emphasis added).

The Letter then explains steps that NMFS anticipated taking if United declined to implement the recommendations:

> Absent a firm commitment by United to timely implement the RPA criteria and measures, combined with timely and accurate monitoring of implementation, NMFS intends to pursue legal options available

> under the ESA to ensure that adequate interim operating measures are in place to minimize the impending take of SC steelhead at the [Dam] pending NMFS's evaluation of United's incidental take permit application.

*Id.* NMFS did not specify what "legal options" might be pursued, or when or how any action would be taken, much less state that a final decision had been made by the agency. *See Biotics Rsch. Corp. v. Heckler*, 710 F.2d 1375, 1378 (9th Cir. 1983) (concluding that "regulatory letters… contain[ing] conclusions by subordinate officials… and also indicat[ing] a readiness on the part of the FDA to initiate enforcement procedures if corrective measures are not taken … do not commit the FDA to enforcement action"); *cf. A-1 Cigarette Vending, Inc. v. United States*, 49 Fed. Cl. 345, 355 (2001), *aff'd sub nom. Brubaker Amusement Co. v. United States*, 304 F.3d 1349 (Fed. Cir. 2002) ("the mere consideration of a regulation" short of implementation "cannot give rise to a takings claim").

The Letter did not include any directive, mandate, or demand for United. Rather, the Letter "*encourage[d]* United in the strongest terms possible to immediately institute the operational criteria and measures of the RPA." Appx055 (emphasis added). And the Letter concluded by "*request[ing]* the *courtesy* of [United's] response" regarding its plans to implement the recommended interim operating measures. *Id.* (emphasis added). By its terms alone, this Letter could not effect a Fifth Amendment taking, either physical or regulatory.

That conclusion is bolstered by United's response to the Letter. In August 2016, United wrote to NMFS indicating that United "*refused* to comply" with measure RPA 2B, as was recommended in the Letter. Appx032, ¶ 44 (emphasis added). United, "instead[,] requested a further discussion with NMFS about RPA 2B requirements." Appx032, ¶ 44. United's response reveals its own understanding that, in the Letter, NMFS was not "mandating" or "demanding" action by United. Rather, United retained the discretion to reject the analysis and recommendations in the Letter and, instead, further engage with NMFS to determine how to proceed. *See Wishtoyo*, 2018 WL 6265099, at *42 ("United understood the OLE [Office of Law Enforcement] June 2016 Letter to reflect ongoing disagreement between United and NMFS since 2013 over how to interpret the Biological Opinion's RPA 2A…."). Having acknowledged in contemporaneous communications with NMFS that the Recommendation Letter did not constitute a mandate or directive, United cannot now proffer the Letter as the basis for a Fifth Amendment takings claim.

Finally, United acknowledges that the Letter is, at most, a "threat" of future legal action. *See* Br. 10, 12, 18, 47; Appx032, ¶ 44; Appx038, ¶ 63; Appx070; Appx081; Appx084; Appx109. But even assuming the Letter's general reference to pursuing "legal options" could be fairly characterized as a concrete threat of future legal action, that is insufficient for subject matter jurisdiction. United does not allege that NMFS initiated any legal pursuits. Indeed, NMFS did not. Moreover,

United cites no legal authority for the notion that mere references to the possibility of litigation that are never formalized or pursued by an agency, and are couched in terms such as "opinion" and "recommendation" and "encourage," can effect a Fifth Amendment taking.

In short, NMFS's Recommendation Letter is advisory, not compulsory, and it does not seize, occupy, or regulate property possessed by United, nor does it demand or require anything from United. Thus, the Letter is not capable of effecting a Fifth Amendment taking, whether regulatory or physical. And because United's takings claim is anchored to the Letter alone, and the Letter constitutes no action by the Government, the CFC had no subject matter jurisdiction. The CFC's decision can and should be affirmed on this basis alone.

## II. Even if NMFS's Recommendation Letter imposed a binding obligation on United, the CFC properly dismissed the Complaint because the allegations in the Complaint do not state a physical takings claim.

United contended in both the CFC and now in its Opening Brief on appeal that its Complaint states a physical takings claim. Even if NMFS's Recommendation Letter had imposed a binding obligation on United (which it did not, as explained in Argument I), the CFC correctly dismissed the Complaint because it fails to allege that United ever possessed the water at issue, or that, in any event, the Government ever required the ouster of any water United could be deemed to possess.

The Supreme Court has recognized two kinds of takings: physical takings and regulatory takings. *See Lucas v. S.C. Coastal Council,* 505 U.S. 1003, 1014-15 (1992). The essential question in distinguishing between the two "is whether the government has physically taken property for itself or someone else"—which represents a physical taking, or whether the government "has instead restricted a property owner's ability to use his own property," which represents a regulatory taking. *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2072 (2021).[10]

United refers to its takings claim as a physical taking. *See, e.g.,* Appx021, ¶ 6; Appx038, ¶ 67. But United's label is not dispositive. This Court must "examine the *substance* of the[] allegations, rather than the plaintiff's labels, to determine their true nature." *Swafford v. McDonald*, 664 F. App'x 937, 940 (Fed. Cir. 2016)) (emphasis added; citation omitted); *see also Jarbough v. Att'y Gen. of U.S.*, 483 F.3d 184, 189 (3d Cir. 2007) ("We are not bound by the label attached by a party to characterize a claim and will look beyond the label to analyze the substance of a claim. To do otherwise would elevate form over substance and

[10] "[T]wo categories of regulatory actions will generally be deemed to be *per se* takings: where the government action requires an owner to suffer a permanent physical invasion of her property and where government regulations completely deprive an owner of all economically beneficial use of her property." *Katzin v. United States*, 908 F.3d 1350, 1361 (Fed. Cir. 2018) (cleaned up) (citations omitted). United does not allege such a "physical invasion" or "complete deprivation" of all economically beneficial use of its water use license.

would put a premium on artful labeling.”). The “substance” of United’s allegations is not a physical takings claim.

A physical taking occurs when the government directly appropriates property or “engages in the functional equivalent of a practical ouster of the owner’s possession.” *Katzin v. United States*, 908 F.3d 1350, 1361 (Fed. Cir. 2018) (brackets omitted); *see also Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 537 (2005). Accordingly, a physical takings claim must allege facts establishing two fundamental elements—namely, that the claimant “possesses” the property at issue, and that the government action caused the “ouster” of possession of that property. *Id.* If the claimant’s facts do not make the threshold showing that the claimant has a possessory interest in the property, the takings inquiry comes to an end. Such is the case here. But even if United’s facts alleged the requisite possessory interest, the facts do not establish that the Government required the requisite “ouster” of United’s property. Thus, there is no set of circumstances under which United’s Complaint satisfies the required elements of a physical takings claim.

### A. United does not have an ownership interest in the River water it alleges was taken.

United alleges that it holds an appropriative, usufructuary water right, which it concedes does not confer any possessory property interest in the molecules of water in the Santa Clara River. *See* Br. 24-25, 31, 38-39, 44. Because the holder of

usufructuary rights has no ownership rights in the water itself, there can be no viable physical takings claim in this case.

"This court has developed a two-step approach to takings claims." *Boise Cascade Corp. v. United States*, 296 F.3d 1339, 1343 (Fed. Cir. 2002). Relevant here is the preliminary step: "[f]irst, a court determines whether the plaintiff possesses a valid interest in the property affected by the governmental action, i.e., whether the plaintiff possessed a stick in the bundle of property rights." *Id.* (cleaned up). Indeed, "[i]t is axiomatic that only persons with a valid property interest at the time of the taking are entitled to compensation." *Am. Pelagic Fishing Co., L.P. v. United States*, 379 F.3d 1363, 1372 (Fed. Cir. 2004); *Cavin v. United States*, 956 F.2d 1131, 1134 (Fed. Cir. 1992) (a claimant "cannot maintain a suit alleging that the Government took their property without just compensation" if the claimant is "[w]ithout undisputed ownership" of the property at the time of the taking). United avers that its water right is a usufructuary, appropriative right under California law. Appx018, ¶ 1; Br. 27. Usufructuary water rights "consist[] not so much of the fluid itself as the advantage of its use." *Crow Creek Sioux Tribe v. United States*, 900 F.3d 1350, 1357 (Fed. Cir. 2018); *Eddy v. Simpson*, 3 Cal. 249, 252 (1853) (same). This Court has squarely held that the holder of usufructuary rights "does not have a possessory property interest in the corpus or molecules of the water itself." *Casitas Mun. Water Dist. v. United States*, 708 F.3d

1340, 1354 (Fed. Cir. 2013) ("*Casitas II*"). Appropriative rights are private property rights under California law but are "usufructuary only and confer *no right of private ownership in the watercourse*." *Id.* at 1354 (emphasis added)).

Because the water itself cannot be privately owned, there can be no dispute that United has no possessory property interest in the water located in either the Santa Clara River itself—i.e., the "watercourse" at issue here—or in any other location where the water is deemed to still be part of the River. *See, e.g.,* Br. 44 (acknowledging that "a party having a right to use a given amount of *California surface water* does not have a possessory property interest in the corpus or molecules of the water itself" (emphasis added)). Thus, for United to have asserted a *physical* takings claim under governing law, United had to allege that the water at issue did not remain in, or was not still part of, the Santa Clara River. The Complaint alleges no such thing. To the contrary, in both its Complaint and Opening Brief, United describes the water at issue as water that "remains" at all times in the Santa Clara River. *See, e.g.,* Appx020, ¶4; Appx021, ¶ 6; Appx024, ¶ 18; Appx035, ¶ 52; Br. 6 (asserting that the "bypass flow" allegedly taken is the "flow of water that United would allow to bypass [United's] Canal and *thereby remain in the river*" (emphasis added)). United further alleges in its Brief that NMFS's Recommendation Letter "prevented United from diverting Santa Clara River water into United's facilities in the first instance." Br. 17. Similarly, United

characterizes its claim as the Government "preventing the water district from diverting the Santa Clara River water into the water district's own facilities." *Id*. at 2. United thus admits that this suit is about its *inability to take possession* of river water "in the first instance."

Because United alleges that the water taken is water that remains in the Santa Clara River, United has failed to show any possessory ownership interest in the water allegedly taken. This failure is fatal for United because a physical taking by the government cannot occur if the claimant has no possessory property interest in the property allegedly taken. *See Katzin*, 908 F.3d 1362 (rejecting that government action was a physical taking or a *per se* regulatory taking where the action did not "effect the functional equivalent of an ouster of *Plaintiffs' possession*" (emphasis added)). United's Complaint, therefore, cannot be properly construed as stating a physical takings claim.[11]

---

[11] If United's Complaint is properly construed as stating a regulatory taking, which is discussed further in Argument III, United's lack of an ownership interest in the water allegedly taken is likewise a proper ground on which this Court may affirm the CFC's dismissal. *See Am. Pelagic Fishing*, 379 F.3d at 1372 ("only persons with a valid property interest" are entitled to compensation).

### B. Even assuming United had a possessory interest in any water, the Complaint alleges no facts showing that the Government caused the "ouster" of that water, another requisite element of a physical taking.

To the extent there is arguably a circumstance in which United could be deemed to have an ownership interest in water from the Santa Clara River, United's claim would still fail because United has not alleged that the government seized or ousted any water that United possessed. This Court's decision in *Casitas I* establishes that United has not stated a physical takings claim because the Complaint includes no allegation that the government ordered United to physically return or relinquish water that United already possessed in its Canal.

In *Casitas I*, a municipal water district possessing a usufructuary water-use right in river water diverted river water into its canal via a diversion dam. 543 F.3d at 1280. The canal carried water to the district's reservoir for future use. *Id.* The district alleged that the government required it to construct a fish ladder facility and divert water *out of the district's canal* and into the fish ladder, which then returned the water to the river. *Id.* at 1282. After the district complied, it filed suit alleging a compensable taking. *Id.* The CFC applied a regulatory takings standard to the district's claim. *Id.* at 1283.

On appeal, this Court reversed. The panel majority concluded that the claim in *Casitas I* was properly treated as a physical taking for several reasons – none of which are present here. First, the district's fish ladder was operated by closing a

gate that was physically "*located in* the [district's] Canal" and that, when operated, the gate caused water already in the district's canal to be returned to the river. 543 F.3d at 1291 (emphasis added). Second, the government "actively caused the physical diversion of water *away from the* [district's] *Canal* … after the water had left the Ventura River" and had been placed inside the district's canal. *Id.* at 1291-92. Third, the required diversion of water "reduc[ed] [the district's] water supply" by withdrawing water from the district's possession within its canal. *Id*; *id.* at 1292 ("[The *district's*] … *water* was *withdrawn* from the Robles-Casitas *Canal* and turned elsewhere…by the government." (emphasis added)).

Simply put, *Casitas I* relied on the fact that (1) the district had already removed water from the river and placed it *within* a structure that the district owned and controlled, namely, the district's canal; and (2) the government required the district to "withdraw" that water out of its canal. Thus, to state a physical takings claim in accordance with *Casitas I*, United would have had to allege that (1) the water at issue was already removed from the Santa Clara River and placed *within* United's Canal; and (2) the Government required United to relinquish that water by *removing it from the Canal*. The facts pleaded by United do not establish these requisite circumstances.

Indeed, contrary to the circumstances in *Casitas I*, United admits that the water at issue "remained" in the Santa Clara River. *See* Appx020, ¶ 4; Appx021,

¶ 6; Appx035, ¶ 52. United admits that the water did not enter its Canal. *See* Appx024, ¶ 18 ("Bypass flow water … does not enter [United's] Canal."); Br. 6 (asserting that "bypass flow" is water that United allows to "bypass [United's] Canal and thereby remain in the river"); Br. 17 (asserting that "Santa Clara River water" was not diverted "into United's facilities in the first instance"). There is no allegation in the Complaint that the government ordered water already possessed by United to be returned to the River. As the CFC correctly pointed out, in *Casitas I*, "the government 'actively caused water to be diverted away from Casitas *after the water had left the Ventura River and was in the Robles-Casitas Canal*." Appx011 (emphasis in original) (citation omitted). In contrast, as the CFC explained,

> United does not allege that water that was already diverted into its diversion canal was required to be returned to the river. Instead, United states that, to comply with the ESA and protect the endangered steelhead trout, water it otherwise could have diverted under its license and permit . . . remained in the river.

Appx012. These facts, viewed through the lens of *Casitas I*, establish that United has not stated a physical takings claim.

Finally, it is important to note that the Court in *Casitas I* drew a pointed and relevant distinction between facts that allege a regulatory taking and facts that allege a physical taking. The Court explained:

> [T]he government did not *merely require some water to remain in stream*, but instead actively caused the physical diversion of water

> away from the Robles-Casitas Canal—*after the water had left the Ventura River and was in the Robles-Casitas Canal*—and towards the fish ladder, thus reducing the water district's water supply.

543 F.3d at 1291-92 (emphasis added). That distinction sums up the dispositive difference between the regulatory taking alleged in the instant case and the physical taking alleged in *Casitas I*. United does not allege any ouster or dispossession of water from its Canal. United's claim amounts to only a putative restriction on its use of water. Consequently, United's taking claim is properly construed as regulatory, not physical.[12]

[12] Because the panel majority in *Casitas I* deemed relevant the location and function of the plaintiff's canal—as opposed to any other area or aspect of the plaintiff's operation—those factors are properly considered in the instant case, but only (1) within the well-established bounds of the usufructuary water rights at issue here; and (2) assuming proper consideration is given to the potential for mischief that the panel majority's approach could engender, as identified by the dissent. *See* 543 F.3d at 1300-01 (admonishing that "a private property owner's choice of prophylactic actions cannot dictate whether a future takings claim will be physical or regulatory"). However, for purposes of determining whether a takings claim involving a usufructuary water right is properly analyzed as a physical or regulatory takings claim, the Government agrees with the dissent in *Casitas I* that the issue must be considered with the confines of the water right itself. *See id.* at 1301 ("because plaintiff possesses a usufructuary interest in the water and does not actually own the water molecules at issue, it is difficult to imagine how its property interest in the water could be physically invaded or occupied"); *id.* ("The government is not appropriating or taking possession of *Casitas' property*, but rather is prohibiting Casitas from making private use of a certain amount of the river's natural flow under a public program to promote the common good").

### C. United's arguments fail to establish that the allegations in its Complaint can be properly construed as asserting a physical takings claim.

The CFC, relying on *Casitas* and the Supreme Court's decision in *International Paper Co. v. United States*, 282 U.S. 399 (1931), held that "[b]ecause United does not allege that it had to return water it had already diverted, it has not stated a physical takings claim." Appx013. United criticizes this holding as (1) "imposing a prerequisite" for the assertion of physical takings claims involving California water rights such that that "the water at issue must have already entered the property owner's facilities before the governmental appropriation at issue;" and (2) concluding that "a physical taking requires that the water rights holder must be able to demonstrate that it was required to *return* water it had already diverted into its facilities." Br. 38 (emphasis in original). United argues that "[t]here is no legal support for imposing such a prerequisite requirement." *Id.*

The "prerequisite requirement" United criticizes is the very criterion on which the Court in *Casitas I* relied. 543 F.3d at 1291-93. Moreover, the "prerequisite" is simply the foundational requirement for physical taking claims: the claimant must allege the "practical ouster" of property in which the claimant holds a present possessory interest. *Katzin*, 908 F.3d at 1361; *supra* at 28-31. The CFC correctly construed and applied the law.

United argues that the CFC misinterpreted the holding of *International Paper*. Br. 38-39, 40-41. According to United, the facts in *International Paper* "run directly contrary to the [CFC's] position" because, in *International Paper*, "the water appropriated by the government had not yet entered the plaintiff's facilities." Br. 40-41. United further maintains that in construing *International Paper*, the Court in *Casitas I*, "plainly understood that the government's requisition of [water] *prevented* the [claimant's] diversion of water into its mill, rather than requiring the [claimant] to *return* water it had already diverted into its mill." Br. 41. United is mistaken. The CFC properly interpreted *International Paper* and concluded that it lent support to the court's holding that United had not stated a physical takings claim.

In *International Paper*, International Paper sought compensation for its rights in water of the Niagara River allegedly taken by the United States for war purposes. 282 U.S. at 404. The Niagara Falls Power Company, which owned water rights in the river, also owned a canal through which the Power Company diverted water, and International Paper was entitled to draw water from the canal and place it into International Paper's mill. *Id.* at 404-05. International Paper's right was to the use of the water, but due to a government requisition for purposes of war, "all the water that [International Paper] used was withdrawn from [its] mill and turned elsewhere by government requisition." *Id.* at 407.

First, as this Court in *Casitas I* and the CFC here both correctly determined, the government action in *International Paper* required water to be "withdrawn" from the claimant's facility. *See* Appx012 (finding that the Court in *International Paper* "specifically considered the fact that the water from the [Power Company's] canal *was already within International Paper Company's mill* when the government issued its requisition"). In fact, *Casitas I* draws a direct parallel between the nature of the taking alleged in *Casitas I* and the taking alleged in *International Paper*, explaining that:

> The petitioner's right [in *International Paper*] was to the use of the water; and…all the water that it used was *withdrawn from the petitioner's mill* and turned elsewhere by government requisition… *Similar to the petitioner in International Paper,* Casitas' right was to the use of the water, and its water was *withdrawn from the Robles-Casitas Canal* and turned elsewhere (to the fish ladder) by the government.

*Casitas I*, 543 F.3d at 1292 (emphasis added); *see also* Appx012.

Moreover, the opinion in *International Paper* confirms that the government action had required the claimant's withdrawal of water from the claimant's facility, which was a mill.

> The petitioner's right was to the use of the water; and when all the water that it used *was withdrawn from the petitioner's mill and turned elsewhere by government requisition* for the production of power it is hard to see what more the Government could do to take the use.

*Id.* at 407 (emphasis added).[13]

In short, and contrary to United's contention, the water appropriated by the government in *International Paper* included water that had indeed entered the claimant's facilities, and the government action required the claimant to withdraw and relinquish that water. That is not United's claim. Here, the CFC correctly found *International Paper* distinguishable.

United also faults the CFC for not discussing *United States v. Gerlach Live Stock Co.*, 339 U.S. 725 (1950), and *Dugan v. Rank*, 372 U.S. 609 (1963), which were cited in *Casitas I*. Br. 39-40. United contends that *Gerlach* and *Dugan* "recognized that governmental appropriations of California water rights are considered physical takings." Br. 39-40.

*Gerlach* and *Dugan* are inapposite. Both cases involved the government's construction of a dam on the San Joaquin River in California. The claimants owned riparian land that benefited from natural seasonal overflow of the river. *See, e.g., Gerlach*, 339 U.S. at 730. Each year, the river swelled and submerged and saturated the low-lying lands owned by the claimants. *Id.* The government's dam

[13] We note that the Court in *International Paper* also referred to "the *shutting off* of the water from [International Paper's] mill." 282 U.S. at 406 (emphasis added) *see also* Br. 41. Nothing in the opinion indicates that this reference to the lower court's findings was intended to negate the Court's express explanation that the government requisition required the "withdrawal" of water from International Paper's mill.

impounded the river water and diverted it into the government's canals. *Id.* at 730; *Dugan*, 372 U.S. at 613. The *Gerlach* claimants alleged that the construction of the dam deprived them of their riparian rights. 339 U.S. at 730.

This Court, in *CRV Enterprises, Inc. v. United States*, 626 F.3d 1241 (Fed. Cir. 2010), described the consequences of the government's dam and ensuing diversion of water in *Gerlach*. The Court explained that "the diversion left a virtually dry riverbed below the dam and ended the natural seasonal overflow of the river onto the plaintiffs' lands." 626 F.3d at 1247 (cleaned up) (citing *Gerlach*, 339 U.S. at 729-30). The Court further explained that the Supreme Court in *Gerlach* analyzed that "deprivation of water as a physical taking, characterizing the action as an expropriation that destroyed and confiscated a recognized property right." *Id.* (cleaned up) (citing *Gerlach*, 339 U.S. at 752-53). As this Court's description of *Gerlach* makes plain, the facts in that case are wholly distinguishable from those here. In *Gerlach*, the government physically redirected water away from the riverbed and dried up the portions of the river in which the claimants held riparian rights, depriving the claimants of all water and, in essence, extinguishing their rights. Here, by contrast, a government letter recommended measures that, according to United, limited United's use of water. The Government did not physically alter the Santa Clara River or its flow, nor did the Government cause portions of the River to dry up.

In *Dugan*, the landowners likewise held riparian rights to the San Joaquin River downstream from the government's dam, and they alleged that there was insufficient water to satisfy their rights. 372 U.S. at 614-16. This Court has described the government action in *Dugan* (and thus *Gerlach*) as the "*physical removal* of the water." *CRV Enterprises*, 626 F.3d at 1247 (citing *Dugan*, 372 U.S. at 620, 625) (emphasis added). And the Court in *Dugan* concluded that such removal constituted a physical taking. 372 U.S. at 620, 625; *see also CRV Enterprises*, 626 F.3d at 1247. United alleges no facts establishing that the Government here required the "physical removal" of the water United claims was taken.

Finally, this Court's characterization of *Dugan*, *Gerlach,* and *Casitas I* in *CRV Enterprises* confirms that the instant case does not present a physical takings claim. According to the *CRV Enterprises* court, all three cases "found a physical taking of riparian water rights when *water* in which the plaintiff held use rights was permanently *removed*." 626 F.3d at 1247 (Fed. Cir. 2010) (citing *Dugan,* 372 U.S. at 625; *Gerlach,* 339 U.S. at 752-53; *Casitas I,* 543 F.3d at 1289-96 (emphasis added)). United alleges no such removal and thus has failed to state a physical takings claim.

In short, *Gerlach* and *Dugan* are distinguishable. Thus, it is irrelevant that the CFC did not provide an explicit discussion of them. But to the extent *Gerlach*

and *Dugan* require express consideration, they establish that United has not stated a physical takings claim.

United next contends that in *Gerlach*, the Supreme Court concluded that a physical taking analysis should apply, "notwithstanding that the claimants were only denied access to the water they wanted to use, as opposed to being forced to return water they had already diverted." Br. 39. United presents that juxtaposition to argue, in essence, that the CFC held that the *only* circumstance under which a physical takings claim can be properly pleaded by any water rights claimant is if the claimant alleges that it was forced to "return water" that the claimant had "already diverted" into something akin to the canal in *Casitas I. See, e.g.,* Br. 39, 42-43, 48-49. The CFC's opinion cannot be fairly characterized in that way. The CFC's analysis and decision are properly tailored to the facts of this case, and nothing more. United has not alleged that it was forced to relinquish water that had been diverted into its Canal; thus, United has not suffered an ouster of a possessory property interest.

United cites *Horne v. Dept of Agric.*, 576 U.S. 350 (2015), in contending that a property owner's loss of "the rights to possess, use and dispose of" property appropriated by the government evidences a "clear physical taking" rather than a regulatory taking. Br. 31. *Horne* concerned personal property and its acquisition by the government. Unlike the instant case, in *Horne*, the property at issue (raisins)

was owned by the plaintiffs, the raisins were "actually…transferred from the growers to the government," "[t]itle to the raisins passe[d] to the [government], and raisins that the government did immediately take were held 'for the account' of the government." *Horne*, 576 U.S. at 361. Here, United does not claim ownership of water in the Santa Clara River, does not allege a transfer of water in its possession, and likewise does not claim a transfer of title in water. *Horne*, therefore, does not support United's claim.

United cites *Estate of Hage v. United States*, 687 F.3d 1281 (Fed. Cir. 2012), for the proposition that "a governmental act that prevents a water rights holder from accessing water to which it owned rights would constitute a physical taking." Br. 32, 43. *Hage* lends no support to United's position. *Hage* emphasized that "the government may [not] prevent *all* access to [a holder's] water rights," offering as an "example" that the government "could not *entirely* fence off a water source." *Id.* at (emphasis added). Similarly, in *Washoe Cnty., Nev. v. United States*, 319 F.3d 1320 (Fed. Cir. 2003), on which United relies, this Court found no physical taking, pointing out that the government neither "denied *all* meaningful access to the[] water rights" nor "physically diverted or reduced the amount of water *accessible* by [the claimants]." *Id.* at 1327 (emphasis added).

Here, United continues to have full access to water from the Santa Clara River. There has been no change to the amount of water in the River; there has

been no reduction in the amount of water available to United from the River; and there is no allegation that the Government has taken physical control of the water or removed it from United's access. In short, United has not and cannot plead a physical taking based on destruction of use rights or the loss of physical access to the Santa Clara River water.

## III. Even if NMFS's Recommendation Letter imposed a binding obligation on United, dismissal was appropriate because United's Complaint is properly construed as asserting a regulatory takings claim that is unripe.

Even assuming NMFS's Recommendation Letter contained a binding command, dismissal of United's Complaint was still appropriate. United's claim concerns NMFS's putative requirement that United allow more water from the Santa Clara River to remain in the River rather than enter United's facility. This is, at most, a regulatory taking claim. But United does not argue on appeal that its Complaint asserts a regulatory taking claim, and United itself acknowledges that such a claim would be unripe.

The gravamen of United's grievance is that due to the actions it took in response to the NMFS Recommendation Letter, United's ability to divert River water into its facility has been limited. *See, e.g.*, Appx033, ¶ 46 (referring to "decreases in the amount of Santa Clara River water United was able to divert at the [Dam] and into the … Canal for its own beneficial use"); Appx035-Appx036, ¶¶ 52-55 (alleging the Government reduced the amount of Santa Clara River water

United would otherwise have diverted for its own beneficial use). In other words, United's action is about (purported) regulation of its use of water from the Santa Clara River.

A complaint asserts a regulatory taking when it is based on a government action that purportedly "restricts," limits, or interferes with the taking claimant's "ability" to use that which it asserts as its own property. *Cedar Point Nursery*, 141 S. Ct. at 2072; *Stearns Co. v. U.S.,* 396 F.3d 1354, 1357 (Fed. Cir. 2005) ("a classic regulatory, not physical, takings problem" is presented when the government action is alleged to "interfere[] with the economic use of the property"); *United States v. Central Eureka Mining Co.,* 357 U.S. 155, 168 (1958) (analyzing as a regulatory taking the issuance of a wartime order requiring nonessential gold mines to cease operations); *Pennsylvania Coal v. Mahon,* 260 U.S. 393, 414-15 (1922) (treating coal companies' takings claim as one involving a regulatory taking where the statute at issue required the companies to leave in place a pillar of coal to provide support for surface land above the coal mines owned by third parties and thus eliminated the coal companies' right to mine the coal contained in pillars); *cf, Horne*, 576 U.S. at 362 ("the government may prohibit the sale of raisins [by the raisin growers and handlers] without effecting a per se taking"); *see also* Br. 28-29. United's claim is properly analyzed as stating a regulatory taking, as the CFC correctly concluded. Appx012- Appx013.

A regulatory takings claim, however, cannot survive the jurisdictional ripeness inquiry. As United confirms in its Opening Brief, "United did not contest below, and does not contest on appeal, that its Complaint does not state a "*regulatory* takings claim that is ripe for adjudication." Br. 17 n.2 (citing Appx077). Indeed, the Recommendation Letter of which United complains, was not a final decision by NMFS and thus was not final agency action, which is generally required to state a ripe regulatory takings claim. *See Schooner Harbor Ventures, Inc. v. United States*, 569 F.3d 1359, 1365 (Fed. Cir. 2009); *Williamson Cnty. Reg'l Plan. Comm'n v. Hamilton Bank*, 473 U.S. 172, 186 (1985). Moreover, under the ESA, a regulatory takings claim alleging restrictions imposed by the Act is not ripe unless the claimant shows it has applied for and been denied an incidental take permit. *See Boise Cascade*, 296 F.3d at 1347-48. United has not done so. *See* Appx007 n.9.

Accordingly, the CFC correctly concluded that United has stated an unripe regulatory takings claim and thus the claim was properly dismissed.

United's arguments to the contrary are unsound. United argues that the putative "mandate" in NMFS's Recommendation Letter is not a "mere *use restriction*" and, thus, is not a regulatory taking because United can never put the water that it foregoes to any beneficial use, which, United argues, "constitutes a physical *appropriation*" of United's "beneficial-use right." Br. 33; *see also id.*

("United forever loses its right to put the foregone water to beneficial use); Br. 13, 20, 37 (same). United fails to recognize that any regulation can cause the loss of a particular aspect of use "forever," but that does not transform a regulatory action into a physical taking. For example, a government regulation that "restrict[s] a property owner's *ability to use* his own property," *Cedar Point Nursery*, 141 S. Ct. at 2071 (emphasis added), is not a physical taking, *see id.*, but the owner still experiences some loss of use permanently. Likewise, a government regulation may prohibit the sale of raisins, causing the raisin growers a loss, but not "effecting a per se taking" that goes so far as to be analogous with a physical taking. *Horne*, 576 U.S. at 362. "A physical taking of [property] and a regulatory limit on production may have the same economic impact on [the property owner];" namely a loss. *Id.* But an allegation of permanent loss in revenue does not convert a regulatory takings claim into a physical takings claim. *See Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 496 (1987) (analyzing as a regulatory taking claim the allegation that the claimant "must leave in the ground" specific tons of coal in their mineral estates).

United argues that the types of restrictions that constitute a regulatory taking are only those that still allow the owner to continue to use the property that is the subject of the taking, but require the owner to use the property in ways other than it intended. Specifically, United contends that, if there had been a regulatory taking

in this case—as opposed to a physical taking as United argues—the restrictions allegedly "imposed" by NMFS in the Recommendation Letter "would have continued to allow United to divert and appropriate 49,800 acre-feet of Santa Clara River water [which United alleges was taken], and would have merely limited the beneficial uses to which United could put that 49,800 acre-feet, such as by preventing United from using the water for the beneficial use of irrigation, *but permitting other beneficial uses of the [49,800 acre-feet of] water*." Br. 36-37 (emphasis added). The essence of United's argument is that property subject to a regulatory taking is never lost, and if it is, that always gives rise to a physical taking. United provides no authority or support for that notion. Moreover, such a position is at odds with controlling precedents, such as *Horne*, which recognizes that a regulatory restriction on one's ability to use its property (e.g., the prohibited sale of raisins) can be fairly characterized as a loss of the property (e.g., lost economic value of those raisins). *See supra* at 45, 47; *see also Keystone Bituminous Coal*, 480 U.S. at 496-97 (regulatory taking where government prohibited the removal of coal from the ground); *Boise Cascade*, 296 F.3d at 1354-55 (regulatory taking where government precluded the harvesting of timber on timber lands).

In sum, even assuming NMFS's Recommendation Letter had any legal effect, United's Complaint alleges, at most, regulatory restrictions on its uses of

water. Thus, United has stated a regulatory takings claim that is unripe. The CFC correctly dismissed the Complaint on that ground.[14]

## CONCLUSION

For the foregoing reasons, the judgment of the Court of Federal Claims should be affirmed.

Respectfully submitted,

/s/ *Tamara Rountree*
TODD KIM
*Assistant Attorney General*
TAMARA ROUNTREE
*Attorney*
Environment and Natural Resources Division
U.S. Department of Justice

November 30, 2023
90-1-23-16586

[14] Plaintiff raises several merits issues that were neither reached by nor essential to the CFC's decision. Merits issues are irrelevant to the disposition of a motion to dismiss and should not in any event be addressed in the first instance by this Court on appeal. Thus, the Court should decline to consider the merits issues that United has presented. *See, e.g.* Br. 23-27 (alleging that United's water use right is a compensable property right); Br. 23-24; Br. 23 n.4; Br. 25 (addressing whether ESA restrictions " 'limit' or supersede United's vested property right in the beneficial use of water under California law"); Br. 32, 36 (alleging the total volume of water United is permitted to appropriate from the Santa Clara River and put to beneficial use under its water-use right); Br. 32 (addressing the question whether a taking of United's water right has occurred); Br. 32-34 (addressing whether the government action challenged here actually constitutes a taking); Br. 44 (addressing whether the "entry of water into a water district's diversion canal" is a "beneficial use" of that water); Br. 50-51 (addressing whether the physical taking that United purportedly alleges "impinged on United's compensable property interest in the beneficial use of Santa Clara River water beginning in 2017").

## CERTIFICATE OF SERVICE

I certify that I filed the foregoing with the United States Court of Appeals for the Federal Circuit through the CM/ECF system on November 30, 2023. All case participants are registered CM/ECF users, and the Notice of Docketing Activity generated by this filing constitutes service under Fed. Cir. R. 25(e)(1).

/s/ *Tamara Rountree*
TAMARA ROUNTREE

Counsel for the United States

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation set forth in Fed. Cir. R. 32(a). Excluding the items exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b), this brief contains 11,995 words.

I certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). This brief has been prepared using Microsoft Word 2013 in 14-point Times New Roman, a proportionally-spaced font.

/s/ Tamara Rountree
TAMARA ROUNTREE

Counsel for the United States