No. 2023-1602

---

## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

---

UNITED WATER CONSERVATION DISTRICT,

*Plaintiff-Appellant*,

v.

UNITED STATES,

*Defendant-Appellee.*

---

On Appeal from the United States Court of Federal Claims
No. 1:22-cv-00542-CFL, Judge Charles Lettow

---

## BRIEF FOR AMICI CURIAE
## NATURAL RESOURCES LAW PROFESSORS
## IN SUPPORT OF APPELLEE AND AFFIRMANCE

---

ANDREW C. MERGEN
SOMMER H. ENGELS
ROSA HAYES
Emmett Environmental Law & Policy Clinic
Harvard Law School
6 Everett Street, Suite 5116
sengels@law.harvard.edu
(617) 384-0464

December 7, 2023            *Attorneys for Amici Curiae Law Professors*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2023-1602

**Short Case Caption** United Water Conservation District v. United States

**Filing Party/Entity** Law Professors Todd Aagard, John Echeverria, John Leshy, Dave Owen, and Sandra Zellmer as Amici Curiae

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 12/07/2023

Signature: /s/ Sommer H. Engels

Name: Sommer H. Engels

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.  ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☑ None/Not Applicable |
| Professor Todd Aagard | | |
| Professor John Echeverria | | |
| Professor John Leshy | | |
| Professor Dave Owen | | |
| Professor Sandra Zellmer | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑     None/Not Applicable        ☐     Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐   Yes (file separate notice; see below)    ☐   No    ☑   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑     None/Not Applicable        ☐     Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

**TABLE OF CONTENTS**

CERTIFICATE OF INTEREST ...............................................................i

TABLE OF AUTHORITIES ..................................................................v

STATEMENT OF INTEREST ..............................................................1

SUMMARY OF ARGUMENT ..............................................................2

ARGUMENT .......................................................................................4

I.     The nature of water rights reflects the distinctive nature of
       water............................................................................................4

       A.     Water is a unique resource. ...............................................5

       B.     Water rights are a different sort of property interest............6

       C.     Water scarcity is a persistent and growing problem. ..........12

II.    Water's unique qualities generally make it a poor fit for the
       physical takings framework...........................................................15

       A.     The physical takings framework applies to specific
              circumstances most likely to warrant categorical
              compensation.....................................................................15

       B.     The contingent and dynamic nature of water rights often
              makes a physical takings analysis a poor fit. .....................17

       C.     The physical takings framework is a particularly poor fit
              here. ...................................................................................21

III.   The regulatory takings framework is a natural fit for the
       circumstances of this case.............................................................24

CONCLUSION ...................................................................................29

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Cases

*Allegretti & Co. v. Cnty. of Imperial*,
  42 Cal. Rptr. 3d 122 (Cal. Ct. App. 2006)....................................................22

*Andrus v. Allard*,
  444 U.S. 51 (1979)..........................................................................................25

*Barney v. City of Keouk*,
  94 U.S. 324 (1876)..........................................................................................26

*Brown v. Legal Found. of Wash.*,
  538 U.S. 216 (2003)........................................................................................19

*Butler, Crockett & Walsh Dev. Corp. v. Pinecrest Water Co.*,
  98 P.3d 1 (Utah 2004)....................................................................................8, 9

*Casitas Municipal Water District v. United States*,
  543 F.3d 1276 (Fed. Cir. 2008) ..............................................................21, 22

*Cedar Point Nursery v. Hassid*,
  141 S. Ct. 2063 (2021)..........................................................................15, 16, 29

*Clajon Prod. Corp. v. Petera*,
  70 F.3d 1566 (10th Cir. 1995) .......................................................................20

*Colorado v. New Mexico*,
  459 U.S. 176 (1982)..........................................................................................7

*Connecticut v. Massachusetts*,
  282 U.S. 660 (1931)..........................................................................................7

*Crow Creek Sioux Tribe v. United States*,
  900 F.3d 1350 (Fed. Cir. 2018) ....................................................................10

*CRV Enters., Inc. v. United States*,
  626 F.3d 1241 (Fed. Cir. 2010) .........................................................20, 22, 23

*Dugan v. Rank*,
    372 U.S. 609 (1963)............................................................23

*Estate of Hage v. United States*,
    82 Fed. Cl. 202 (2008)......................................................10

*First Eng. Evangelical Lutheran Church of Glendale v. Los Angeles Cnty.*,
    482 U.S. 304 (1987)..........................................................15

*Hage v. United States*,
    51 Fed. Cl. 570 (2002)......................................................10

*Horne v. U.S. Dep't of Agric.*,
    576 U.S. 350 (2015)..........................................................19

*Hudson Cnty. Water Co. v. McCarter*,
    209 U.S. 349 (1908)..........................................................27

*In re Adjudication of the Existing Rights to the Use of All the Water*,
    55 P.3d 396 (Mont. 2002)..................................................13

*In re Water Rights of Deschutes River & Its Tributaries*,
    286 P. 563 (Or. 1930) ........................................................9

*In re Water Use Permit Applications*,
    9 P.3d 409 (Haw. 2000)..................................................8, 11

*Int'l Paper Co. v. United States*,
    282 U.S. 399 (1931)..........................................................23

*Keystone Bituminous Coal Ass'n v. DeBenedictis*,
    480 U.S. 470 (1987)......................................................20, 22

*Kreuziger v. Milwaukee Cnty.*,
    60 F.4th 391 (7th Cir. 2023) ..............................................7

*Lingle v. Chevron U.S.A. Inc.*,
    544 U.S. 528 (2005)....................................................3, 16, 18

*Loretto v. Teleprompter Manhattan CATV Corp.*,
  458 U.S. 419 (1982)............................................................16, 18, 19, 20

*Lost Tree Village Corp. v. United States*,
  787 F.3d 1111 (Fed. Cir. 2015) ...........................................................29

*Lucas v. S.C. Coastal Council*,
  505 U.S. 1003 (1992) ...........................................................................17

*Maritrans Inc. v. United States*,
  342 F.3d 1344 (Fed. Cir. 2003) ....................................................26, 28

*Midway Irrigation Co. v. Snake Creek Mining & Tunnel Co.*,
  271 F. 157 (8th Cir. 1921) ...............................................................7, 8

*Millview Cnty. Water Dist. v. State Water Res. Control Bd.*,
  177 Cal. Rptr. 3d 735 (Cal. Ct. App. 2014)........................................10

*Mississippi v. Tennessee*,
  595 U.S. 15 (2021).................................................................................26

*Montana v. Wyoming*,
  563 U.S. 368 (2011)................................................................................7

*Murr v. Wisconsin*,
  582 U.S. 383 (2017)................................................................................4

*Nat'l Audubon Soc'y v. Superior Ct.*,
  658 P.2d 709 (Cal. 1983)...........................................................11, 12, 13

*Pa. Coal Co. v. Mahon*,
  260 U.S. 393 (1922).......................................................................15, 25

*Pac. Live Stock Co. v. Read*,
  5 F.2d 466 (9th Cir. 1925) ..................................................................10

*Palazzolo v. Rhode Island*,
  533 U.S. 606 (2001)..............................................................................15

*Peabody v. City of Vallejo*,
  40 P.2d 486 (Cal. 1935)..........................................................................5

vii

*Penn Cent. Transp. Co. v. City of New York*,
  438 U.S. 104 (1978)..................................................................25, 28

*Red Canyon Sheep Co. v. Ickes*,
  98 F.2d 308 (D.C. Cir. 1938)...............................................10

*Rose Acre Farms, Inc v. United States*,
  559 F.3d 1260 (Fed. Cir. 2009) ...........................................26, 28

*Seiber v. United States*,
  364 F.3d 1356 (Fed. Cir. 2004) ...........................................20

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*,
  535 U.S. 302 (2002)..................................................15, 16, 19, 25

*Tenn. Valley Auth. v. Hill*,
  437 U.S. 153 (1978)..................................................................27

*Tyler v. Wilkinson*,
  24 F. Cas. 472 (C.C.D.R.I. 1827) ...........................................8

*United States v. Gerlach Live Stock Co.*,
  339 U.S. 725 (1950)..................................................................9, 23

*United States v. Oakland Cannabis Buyers' Co-op.*,
  532 U.S. 483 (2001)..................................................................27

*United States v. Pewee Coal Co.*,
  341 U.S. 114 (1951)..................................................................22

*Yunker v. Nichols*,
  1 Colo. 551 (1872).....................................................................26

## Constitutions

U.S. Const. amend. V...................................................................15

Cal. Const. art. X, § 2................................................................. 8-9

## Statutes

16 U.S.C. § 1531 ................................................................13, 27

Ariz. Rev. Stat. Ann. § 45-141(A) ..........................................11

Cal. Water Code § 102 (West 2009)....................................11, 18

Cal. Water Code § 102 (West 2023).........................................11

Cal. Water Code § 1241 (West 2023).........................................9

Cal. Water Code § 1243 (West 2023).........................................9

Utah Code Ann. § 73-1-1(1) (West 2023) ..................................11

## Other Authorities

Robert H. Abrams, *Water Law Transitions*,
    66 S.C. L. Rev. 597 (2015)..............................................8

Philip Ball, *Water Is an Active Matrix of Life for Cell and Molecular Biology*,
    114 Proc. Nat'l Acad. Scis. 13327, 13327 (2017).........................6

Sylvie Corbet & Vanessa Gera, *Wildfires Spread, Fish Die Off Amid Severe Drought in* Europe, Associated Press (Aug. 11, 2022), https://apnews.com/article/wildfires-science-france-fires-climate-and-environment-842e761c3c6fa8104dfa105757c87ea7 .................6

Myrl L. Duncan, *Reconceiving the Bundle of Sticks: Land as a Community-Based Resource*,
    32 Env't L. 773 (2002) ...................................................5, 15, 25

John D. Echeverria, *Is Regulation of Water a Constitutional Taking?*,
    11 Vt. J. Env't L. 579 (2010)......................................11

John D. Echeverria, *What Is a Physical Taking?*,
    54 U.C. Davis L. Rev. 731 (2020)................................24

Colbi Edmonds, *Saltwater Flows Into the Mississippi, Threatening the New Orleans Water Supply*, N.Y. Times (Sept. 23, 2023), https://www.nytimes.com/2023/09/23/us/saltwater-mississippi-new-orleans.html ................................................................ 5-6

*How We Use Water*, EPA, https://www.epa.gov/watersense/how-we-use-water (last updated Apr. 24, 2023) ........................................13

Goutam Konapala et al., *Climate Change Will Affect Global Water* Availability *Through Compounding Changes in Seasonal Precipitation and Evaporation*, Nature Commc'ns, June 23, 2020, https://doi.org/10.1038/s41467-020-16757-w .....................................5

John D. Leshy, *A Conversation About Takings and Water Rights*, 83 Tex. L. Rev. 1985 (2005) ........................................24

*Megadroughts in U.S. West Projected to be Worst of Millennium*, NASA (Feb. 12, 2015), https://svs.gsfc.nasa.gov/cgi-bin/details.cgi?aid=4270 ........................................ 12-13

Dave Owen, *Taking Groundwater*, 91 Wash. U. L. Rev. 253 (2013) ........................................8

*Research Spotlight: Climate-Driven Megadrought*, Nat'l Oceanic & Atmospheric Admin., https://www.drought.gov/research-spotlight-climate-driven-megadrought (last visited Nov. 20, 2023) ........................................12

Joseph L. Sax, *The Constitution, Property Rights and the Future of Water Law*, 61 U. Colo. L. Rev. 257 (1990) ........................................26

Joseph L. Sax, *The Limits of Private Rights in Public Waters*, 19 Env't L. 473 (1989) ........................................11

Joseph L. Sax, *Takings and the Police Power*, 74 Yale L.J. 36 (1964) ........................................16, 24

David B. Schorr, *Appropriation and Agrarianism: Distributive Justice in the Creation of Property Rights*, 32 Ecology L.Q. 3 (2005) ........................................................................7, 8

Daniel Trotta & Brad Brooks, *Western States Reach 'Historic' Deal to Help Save Colorado River*, Reuters, May 22, 2023, https://www.reuters.com/world/us/us-states-reach-colorado-river-water-conservation-deal-interior-dept-2023-05-22/ ...........................14

*Water Cycle*, Nat'l Oceanic & Atmospheric Admin., https://www.noaa.gov/education/resource-collections/freshwater/water-cycle (last updated Feb. 1, 2019) ....................5

Sandra B. Zellmer & Jessica Harder, *Unbundling Property in Water*, 59 Ala. L. Rev. 679 (2008) ...........................................................................9

## STATEMENT OF INTEREST

*Amici* are professors and scholars who teach, research, and write on water law, property law, and the Takings Clause. Their expertise and experiences give them a unique perspective on the historical and factual context of this case, and they submit this brief to aid in its resolution.

Todd Aagaard is Professor of Law at Villanova University Charles Widger School of Law, where he teaches property, environmental law, energy law, and regulation. He has authored numerous articles about environmental and natural resources law, including an article in progress about when regulatory burdens merit compensation.

John Echeverria is a Professor of Law at Vermont Law School, where he teaches Property and Water Resources. He is an award-winning and renowned takings scholar, who has written extensively about the intersection of water law and takings.

John D. Leshy is emeritus professor at U.C. College of the Law San Francisco, co-author of a water law text (Legal Control of Water Resources, now in its fifth edition), and taught water law and constitutional law many times before he assumed emeritus status. His numerous publications include one on takings and water rights.

Dave Owen is the Associate Dean for Research and the Harry Sunderland '61 Professor of Law at University of California Law San Francisco, where he teaches environmental law, water law, and land use law. He has published widely in the field of water law and water resource management and has received numerous awards for his academic writing.

Sandra Zellmer is a Professor of Natural Resources and Environmental Law and the Director of the Natural Resources Clinics at the University of Montana Alexander Blewett III School of Law. She has written on water law, wildlife law, and public lands, publishing dozens of law review articles and several books.

Neither party's counsel authored this brief in whole or in part, and neither party nor party's counsel contributed money that was intended to fund the preparation or submission of this brief. No other individual or organization contributed money that was intended to fund the preparation of submission of this brief. All parties have consented to the filing of this brief.

## SUMMARY OF ARGUMENT

United Water Conservation District's ("United") claim should be assessed under the regulatory takings framework. The rule United seeks—that regulatory restrictions on water diversions should be treated as physical takings—would make regulation of water categorically more likely to require automatic compensation than

regulation affecting other forms of property.[1] Yet everything about water calls for the opposite result.

Water is a unique resource, and water rights represent a distinct form of property interest. Both water and water rights are inherently contingent and dynamic. Just as water supplies vary in time and place, water rights depend upon water availability and competing claims to its use. And just as water itself is fluid and ever-changing, water rights are similarly flexible and have long evolved to meet changing public needs. These characteristics generally make regulatory actions affecting water rights a poor fit for the physical takings framework.

The physical takings framework offers courts a shortcut to quickly adjudicate those claims most likely to warrant compensation. Its application is both rigid and narrow. While it calls for per se compensation, it applies only in specific circumstances: "a direct government appropriation or physical invasion of private property." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005). These circumstances involve a uniquely severe property deprivation or a heightened likelihood of governmental abuse.

Regulations of water usage differ in significant respects from appropriations and invasions, and the concerns motivating special treatment of physical takings

---

[1] Because United's claim should be assessed as a regulatory taking (if it is assessed at all), *amici* agree with the United States that this case is not ripe for resolution. *See* Fed. Answering Brief at 44-49.

seldom apply in the water context. Usufructuary water rights involve no right to the possession or ownership of instream water itself, and their contingency and dynamicity call for flexibility in the takings inquiry, not rigid, per se rules. While courts have in narrow circumstances found that the deprivation of a water right rose to the level of a physical taking, this case falls well beyond the scope of those precedents. Any broader application of the physical takings framework in the water rights context would risk making the cost of regulation "crippling." *Murr v. Wisconsin*, 582 U.S. 383, 408-09 (2017) (Roberts, C.J., dissenting).

The regulatory takings framework, by contrast, enables courts to balance the protection of private property interests with the government's obligation and ability to regulate common resources for the public good. That balance will become even more important as water becomes increasingly scarce and competing public and private uses of water clash more often. The regulatory takings framework offers the requisite flexibility for governments to navigate these conflicts and fairly allocate the burdens of scarcity. Thus, the lower court's judgment should be affirmed.

## ARGUMENT

### I. The nature of water rights reflects the distinctive nature of water.

This is a case about water. Water is fundamentally different from other resources subject to treatment as property, and this difference manifests in the distinctive nature of water rights.

### A.      Water is a unique resource.

Water is unlike other resources subject to regulation as property. In its canonical form, real property is generally immobile, easy to apportion, and able to exist unchanged and uninfluenced for hundreds of years. *See* Myrl L. Duncan, *Reconceiving the Bundle of Sticks: Land as a Community-Based Resource*, 32 Env't L. 773, 798 (2002). Water, on the other hand, is literally fluid. As water moves and flows, its individual molecules are constantly being absorbed into the ground, evaporated into the air, taken up by surrounding flora and fauna, or put to use by humans. *Water Cycle*, Nat'l Oceanic & Atmospheric Admin., https://www.noaa.gov/education/resource-collections/freshwater/water-cycle (last updated Feb. 1, 2019).

Water cycles influence the availability of water, causing water supplies to vary from place to place and season to season. Goutam Konapala et al., *Climate Change Will Affect Global Water Availability Through Compounding Changes in Seasonal Precipitation and Evaporation*, Nature Commc'ns, June 23, 2020, at 2, https://doi.org/10.1038/s41467-020-16757-w. As the California Supreme Court has observed, "[t]he waters of our streams are not like land which is static, can be measured and divided, and the division remains the same. Water is constantly shifting, and the supply changes to some extent every day." *Peabody v. City of Vallejo*, 40 P.2d 486, 491 (Cal. 1935); *see also* Colbi Edmonds, *Saltwater Flows*

*Into the Mississippi, Threatening the New Orleans Water Supply*, N.Y. Times (Sept. 23, 2023), https://www.nytimes.com/2023/09/23/us/saltwater-mississippi-new-orleans.html (describing how a recent drop in Mississippi River water has allowed saltwater intrusion, affecting drinking water systems in nearby municipalities).

Most importantly, and most unlike other resources, water is necessary for life to exist. Philip Ball, *Water Is an Active Matrix of Life for Cell and Molecular Biology*, 114 Proc. Nat'l Acad. Scis. 13327, 13327 (2017), https://www.pnas.org/doi/full/10.1073/pnas.1703781114. Every living thing needs water to survive, and the consequences of not having water are dire. *See, e.g.*, Sylvie Corbet & Vanessa Gera, *Wildfires Spread, Fish Die Off Amid Severe Drought in Europe*, Associated Press (Aug. 11, 2022), https://apnews.com/article/wildfires-science-france-fires-climate-and-environment-842e761c3c6fa8104dfa105757c87ea7. That is why, when searching for life on other planets, scientists begin their search with a search for water. Ball, *supra*, at 13327.

**B.      Water rights are a different sort of property interest.**

The legal regimes governing rights in water reflect water's unique characteristics and shifting availability. The two dominant regimes for allocating water rights—riparianism in the East and prior appropriation in the West—have evolved over time in response to changing circumstances. And, even within these

regimes, water rights have always incorporated inherent limitations dictated by the public nature of water.

In the United States, different water rights regimes developed between the East and West in reflection of the different constraints on water use in those regions. Eastern states generally still follow the English common law approach of granting riparian water rights to owners of land adjacent to surface water resources. *See, e.g.*, *Kreuziger v. Milwaukee Cnty.*, 60 F.4th 391, 394-95 (7th Cir. 2023) (discussing riparianism and associated rights in Wisconsin).

Western states, in contrast, employ a system of prior appropriation, which grants priority water rights in order of when right-holders first appropriated water and put it to beneficial use. *Colorado v. New Mexico*, 459 U.S. 176, 179 n.4 (1982); *Montana v. Wyoming*, 563 U.S. 368, 375-76 (2011). Nineteenth-century settlers eschewed the riparian system in favor of the prior appropriation regime in response to the unique challenges they faced in developing arid western lands. *See Midway Irrigation Co. v. Snake Creek Mining & Tunnel Co.,* 271 F. 157, 162-63 (8th Cir. 1921); David B. Schorr, *Appropriation and Agrarianism: Distributive Justice in the Creation of Property Rights*, 32 Ecology L.Q. 3, 7-8 (2005).

Even within these different regimes, however, water rights have continued to evolve over time and remain subject to change. *See Connecticut v. Massachusetts*, 282 U.S. 660, 670 (1931) (noting that "every State is free to change its laws

governing" water); *In re Water Use Permit Applications*, 9 P.3d 409, 493-94 (Haw. 2000) (listing courts that have upheld state changes to regimes governing water rights); *see also* Dave Owen, *Taking Groundwater*, 91 Wash. U. L. Rev. 253, 268-70 (2013). Indeed, the riparian regime in the East shifted dramatically in the mid-nineteenth century to accommodate the concentrated, out-of-stream water uses necessary for industrialization. Robert H. Abrams, *Water Law Transitions*, 66 S.C. L. Rev. 597, 597-98 (2015). Eastern states curtailed historical "natural flow" entitlements in favor of a "reasonable use" approach, allowing water to be put to use outside of streambeds as long as the use was "reasonable" and did not materially impede the rights of downstream riparian owners. *See, e.g.*, *Tyler v. Wilkinson*, 24 F. Cas. 472, 474 (C.C.D.R.I. 1827) (developing the American doctrine of riparian reasonable use). And in Western prior appropriation regimes, water rights have also evolved over time in response to changing natural and social conditions. *See, e.g., Butler, Crockett & Walsh Dev. Corp. v. Pinecrest Water Co.*, 98 P.3d 1, 11-12 (Utah 2004); Schorr, *supra*, at 7-8 (describing the evolution of prior appropriation regimes).

The existence or scope of any right in water is also contingent on external factors. For example, many states, including California, limit holders of water rights to reasonable and beneficial use. *Midway Irrigation Co.*, 271 F. at 162 (calling the "reasonable and beneficial use" limitation the "American" rule); *see, e.g.*, Cal.

Const. art. X, § 2 (constitutionalizing reasonable and beneficial use requirement). This means that water can be diverted and used only if the use is reasonably necessary for some beneficial use. *See, e.g.*, Cal. Water Code § 1241 (West 2023); *see also United States v. Gerlach Live Stock Co.*, 339 U.S. 725, 752 (1950) (recognizing that water "claimants can enforce no use of wasteful or unreasonable character"). What constitutes a reasonable or beneficial use is often dictated by statute or regulation. *See, e.g.*, Cal. Water Code § 1243 (West 2023) ("The use of water for recreation and preservation and enhancement of fish and wildlife resources is a beneficial use of water."); N.M. Code R. § 19.26.2.7(D) (LexisNexis 2023) (identifying "agricultural, municipal, commercial, industrial, domestic, livestock, fish and wildlife, and recreational uses" as beneficial uses).

Context and conditions can also dictate the validity of a given use. *E.g.*, *Butler, Crockett & Walsh*, 98 P.3d at 11 ("[T]he concept of beneficial use is not static. Rather, it is susceptible to change over time in response to changes in science and values associated with water use."); *In re Water Rights of Deschutes River & Its Tributaries*, 286 P. 563, 577-78 (Or. 1930) (defining beneficial use differently in the irrigation season relative to the non-irrigation season); *see generally* Sandra B. Zellmer & Jessica Harder, *Unbundling Property in Water*, 59 Ala. L. Rev. 679, 694 (2008) (explaining that the reasonableness of any given use evolves over time and is a question of fact resolved on a case-by-case basis).

For example, the exercise of water rights is also contingent on the availability of water in any given year. Parties authorized to divert water via permit may be entirely precluded from diverting in dry years when supplies run low. *See, e.g.*, *Millview Cnty. Water Dist. v. State Water Res. Control Bd.*, 177 Cal. Rptr. 3d 735, 744 (Cal. Ct. App. 2014) (recognizing that "appropriators may be deprived of all use of water when the supply is short"). Diversion rights may also expand in times of heavy flow. *See, e.g.*, *Pac. Live Stock Co. v. Read*, 5 F.2d 466, 468-69 (9th Cir. 1925) (holding that prior appropriator could divert more water during periods of heavy flow and "less as the streams diminish").

Given those contingencies, water rights are necessarily limited. They are merely "usufructuary rights"—that is, "right[s] not to the corpus of the water but to the use of the water"—and are thus "something less than the full ownership of property." *Hage v. United States*, 51 Fed. Cl. 570, 576 (2002) (quoting *Red Canyon Sheep Co. v. Ickes*, 98 F.2d 308, 315 (D.C. Cir. 1938)); *see Crow Creek Sioux Tribe v. United States*, 900 F.3d 1350, 1357 (Fed. Cir. 2018).

The holder of a usufructuary right also generally lacks the right to exclude others from its use. *See Estate of Hage v. United States*, 82 Fed. Cl. 202, 211 (2008) ("Whereas real property ownership is defined by a right to exclude others from that property, water ownership is defined by the right to access and use that water."), *rev'd in part on other grounds, vacated in part*, 687 F.3d 1281 (Fed. Cir. 2012); *see*

*also* John D. Echeverria, *Is Regulation of Water a Constitutional Taking?*, 11 Vt. J. Env't L. 579, 591-92 & n.63 (2010) (citing, *e.g.*, Cal. Water Code § 102 (West 2009)).

Ultimately, although individuals may obtain water-use rights, the public retains an ownership interest in the physical water itself. *See, e.g.,* Cal. Water Code § 102 (West 2023); Ariz. Rev. Stat. Ann. § 45-141(A) (2023); Utah Code Ann. § 73-1-1(1) (West 2023). This dual ownership structure reflects that even when subjected to private exploitation, waterways retain a public character. *See* Joseph L. Sax, *The Limits of Private Rights in Public Waters*, 19 Env't L. 473, 481-82 (1989). Indeed, several states recognize water as a public trust resource, which imposes on regulators "a duty of continuing supervision over the taking and use of the appropriated water" to ensure that public interests are protected. *Nat'l Audubon Soc'y v. Superior Ct.*, 658 P.2d 709, 728 (Cal. 1983); *see In re Water Use Permit Applications*, 9 P.3d at 453. By "preclud[ing] anyone from acquiring a vested right to harm the public trust," *Nat'l Audubon*, 658 P.2d at 732, the public trust doctrine limits water use in accordance with public needs.

In sum, the public nature of water and the inherent contingency of water rights create dynamism in water rights regimes and permit restrictions on water rights in the name of public interest beyond what is typical of most other interests in property.

**C.  Water scarcity is a persistent and growing problem.**

Water's status as both a building block of life and variable resource has often created tension among water users and prompted controversy over water allocations. After all, relative water scarcity in the West forced the original shift from riparianism to prior appropriation. *Supra* Part I.B. Now, water scarcity across the United States is increasing. Since 2000, the West has been suffering from the worst mega-drought in 1,200 years. *Research Spotlight: Climate-Driven Megadrought*, Nat'l Oceanic & Atmospheric Admin., https://www.drought.gov/research-spotlight-climate-driven-megadrought (last visited Nov. 20, 2023). Researchers at UCLA attribute responsibility for at least forty-two percent of that mega-drought to climate change. *Id.*

These problems will persist. Recent research supported by the U.S. Forest Service projected that in the next twenty-two years, more than forty percent of the freshwater basins in the United States will experience some form of monthly shortage. *See* Thomas C. Brown et al., *Adaptation to Future Water Shortages in the United States Caused by Population Growth and Climate Change*, 7 Earth's Future 219, 226-27 (2019). And NASA predicts that, in the next fifty years, droughts in the southwest and central United States could be the driest and longest these regions have seen in the past 1,000 years. *Megadroughts in U.S. West Projected to be Worst*

*of Millennium*, NASA (Feb. 12, 2015), https://svs.gsfc.nasa.gov/cgi-bin/details.cgi?aid=4270.

Various uses currently compete for water in the United States. Domestic uses are perhaps the most familiar from day to day, but well over half of the fresh water in the United States is used in the generation of electricity or for agricultural purposes. *How We Use Water*, EPA, https://www.epa.gov/watersense/how-we-use-water (last updated Apr. 24, 2023). Other municipal uses, industrial operations, aquaculture, and mining also account for substantial water use. *Id.*

Uses are not always consumptive, however. Water law acknowledges and preserves rights for recreation and the preservation of wildlife as well. Indeed, the protection of natural resources and the environment has consistently been recognized as a legitimate water use by federal laws, *e.g.,* 16 U.S.C. § 1531(c)(2) (establishing federal policy that water use issues should be resolved "in concert with conservation of endangered species"); by state laws, *e.g.*, Cal. Water Code Ann. § 1257 (West 2023) (authorizing state water board to consider "all beneficial uses of the water" including "the preservation and enhancement of fish and wildlife" before acting on appropriation application); and by the courts, *see, e.g., In re Adjudication of the Existing Rights to the Use of All the Water*, 55 P.3d 396, 407 (Mont. 2002) (concluding that "fish, wildlife and recreation" are beneficial uses).

Water regulators already face difficult decisions when allocating water uses. In 2023, for example, record-low water levels forced Western states that depend on the Colorado River to negotiate a new deal to cut water consumption, one hundred years after the original Colorado River Compact was signed. Daniel Trotta & Brad Brooks, *Western States Reach 'Historic' Deal to Help Save Colorado River*, Reuters, May 22, 2023, https://www.reuters.com/world/us/us-states-reach-colorado-river-water-conservation-deal-interior-dept-2023-05-22/. Under that deal, California, Nevada, and Arizona agreed to cut their water consumption by three million acre-feet through the end of 2026, a decision that will affect holders of water rights in each state. *Id.*

These allocation decisions will only become more difficult in the coming years as global temperatures continue to rise, weather patterns become more inconsistent, and water scarcity increases. Regulators will be forced to prioritize certain uses at the expense of others, pursuant to the values enshrined in the governing water rights regime. To make choices between uses, states must retain the flexibility long granted by state water law to balance competing uses and the public interest.

## II. Water's unique qualities generally make it a poor fit for the physical takings framework.

### A. The physical takings framework applies to specific circumstances most likely to warrant categorical compensation.

The Takings Clause of the Fifth Amendment provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. The clause "does not prohibit the taking of private property, but instead places a condition on the exercise of that power." *First Eng. Evangelical Lutheran Church of Glendale v. Los Angeles Cnty.*, 482 U.S. 304, 314 (1987).

The Supreme Court has long recognized a "fundamental" distinction between two forms of governmental takings: regulatory takings and physical takings. *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 325 (2002). A regulatory taking involves a governmental restriction on "an owner's ability to use his own property" that "'goes too far.'" *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2071-72 (2021) (quoting *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922)). Compensation is due only when a regulation is sufficiently burdensome, and courts conducting a regulatory takings analysis apply a flexible framework that "allow[s] careful examination and weighing of all the relevant circumstances." *Murr*, 582 U.S. at 393 (quoting *Tahoe-Sierra*, 535 U.S. at 322); *see infra* Part III.

A physical taking—the sort that United claims to have suffered here—is the "clearest sort of taking." *Cedar Point*, 141 S. Ct. at 2071 (quoting *Palazzolo v. Rhode*

*Island*, 533 U.S. 606, 617 (2001)). As explained above, a classic physical taking involves either "direct government appropriation or physical invasion of private property." *Lingle*, 544 U.S. at 537. Such conduct is "relatively rare," and when the government engages in it, "the fact of a taking is typically obvious and undisputed." *Tahoe-Sierra*, 535 U.S. at 324, 322 n.17. Thus, the physical takings test is inflexible. When courts find that a physical taking has occurred, they apply a "simple, *per se* rule: The government must pay for what it takes." *Cedar Point*, 141 S. Ct. at 2071.

This rigid approach reflects the sort of property deprivations and governmental actions at play when a physical taking occurs. Physical takings involve deprivation of either the right to exclude—"'one of the most treasured' rights of property ownership"—or ownership or possession of the property right itself. *Cedar Point*, 141 S. Ct. at 2072 (quoting *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982)). As described below at p.24, invasions and appropriations carry a significant risk of unfairness or arbitrariness. *See* Joseph L. Sax, *Takings and the Police Power*, 74 Yale L.J. 36, 64-66 (1964). Given the severity of these kinds of deprivations, their susceptibility to abuse, and the comparative ease of identifying physical takings, a rigid per se rule offers an administrable shortcut for courts to quickly adjudicate those takings claims most likely to warrant compensation.

## B. The contingent and dynamic nature of water rights often makes a physical takings analysis a poor fit.

As explained above in Part I.B, water rights are a unique form of property. This makes the rigid test for physical takings a poor fit for asserted takings of water rights for three primary reasons. First, because water rights are flexible and contingent upon water availability and public need, it makes little sense to require compensation every time they change. Second, the sorts of governmental actions that typically affect water rights are unlike the sorts of actions that motivate the application of a physical takings analysis. Third and finally, the fact that water rights are usufructuary—and thus distinctively non-absolute—suggests there is less reason to make modifications automatically compensable than there is for other rights.

First, the historic treatment of water rights as flexible and contingent weakens the case for applying a rigid test to asserted takings of those rights. The Supreme Court has recognized that takings jurisprudence is guided by citizens' understandings "regarding the content of, and the State's power over" their property. *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1027 (1992). In the context of water, there is an extensive history of changing rights, as well as a substantial body of law rendering rights contingent upon public needs. *See supra* Part I.B. These features put right-holders on notice that their water rights have always been (and remain) subject to significant modification by the State. That notice undermines parties' claims to

categorical compensation and reinforces the need for a fact-specific inquiry into whether compensation is due.

Furthermore, looking backwards, *had* modifications of water rights always been subject to rigid physical takings analysis, the historic evolution of water rights could not have been lawfully accomplished without widespread compensation. *See supra* Part I.B; *infra* Part III. Subjecting modifications of water rights to physical takings analysis now would ahistorically imperil states' abilities to effectively manage their scarce and essential water resources.

Second, the sorts of governmental actions that affect water rights generally lack the key characteristics that motivate application of a physical takings analysis. As noted above at p.3, two sorts of governmental actions are treated as physical takings—invasions and appropriations, *Lingle*, 544 U.S. at 537—and neither maps neatly onto the regulation of instream water.

An invasion occurs when the government occupies an owner's property. *See Loretto*, 458 U.S. at 434-36. But for an invasion upon a property right to occur, the right-holder must have at least the right to exclude. *Id.* at 435 (explaining that a government occupation "destroys" the owner's right to exclude). A usufructuary water right-holder generally has no such right. *See supra* Part I.B; Echeverria, *supra*, at 591-92 & n.63 (citing, *e.g.*, Cal. Water Code § 102 (West 2009)).

Nor are restrictions on in-stream water use akin to physical appropriations, which occur "[w]hen the government physically takes possession of an interest in property for some public purpose . . . , regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof." *Tahoe-Sierra*, 535 U.S. at 322; *see, e.g.*, *Horne v. U.S. Dep't of Agric.*, 576 U.S. 350, 361-62 (2015) (appropriative transfer to the government); *Brown v. Legal Found. of Wash.,* 538 U.S. 216, 235 (2003) (appropriative transfer to a third party); *supra* pp.3-4. After all, in California and across the West, water right holders neither own nor possess any actual water. Echeverria, *supra*, at 591-92. And while a different sort of analysis may be appropriate when water has already been diverted, *see infra* p.22, the government can hardly be said to have repossessed water by merely keeping it in its natural in-stream state. Put simply, subjecting use restrictions on water to the physical takings test would subvert the rationale under which physical takings are singled out for rigid treatment.

Third and finally, the distinctively qualified nature of water-use rights weakens the case for automatic compensation following the imposition of water-use restrictions. Physical takings merit rigid treatment and automatic compensation because they are "restriction[s] of an unusually serious character," *Loretto*, 458 U.S. at 426. When the government physically appropriates property, it "does not simply

take a single 'strand' from the 'bundle' of property rights: it chops through the bundle, taking a slice of every strand." *Id.* at 435.

But water rights holders possess only one stick in that bundle of rights—the right to use. *See supra* Part I.B. Deeming any encroachment on that right a per se physical and compensable taking simply because it affects the whole of the right would elevate water rights above other more durable and absolute sorts of rights, like rights in land. *See CRV Enters., Inc. v. United States*, 626 F.3d 1241, 1248 (Fed. Cir. 2010) (recognizing that "[i]f a mere use restriction that interferes with one of a property owner's rights were enough to support a compensable physical taking, almost every regulatory taking would be a physical taking").

Indeed, courts have long analyzed restrictions preventing a property owner from fully using resources to which they have a right using a regulatory takings approach (and without awarding compensation). *See, e.g., Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 498 (1987) (holding that act requiring that 50 percent of coal beneath certain structures to be kept in place was not a taking); *Seiber v. United States*, 364 F.3d 1356, 1366-67, 1370-72 (Fed. Cir. 2004) (holding that denial of incidental take permit necessary to proceed with logging on private timberland was neither a physical nor regulatory taking); *Clajon Prod. Corp. v. Petera*, 70 F.3d 1566, 1576-80 (10th Cir. 1995) (holding that limits on hunting on private property imposed by a licensing regime did not constitute a taking).

Given the limited and conditional nature of water rights, *see supra* Part I.B, evaluating limits on their use as physical takings categorically entitled to compensation would elevate water rights above rights in property. That cannot be the rule.

### C. The physical takings framework is a particularly poor fit here.

Given this general dissonance between the physical takings framework and water rights, courts have been understandably hesitant to treat deprivations of water rights as physical takings. They have generally done so only in the following narrow circumstances: (1) the re-diversion of water that has in some sense already been physically possessed, and (2) the acquisition and conferral of a water right upon a third party. These circumstances closely track the hallmark of a physical appropriation: the transfer of possession or ownership to the government or its designee. And neither circumstance is present here.

First, unlike in *Casitas Municipal Water District v. United States,* 543 F.3d 1276 (Fed. Cir. 2008) (*Casitas I*), *cited in* Opening Brief at 32-33, the government here has at most restricted United's ability to divert water in the first place to maintain instream flow. United has in no sense physically possessed the water of which it claims to have been deprived, which fundamentally distinguishes this case from *Casitas I. See* 543 F.3d at 1291-92, 1294, 1295 n.16 (emphasizing change in physical possession). There, in concluding that a "physical appropriation" had

occurred, the Court relied on the fact that "the government did not merely require some water to remain in stream, but instead actively caused the physical diversion of water away from" Casitas' canal after the water had already left the river. *Id.* at 1291-92. The Court described such governmental action as taking "physical possession of the water." *Id.* at 1294; *see CRV Enters.*, 626 F.3d at 1247 (distinguishing *Casitas I* because, "[u]nlike *Casitas* . . . , plaintiffs have not shown any physical appropriation of water or the actual removal of any amount of water").[2]

Other courts have drawn a similar distinction between "passive restriction[s]" and "actual physical diversion[s] of water." *See, e.g.*, *Allegretti & Co. v. Cnty. of Imperial*, 42 Cal. Rptr. 3d 122, 132 (Cal. Ct. App. 2006). And courts have applied a similar dividing line in the context of other usufructuary rights. *Compare Keystone Bituminous Coal*, 480 U.S. at 498-99 (applying regulatory takings analysis where government prohibited plaintiffs from extracting some coal and required it be left in place), *with United States v. Pewee Coal Co.*, 341 U.S. 114, 116-19 (1951). (treating government's possession and control of a coal mine as a categorical taking). While this dividing line may be an imperfect one in the water context—for reasons that, in

---

[2] The rehearing petition and briefs in support filed after *Casitas I* was decided reflect the controversy surrounding that opinion. Rehearing was denied, but the Court has since underscored that *Casitas* is to be read narrowly. *See, e.g.*, *CRV Enters.*, 626 F.3d at 1247. This narrow reading ensures that the Federal Circuit's takings jurisprudence remains consistent with that of the Supreme Court and other circuits, which have generally declined to treat regulatory restrictions on the use of property as categorical physical takings. *See supra* pp.15-16, 20.

*amici*'s view, generally make asserted water takings a poor fit for categorical treatment[3]—it at least tracks to some extent a defining feature of physical appropriations: a change in possession.

Second, unlike in *International Paper*, *Dugan*, and *Gerlach*, cited in Opening Brief at 39-42, the government here has not transferred the water right to itself or a third party. Each of those cases involved government acquisition and transfer of water rights to third parties. *Int'l Paper Co. v. United States*, 282 U.S. 399, 404-06 (1931) (government requisition and transfer of water rights from a paper company to a utility); *Dugan v. Rank*, 372 U.S. 609, 620-21 (1963) (government damming and diversion of water from downstream owners of riparian water rights to irrigation and utility projects); *Gerlach*, 339 U.S. at 728-30 (same). This case, by contrast, involves a mere restriction on one party's water use to protect an endangered species for the benefit of the public. The government has neither acquired the water right for itself nor transferred it to another party. *See CRV Enters.*, 626 F.3d at 1247 (distinguishing *Dugan* and *Gerlach* on similar grounds).

This distinction matters, because when the government is acting in an "enterprise capacity" (that is, "engag[ing] in resource acquisition for its own account"), there is a greater risk of "arbitrary, unfair, or tyrannical government"

---

[3] Most notably, as discussed above, under California law, a party's diversion of water does not grant them absolute ownership of that water—their claim to the water remains limited by their ability to use it for a beneficial purpose. *See supra* Part I.B.

action. Sax, *Takings and the Police Power*, *supra*, at 64. In such contexts, the government is more likely to "reward[] the faithful or punish[] the opposition," act with "excessive zeal" in pursuit of its goals, or subject its citizens to "extraordinary and unprecedented" risks. *Id.* at 64-66; *see* John D. Echeverria, *What Is a Physical Taking?*, 54 U.C. Davis L. Rev. 731, 791-92 (2020). And the risk of government playing favorites is only magnified when it not only acquires a property interest but transfers that interest to other private parties. *See* John D. Leshy, *A Conversation About Takings and Water Rights*, 83 Tex. L. Rev. 1985, 2008 (2005).

The government action at issue here falls well beyond the scope of those precedents. Treating a restriction on the diversion of instream flows as a physical taking would unmoor the physical takings framework from its core justification—that physical appropriation or invasion of private property is uniquely likely to warrant compensation. Moreover, it would do so arbitrarily in a single, isolated context—that of water—the context least suited for categorical treatment.

## III. The regulatory takings framework is a natural fit for the circumstances of this case.

The fair and effective regulation of water requires flexibility to account for both the dynamic and contingent nature of water and water rights. The regulatory takings framework provides this flexibility. As water scarcity increases and water availability becomes more variable, decisionmakers will have to prioritize competing claims to diminished water resources. The flexibility permitted by the

regulatory takings framework will become even more critical to ensuring that water is fairly and efficiently allocated according to the controlling principles of the states' water law regimes.

Unlike the rigid physical takings analysis, the regulatory takings analysis requires a case-specific balancing of values. Courts evaluating alleged regulatory takings consider (1) the economic impact on the property owner; (2) the degree of interference with distinct investment-backed expectations; and (3) the character of the governmental action. *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978). This analysis recognizes that a government interference that "arises from some public program adjusting the benefits and burdens of economic life to promote the common good" is generally not a compensable taking. *Id.* After all, the government "hardly could go on," if it had to pay for every regulation impacting property values. *Murr*, 582 U.S. at 394 (quoting *Mahon*, 260 U.S. at 413).

That multi-factor test allows courts evaluating whether a compensable regulatory taking has occurred to weigh two competing objectives: "the individual's right to retain the interests and exercise the freedoms at the core of property ownership" and "the government's well-established power to 'adjus[t] rights for the public good.'" *Id.* (quoting *Andrus v. Allard*, 444 U.S. 51, 65 (1979)); *see, e.g., Tahoe-Sierra*, 535 U.S. at 336-41 (balancing the private interest in building a retirement home with the public interest in temporarily stopping economic uses of

property); *Rose Acre Farms, Inc v. United States*, 559 F.3d 1260, 1283 (Fed. Cir. 2009) (balancing the private interest in selling one's goods with the public interest in mitigating foodborne illnesses); *Maritrans Inc. v. United States*, 342 F.3d 1344, 1358-59 (Fed. Cir. 2003) (balancing the private interest in preserving property value with the public interest in preventing oil spills).

The flexibility accorded by the regulatory takings test is particularly appropriate when an asserted taking of a water right is at issue. As explained above, *supra* Part I.B, courts and legislatures have consistently found it appropriate to adjust the exercise of water rights in light of changing circumstances and public necessity. Courts recognized early on that rigid legal principles were a poor fit for evaluating changes in water rights, and they instead allowed the law to change without requiring consistent compensation. *See, e.g.*, *Yunker v. Nichols*, 1 Colo. 551, 552-53 (1872) (explaining that Colorado's "dry and thirsty land" requires departure from English common law water doctrine); *Barney v. City of Keouk*, 94 U.S. 324, 337-38 (1876) (explaining the need to depart from the English common law definition of navigable waters); Joseph L. Sax, *The Constitution, Property Rights and the Future of Water Law*, 61 U. Colo. L. Rev. 257, 267-69 (1990) (discussing those cases and others). Since water resources will continue to be the subject of disputes, water law and water rights will continue to change. *See Mississippi v. Tennessee*, 595 U.S. 15, 24 (2021) (extending existing water law to a question of first impression regarding an interstate

aquifer). The regulatory takings framework ensures that undue constitutional constraints will not deprive water law of its inherent dynamicity.

This sort of flexibility is doubly important in the circumstances present here, where the government has acted to regulate water as a public resource. Governments have a strong interest in regulating water to ensure its availability for the many uses to which it can be put, *see Hudson Cnty. Water Co. v. McCarter*, 209 U.S. 349, 356 (1908) (stating "few public interests are more obvious"), and water law has evolved over time subject to this public interest. As explained above, *supra* Part I.B, many water rights are limited by the values of reasonable or beneficial use, and several states include water in the public trust. These inherent limits on water rights have allowed water law to evolve as governments take action to benefit the public interest to the detriment of some water right-holders.

Protecting aquatic habitat to conserve listed species is one such public interest entitled to weight in the takings analysis. *See supra* Part I.C (citing 16 U.S.C. § 1531). In passing the Endangered Species Act, for example, Congress "declared" it the "policy of Congress that Federal agencies" seek to "resolve water resource issues in concert with conservation of listed species." 16 U.S.C.§ 1531(c)(2); *see United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 497 (2001) (recognizing that statutes reflect Congress's "order of priorities in a given area" (quoting *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 194 (1978))). That public interest

must reasonably be considered here, and the regulatory takings framework supplies the appropriate test. *See Penn Cent. Transp. Co.*, 438 U.S. at 124.

Increasing water scarcity will force governments to make ever more difficult decisions to balance the public interest with the rights of water users. Problems arising from depleting water resources have already caused issues for the public and private water right-holders alike, *see supra* Part I.C, and will require innovative regulatory solutions. The regulatory takings framework will allow courts evaluating the effects of those solutions on property owners to consider the government's obligation to adjust those rights for the public good, thereby ensuring that takings law does not create a "disincentive for the government to enact publicly beneficial laws" that would require "compensation every time." *Rose Acre Farms*, 559 F.3d at 1283. The maintenance of particular instream levels should not trigger an obligation to compensate holders of water rights in all instances, as the application of a physical takings test would require.

Regulatory actions that change a party's exercise of their water rights may still require compensation in some instances. The bottom line, however, is that government actions changing access to instream water must be evaluated with care before compensation is awarded. After all, regulatory actions can often lead to irreversible change but do not always amount to takings. *Compare Maritrans*, 342 F.3d at 1356-58 (holding that a 13.1% value reduction did not automatically warrant

compensation), *with Lost Tree Village Corp. v. United States*, 787 F.3d 1111, 1118-19 (Fed. Cir. 2015) (holding that a complete elimination of economic use warranted compensation). Put another way, the crucial question is not whether the government has affected a private property interest, but rather whether its actions exceed a certain threshold. *See Cedar Point,* 141 S. Ct. at 2071-72.

As water resources change and become scarcer, governments will be forced to make difficult decisions to ensure that water remains available for the many essential uses to which it can be put. A physical takings test might seem simpler to apply in some cases, but applying that test to alleged takings of water rights would raise numerous intractable problems for courts and could severely disrupt efforts by government to allocate scarce water resources. Courts evaluating these sorts of claims should instead conduct the more searching inquiry associated with regulatory takings—the sort of inquiry that ensures that the benefits and burdens of government actions taken in the public interest are distributed fairly.

## CONCLUSION

For all these reasons, the district court's judgment should be affirmed.

Respectfully submitted,

/s/ *Sommer H. Engels*

ANDREW C. MERGEN
SOMMER H. ENGELS
ROSA HAYES
*Attorneys*
Emmett Environmental Law & Policy Clinic
Harvard Law School
6 Everett St., Suite 5116
Cambridge, MA 02138
sengels@law.harvard.edu
(617) 384-0464

*Attorneys for Amici Curiae Law Professors*[4]

December 7, 2023

---

[4] The Emmett Environmental Law & Policy Clinic would like to acknowledge the contributions of clinic students Isaiah Bennett, Will McCann, Grace Summers, and John Sutton.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:** 2023-1602

**Short Case Caption:** United Water Conservation District v. United States

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes ___6,750___ words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: __12/07/2023__        Signature: _/s/ Sommer H. Engels_

Name: _Sommer H. Engels_