**2023-1602**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT**

---

**UNITED WATER CONSERVATION DISTRICT,**

*Plaintiff-Appellant*

v.

**UNITED STATES,**

*Defendant-Appellee*

---

Appeal from the United States Court of Federal Claims
in No. 1:22-cv-00542-CFL, Senior Judge Charles F. Lettow.

---

# PLAINTIFF-APPELLANT'S REPLY BRIEF


FRANK S. MURRAY
FOLEY & LARDNER LLP
3000 K Street, N.W., Suite 600
Washington D.C. 20007-5143
(202) 295-4163
fmurray@foley.com

*Counsel for Plaintiff-Appellant*
*United Water Conservation District*

OF COUNSEL:

David T. Ralston, Jr.
FOLEY & LARDNER LLP
3000 K Street, N.W., Suite 600
Washington, D.C. 20007-5143
(202) 295-4097
dralston@foley.com

Michael P. Calabrese
FOLEY & LARDNER LLP
555 South Flower Street, Suite 3300
Los Angeles, CA 90071
(213) 972-4564
mcalabrese@foley.com


FEBRUARY 12, 2024

# TABLE OF CONTENTS

I. A Claimant's Prior Physical Possession of the Property Appropriated by the Government Is Not a Required Element of a Physical Takings Claim. 2

A. The Supreme Court and This Court Have Both Recognized Physical Takings Claims Involving Usufructuary Water Rights. 8

B. The Supreme Court Has Consistently Recognized Physical Takings of Nonpossessory Property Rights. 16

II. United Has Pled the "Ouster" of Its Beneficial Use Property Right. 18

III. The Regulatory Takings Precedents Cited by the Government Are Inapposite. 19

IV. United Has Plausibly Alleged That the NMFS Enforcement Letter Effected a Physical Taking. 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Armstrong v. United States*,
364 U.S. 40 (1960) ....................18

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....................21

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ....................22

*Bennett v. Spear*,
520 U.S. 154 (1997) ....................26

*Boise Cascade Corp. v. United States*,
296 F.3d 1339 (Fed. Cir. 2002)....................20

*Cary v. United States*,
552 F.3d 1373 (Fed. Cir. 2009)....................22

*Casitas Mun. Water Dist. v. United States*,
543 F.3d 1276 (Fed. Cir. 2008)....................5

*Casitas Mun. Water Dist. v. United States*,
708 F.3d 1340 (Fed. Cir. 2013)....................4, 5

*Cedar Point Nursery v. Hassid*,
141 S. Ct. 2063 (2021)....................21

*Dow AgroSciences LLC v. Nat'l Marine Fisheries Serv.*,
637 F.3d 259 (4th Cir. 2011)....................26

*Dugan v. Rank*,
372 U.S. 609 (1963) .................... 4, 6, 7

*Estate of Hage v. United States*,
687 F.3d 1281 (Fed. Cir. 2012)....................5

*International Paper Co. v. United States*,
282 U.S. 399 (1931) .......... 4, 6, 9, 12, 13

*International Paper Co. v. United States*,
68 Ct. Cl. 414 (1929) .......... 10, 11, 12, 13

*Katzin v. United States*,
908 F.3d 1350 (Fed. Cir. 2018) .......... 5, 19

*Keystone Bituminous Coal Ass'n v. DeBenedictis*,
480 U.S. 470 (1987) .......... 20

*Klamath Irrigation Dist. v. United States*,
635 F.3d 505 (Fed. Cir. 2011) .......... 2, 4, 5, 6, 9

*Lingle v. Chevron U.S.A., Inc.*,
544 U.S. 528 (2005) .......... 6

*Louisville Joint Stock Land Bank v. Radford*,
295 U.S. 555 (1935) .......... 18

*Niagara Mohawk Power Corp. v. Federal Power Comm'n*,
202 F.2d 190 (D.C. Cir. 1952) .......... 11

*Thayer v. Cal. Dev. Co.*,
164 Cal. 117, 128 P. 21 (1912) .......... 5

*Tyler v. Hennepin County, Minn.*,
598 U.S. 631 (2023) .......... 16, 17, 18

*United States v. Gerlach Live Stock Co.*,
339 U.S. 725 (1950) .......... 4, 6

*Wishtoyo Found. v. United Water Conservation Dist.*,
No. 16-CV-03869-DOC (PLAx), 2018 WL 6265099 (C.D. Cal. Sept. 23, 2018) .......... 24

*Yuba Goldfields, Inc. v. United States*,
723 F.2d 884 (Fed. Cir. 1983) .......... 25, 28

**Statutes**

16 U.S.C. § 1540(g)(2) .......... 26

**Rules**

Rule of Court of Federal Claims 12(b)(6) ..............................................................21

In the proceedings below, the parties briefed and argued, and the trial court decided, the narrow question of whether United Water Conservation District's ("United's") Fifth Amendment takings claim should be considered the physical taking pled in United's Complaint, or a regulatory takings claim, as asserted by the Government. The Government's jurisdictional challenge contended that, as a matter of law, United's Complaint stated (i) a regulatory takings claim that (ii) was not yet ripe for adjudication. United's Opening Brief in this Court explained why the trial court's decision accepting the Government's characterization of United's Complaint as stating an unripe regulatory takings claim was both erroneous and contrary to decades of controlling Supreme Court precedent that governmental appropriation of a usufructuary water right constitutes a physical taking.[1]

The pivotal question posed by this appeal, therefore, is whether the trial court was correct in holding the Government cannot, as matter of law, effect a physical taking of a usufructuary water right unless the alleged Government takings action includes requiring the rights holder to *return* water already diverted into the holder's own facilities. The trial court erred. Accordingly, this Court should sustain United's appeal, reverse the trial court's judgment, and remand the case for further proceedings under physical takings law and precedent.

[1] Citations to United's Opening Brief appear herein as "Br." Citations to the Government's Answering Brief appear herein as "Gov't Br."

On appeal, the Government has raised a further argument, neither briefed nor argued by the parties below, nor addressed by the trial court decision, that the NMFS Enforcement Letter is not, as a matter of law, a government action sufficient to trigger *any* taking, physical or regulatory. As demonstrated herein, the Government's new argument both (i) is contradicted by the Government's own characterization of the NMFS Enforcement Letter in the trial court, and (ii) presents a merits issue of mixed law *and* fact. The Court should therefore reject it here, and remand for consideration by the trial court, should the Government raise it on remand.

## I. A Claimant's Prior Physical Possession of the Property Appropriated by the Government Is Not a Required Element of a Physical Takings Claim.

As United's Opening Brief explained, a two-part test applies when evaluating whether a governmental action constitutes a Fifth Amendment taking. Br. at 22-23. The first prong of that test is whether the claimant has identified a cognizable property interest that is asserted to be the subject of the taking. *Klamath Irrigation Dist. v. United States*, 635 F.3d 505, 511 (Fed. Cir. 2011) ("*Klamath*"). As a predicate matter, the Government has not disputed during this appeal or in the proceedings below that United possesses a cognizable property right under California law to the beneficial use of all the Santa Clara River water that United is authorized to divert, appropriate, and then beneficially use under the terms of its California water license and permit. *See* Gov't Br. at 6-7; Appx052 ("To the extent

that any future final agency action requires United to forego water that it would otherwise have put to beneficial use, it is free to file suit at that time"). *See also* Hr'g Tr. 39:1-5, Appx107 (Gov't counsel: "The water rights that United Water may or may not have under California law the United States has not taken a position on and may well dispute, but they are not germane to the instant motion, which relates only to when the claims ripen.").

Instead, the Government asserts various arguments centered on United's possession or ownership rights in the property appropriated by the Government. In those arguments the Government confuses the relevant "property interest" inquiry in this appeal by repeatedly conflating two distinct, separate considerations: (i) United's vested California property right to divert and then put Santa Clara River water to *beneficial use*; versus (ii) an "ownership" or "possessory" interest in the Santa Clara River water itself. As to the first consideration, as noted above, it is undisputed on the record before this Court that United has, at all times relevant to its takings claim, owned and possessed a property right under California law to divert and then put Santa Clara River water to beneficial use. Appx009, Gov't Br. at 6-7. Thus, the Government's assertions that the rights holder must possess or own the property interest taken (here a right to beneficially use water), when applied to the actual property interest on which United grounds its claim (United's beneficial use water rights), are uncontroversial and irrelevant to resolution of this appeal.

On the other hand, when the Government elides (i) United's established beneficial use water right with (ii) a purported further physical takings requirement that United must *also* have owned and possessed the actual *water molecules* whose use the Government appropriated (Gov't Br. at 26-31), the Government misstates federal and California law and ignores nearly a century of controlling federal precedent to the contrary. In short, a usufructuary water right is a right of *use*, and does not (and need not) confer ownership of or "title" to, or a "possessory interest" in, the water molecules themselves. It nonetheless constitutes a cognizable property right to appropriate and then deploy the water to beneficial use. *Casitas Mun. Water Dist. v. United States*, 708 F.3d 1340, 1353-54 (Fed. Cir. 2013) ("*Casitas II*"); *Klamath*, 635 F.3d at 518 n.8 (observing that a usufructuary water right "is chiefly a *right of use*, *not a right of possession* or other right associated with land ownership, *and has been acknowledged as a cognizable property interest*." (emphases added) (citing *Dugan v. Rank*, 372 U.S. 609, 625-26 (1963)).

Notwithstanding that a usufructuary water right does not confer a right of ownership or "possessory interest" in the water itself, both the U.S. Supreme Court and this Court—as well as California courts—have long recognized usufructuary water rights as a cognizable private property right subject to a Fifth Amendment physical taking. *See, e.g., International Paper Co. v. United States*, 282 U.S. 399 (1931); *United States v. Gerlach Live Stock Co.*, 339 U.S. 725 (1950); *Dugan*, 372

U.S. at 625-26; *Casitas II*, 708 F.3d at 1357 (recognizing California water district's right to beneficial use as "the property interest subject to a potential government taking"); *Casitas Mun. Water Dist. v. United States*, 543 F.3d 1276 (Fed. Cir. 2008) ("*Casitas I*"); *Klamath*, 635 F.3d at 519-20 (remanding to Court of Federal Claims for case-by-case determination whether plaintiffs' beneficial or equitable rights to use Klamath Project water had been taken); *Estate of Hage v. United States*, 687 F.3d 1281, 1290 (Fed. Cir. 2012) (recognizing governmental action preventing claimant from accessing water to which it held usufructuary rights would constitute a physical taking); *Thayer v. Cal. Dev. Co.*, 164 Cal. 117, 125, 128 P. 21 (1912) ("the water right which a person gains by diversion from a stream for a beneficial use is a private right—a right subject to ownership and disposition by him, as in the case of other private property").

The Government nonetheless argues that United cannot state a claim for a physical taking of its compensable usufructuary property right unless United can establish that it first had actual possession of the water molecules at issue in the alleged taking. At its core, the Government's "possess and return" argument distills to its assertion that "a physical taking by the government cannot occur if the claimant has no possessory property interest in the property allegedly taken." Gov't Br. at 31. However, neither of the two cases the Government cites as supporting this assertion, Gov't Br. at 28 (citing *Katzin v. United States*, 908 F.3d 1350, 1361 (Fed.

Cir. 2018) and *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 537 (2005)), stands for the proposition that the Government cannot effect a physical taking of a nonpossessory property interest. Nor could they, given that nearly a century of Supreme Court precedent has recognized physical takings of property that government action denied the claimant from possessing, including the very type of usufructuary water right at issue here.

The Government baldly asserts that "[i]f the claimant's facts do not make the threshold showing that the claimant has a possessory interest in the property, the takings inquiry comes to an end." Gov't Br. at 28. The proposition that a rights holder's "possessory interest" in the property appropriated by the Government is a prerequisite for a physical taking is notably unsupported by citation to legal authority and would come as quite a surprise to the Supreme Court and to this Court, both of which have recognized the viability of physical takings claims for usufructuary rights in water that never entered the claimant's facilities or physical possession. *E.g., International Paper*, 282 U.S. 399; *Dugan*, 372 U.S. 609; *Gerlach*, 339 U.S. 725; *Klamath*, 635 F.3d at 519-20.

The Government cannot articulate a coherent legal theory harmonizing the trial court's erroneous decision with the controlling Supreme Court precedents finding physical takings of usufructuary water rights. The Government primarily argues that it is an absolute prerequisite to stating a physical takings claim that the

claimant have had prior physical possession of the precise water molecules taken by the Government for its use.

Yet, the Government must then acknowledge that its "possess-and-return" theory cannot explain the results in *Dugan* and *Gerlach*. Gov't Br. at 39-41. To dodge those precedents, the Government hastily appends an exception codicil to its "possess-and-return" requirement theory: prior possession of the water molecules taken is a requirement for a physical taking of water rights, *except* when the Government "physically alter[s]" the river or its flow, including by impounding the taken water such that none even reaches the claimant. *See* Gov't Br. at 40-41. That supposed exception, however, is so fundamentally at odds with what the Government suggests is the basic rule that the exception vitiates the rule.

In discussing *Gerlach*, the Government apparently concedes that a Government action "depriving the claimants of *all* water" does effect a physical taking. Gov't Br. at 40. Thus, contrary to its own arguments elsewhere in its brief, the Government acknowledges that a physical taking of water rights *can occur* even when the claimant never receives or possesses the water molecules taken. The distinction the Government seeks to draw here, it seems, is one of degree. Denying the claimant access to *all* the water in which it holds usufructuary rights *would* be a physical taking, the Government concedes, without the claimant's prior possession of the water molecules taken. Yet, denying the claimant access only to a *portion* of

the water in which it holds usufructuary rights is somehow *not* a physical taking as a matter of law, unless the claimant first possessed the relevant water molecules before being required to "return" them to the river. That type of illogical and incoherent legal "rule" results from the Government's tortured effort to reverse-engineer a predetermined erroneous result from established takings precedents, rather than following the precedents to their logical conclusion.

United, by contrast, has articulated the only coherent unifying principle that harmonizes the controlling precedent involving physical takings of water rights: when the government action denied the claimant's access to water in which the claimant had usufructuary rights, thereby reducing the amount of water the claimant could put to beneficial use, the claim involves a physical taking of that portion of the claimant's usufructuary right impacted by the government action. Applying that principle here requires reversal of the trial court's erroneous decision, because United has sufficiently alleged a viable physical takings claim of a portion of its property right to beneficial use of Santa Clara River water.

### A. The Supreme Court and This Court Have Both Recognized Physical Takings Claims Involving Usufructuary Water Rights.

The Government, in the same brief that cites multiple precedents of this Court and the Supreme Court finding that the claimant had stated valid physical takings claims involving usufructuary water rights, strangely argues that "there can be no viable physical takings claim" involving such a right "[b]ecause the holder of

usufructuary rights has no ownership rights in the water itself." Gov't Br. at 28-29. That glaring incongruity in the Government's brief highlights the flaw in its attempt, both below and in this appeal, to elevate prior physical possession of the exact water molecules taken by the Government to a *sine qua non* of a physical takings claim involving a usufructuary water right.[2]

The trial court properly recognized the *International Paper* decision as controlling authority, but then misread that case as involving a takings claim grounded in the claimant having to "return water it had already diverted." Appx012-13. United explained in its Opening Brief how the trial court premised its decision on a fundamental misreading of the *International Paper* facts. Br. at 40-42.

The Government seeks to defend the trial court's misreading of *International Paper*, asserting that "the water appropriated by the government in *International*

[2] The Government's position also ignores this Court's acknowledgement in *Klamath* that water users could assert viable Fifth Amendment physical takings claims involving water they never received. The record in *Klamath* established that the United States at all times retained possession of, and had failed to deliver to the plaintiffs, the water at the root of their takings claims. 635 F.3d at 509-10 (noting that the Bureau of Reclamation ceased delivery of water to the plaintiffs in 2001 due to Endangered Species Act ("ESA") restrictions on the Bureau's operation of the Klamath Project, which triggered the plaintiffs' Fifth Amendment takings claims). This Court nonetheless remanded those takings claims to the trial court to determine whether the plaintiffs' beneficial or equitable, non-possessory water rights had been taken or impaired by the Government's non-delivery of water. *Id.* at 519-20. No remand would have been necessary had this Court deemed possession of the relevant water molecules by the water users a prerequisite to a viable takings claim—the legal standard the Government advances in United's appeal.

*Paper* included water that had indeed entered the claimant's facilities, and the government action required the claimant to withdraw and relinquish that water." Gov't Br. at 39. Those are simply not the facts of *International Paper*: the physical taking claim upheld by the Supreme Court involved water that *was never allowed to enter* the paper company's canal or millworks in the first place.

The Court of Claims decision denying International Paper's takings claim, subsequently reversed by the Supreme Court, makes this point clear when it spells out the precise nature of International Paper's Fifth Amendment claim that the Supreme Court later held to constitute a physical taking: "The alleged taking, stating it in a general way, is the action of the defendant in *preventing* [the paper company] from getting water to generate its power for its plant from the canal of the Niagara Falls Power Company." *International Paper Co. v. United States*, 68 Ct. Cl. 414, 432 (1929), *rev'd by* 282 U.S. 399 (1931) (emphasis added). The Court of Claims decision makes plain that the alleged taking resulted from the paper company being "cut off" from the ability to continue to draw water *from* the *power* company's canal *into* the *paper* company's own canal and millworks—and not from the paper company being forced to return or re-divert water to the power company that the paper company had already diverted into its canal: "by virtue of this agreement between the Secretary of War and the power company [the paper company] *would be cut off and was cut off from taking water for its power plant* under its contract

with the power company, as the latter was to use all the water that the Government under the license allowed to be taken." 68 Ct. Cl. at 437 (emphasis added).

The "special findings of fact" spelled out in the reported Court of Claims decision establish beyond dispute that the governmental action in the *International Paper* case prevented the paper company from drawing the allegedly taken water into the paper company's own facilities in the first place:

> On or about December 12, 1917, the local manager of the Niagara Falls mill of the International Paper Company was notified that the water which it was then taking from the power company's canal was to be shut off as soon as the stock which was then in process of manufacture could be run out. […]
>
> At 12.30 a.m., February 7, 1918, the paper company ceased using water from the power canal of the power company and thereafter did not resume the use of such water until midnight November 30, 1918…. During this entire period the power company took and used all the water diverted from the Niagara River through its power canal and *refused to deliver and did not deliver any water to the paper company.*

*Id.* at 429-30 (emphasis added). *See also Niagara Mohawk Power Corp. v. Federal Power Comm'n*, 202 F.2d 190, 195 (D.C. Cir. 1952) (summarizing facts underlying *International Paper* takings claim as having deprived paper company "of *the right to take that water* for a period of more than nine months" (emphasis added)).

The International Paper Company's takings claim was not based on a need to "return water [they] had *already removed* from the river," as the Government

asserted below, an assertion the trial court erroneously accepted. Appx012 (citing Appx095) (emphasis in original). Both the Supreme Court and the Court of Claims specifically observed that the paper company *was permitted to use* the water already drawn into the paper company's facilities until it had completed manufacturing paper from the unfinished stock and wood pulp it had on hand when the governmental order was issued. 282 U.S. at 406; 68 Ct. Cl. at 430. The governmental directive in *International Paper* therefore patently did not affect, or purport to require "return" of, water the paper company had *already* diverted into its facilities, as the trial court erroneously interpreted. *See* Appx013 (characterizing *International Paper* as a case in which the rights holder "had to return water it had already diverted"). Rather, the government directive expressly permitted the paper company to use the water it had already diverted, *ipso facto* precluding a "return" of the water to the power company. 282 U.S. at 406; 68 Ct. Cl. at 430.

Thus, the paper company's takings claim was based on its *inability to draw water into its own facilities* for a subsequent period of over nine months—what the Supreme Court and the Court of Claims both referred to as a "shutting off" of the paper company's access to water for its canal and millworks. 282 U.S. at 406; 68

Ct. Cl. at 429.[3] The Government notes the Supreme Court's reference to the "shutting off of the water" from the paper company's mill, but attempts to dismiss it in a footnote as somehow negated by the Court's use of the term "withdrawn" later in the decision. Gov't Br. at 38-39 n.13. The selective emphasis the Government and the trial court place on the Supreme Court's singular use of the word "withdrawn" cannot and does not change the underlying facts that the Supreme Court found to constitute a physical taking of the paper company's usufructuary water right.

The physical taking arose from the government action "shutting off" the paper company's ability to draw water into its facilities for a nine-month period, which had the effect of taking the paper company's usufructuary right to use the water it otherwise would have been entitled to divert into its canal. The paper company's claim was not based on a non-existent requirement—conjured by the Government and the trial court from a single word in the Supreme Court decision—to "return" or "relinquish" water already located within the paper company's canal and millworks.

United stands squarely in the shoes of the International Paper Company here. Like the paper company, United is the holder of an established usufructuary water

[3] The Supreme Court decision also quoted a contemporaneous memorandum explaining that the requisition order "is intended to *cut off* the water being taken by the International Paper Company." 282 U.S. at 405-406 (emphasis added).

right and has alleged a physical taking of that right through governmental action that prevented it from drawing the taken water into its facilities to put to beneficial use. In *International Paper*, the Supreme Court held that the denial of the rights holder's ability to access water it could have otherwise drawn into its facilities constitutes a physical taking of a usufructuary water right compensable under the Fifth Amendment. The efforts by the Government and the trial court to distinguish the Supreme Court's *International Paper* precedent are unavailing.

The Government also fails to reconcile the holdings of *Gerlach* and *Dugan*—Supreme Court precedent finding physical takings of California water rights—with its assertion that prior possession of the relevant water molecules within a rights holder's facilities is a required element of a viable physical takings claim of a usufructuary water right in California. As United explained in its opening brief, both *Gerlach* and *Dugan* found physical takings of water to have occurred where the water at issue was impounded in a dam upstream from the claimants' property, preventing the water from reaching the claimants or their facilities. Br. at 39-40.

As Supreme Court precedents, *International Paper*, *Gerlach*, and *Dugan* control to the extent of any conflict with language used by this Court to explain its decision in *Casitas I*. The *Casitas I* decision cannot be given the reading urged by the Government here and accepted by the trial court below—*i.e.*, as *requiring* a water rights holder to establish *prior* possession and *subsequent* return of the water

molecules alleged to have been taken through the governmental action, to state a claim for a physical taking of a usufructuary water right. Rather, given the controlling Supreme Court precedent precluding that reading, the Court's observation in *Casitas I* that the government action required Casitas to return water it had already diverted must be read not as a requirement for a physical taking, but instead as merely identifying *additional factual support* for the Court's conclusion that Casitas' claim should be viewed as a physical taking. With that reading, *Casitas I* is squarely in harmony with *International Paper*, *Gerlach*, and *Dugan*. Whether the Government appropriation is accomplished by government directive "shutting off" the water from being taken into the claimant's facilities (as in *International Paper* and United's claim), impounding the water upstream (as in *Gerlach* and *Dugan*), or government directive to return the water (*Casitas I*), the outcome vis-à-vis the rights holder claimant is identical: the Government has appropriated water for its own use that the rights holder was entitled to use, thereby permanently denying the rights holder use of that water.

Rather than engaging in semantic exercises to attempt, unsuccessfully, to distinguish *International Paper*, the Government should be forthright about what it is seeking in this appeal. Essentially, the Government is asking this Court to set aside or ignore the Supreme Court's *International Paper* decision—something this Court cannot do. This Court is bound by *International Paper*, which recognizes that

a physical taking of a usufructuary water right occurs when the government action denies the rights holder access to the water it has a property right to use. United's Complaint alleges that government action has denied it access to Santa Clara River water it has a cognizable property right to use. Appx035-39 (¶¶ 52-69). Under the controlling authority of *International Paper*, *Gerlach*, and *Dugan*, United has stated a claim for a physical taking, and that claim is ripe for adjudication.

### B. The Supreme Court Has Consistently Recognized Physical Takings of Nonpossessory Property Rights.

In addition to the context of usufructuary water rights, the Supreme Court has also consistently recognized the viability of claims asserting physical takings of other nonpossessory property rights, such as mortgages or liens. Indeed, just last year, the Supreme Court ruled unanimously that the Government effected a physical taking of property that the claimant *never* possessed prior to the challenged governmental action—a decision fatal to the Government's theory here that a claim for a physical taking of property requires that the claimant establish that it "has a possessory interest in the property" taken.

In *Tyler v. Hennepin County, Minn.*, 598 U.S. 631 (2023), the claimant, Geraldine Tyler, had been the owner of a condominium that Hennepin County seized under the state of Minnesota's forfeiture procedures due to her failure to pay roughly $15,000 in tax debt. Under Minnesota law, absolute title to Tyler's condominium vested in the State upon completion of the tax delinquency proceeding, and her tax



4857-0084-4700.7

delinquency was extinguished. Thereafter, all proceeds from the sale of the property in excess of the tax debt and cost of sale remained with the County; thus, Tyler was afforded no opportunity to recover the surplus. The County ultimately sold Tyler's condominium for $40,000, extinguishing the $15,000 in debt and keeping the remaining $25,000 surplus for its own use. 598 U.S. at 635. Tyler asserted a claim under the Fifth Amendment that the County had taken the excess value of her home above her tax debt.

A unanimous Supreme Court held Tyler had stated a claim for a physical taking: "The County had the power to sell Tyler's home to recover the unpaid property taxes. But it could not use the toehold of the tax debt to confiscate more property than was due. By doing so, it effected a classic taking in which the government directly appropriates private property for its own use. Tyler has stated a claim under the Takings Clause and is entitled to just compensation." *Id.* at 639 (internal cites and quotation marks omitted). The unanimous Court so held, notwithstanding that Tyler never actually had *possession* of the surplus $25,000. Nor did she hold *title* to, or have possession of, the condominium when the sale that generated the $25,000 surplus occurred.

The Government's contention in its Brief that "a physical taking by the government cannot occur if the claimant has no possessory property interest in the property allegedly taken[,]" Gov't Br. at 31, is patently irreconcilable with the result

in *Tyler*. Tyler never had a "possessory property interest" in the $25,000 surplus from a public sale that occurred after she lost title to the condominium. The local government, not Tyler, held title to the condominium, arranged and conducted the public sale of the condominium, and received the proceeds of the sale. That Tyler never had a "possessory interest" in the $25,000 surplus (nor in the condominium itself at the time of the sale) was no obstacle to the Supreme Court recognizing that she had a nonpossessory property *right* to the surplus that the County had appropriated for its own use.

*Tyler* is far from the first or only decision of the Supreme Court recognizing a Fifth Amendment physical taking of a nonpossessory property right. *See, e.g.*, *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 594-95 (1935) (recognizing physical taking of nonpossessory property interests inherent in a bank's mortgage interest in a farm); *Armstrong v. United States*, 364 U.S. 40, 48 (1960) (recognizing Fifth Amendment taking of materialman's lien, where lienholders had no possessory property interest in property to which lien attached). These precedents directly contradict the Government's assertion in this appeal that "a possessory property interest" is required to state a valid physical takings claim.

## II. United Has Pled the "Ouster" of Its Beneficial Use Property Right.

The Government's parallel assertion that "United has not suffered an ouster of a possessory property interest" (Gov't Br. at 42) suffers from the same defect as

the Government's assertion that possession of the property at issue is necessary to state a physical takings claim. *International Paper*, *Gerlach*, and *Dugan* all stand for the proposition that government action denying a water rights holder access to the water in which it holds a usufructuary right constitutes a physical taking of that usufructuary right.

United has alleged that the government action here had the effect of appropriating an estimated 49,800 acre-feet of Santa Clara River water to which United held a vested property right to divert and put to its own beneficial use, thereby denying United its right to use that water. Br. at 32-33; Appx036-38 (Compl. ¶¶ 55-56, 64). The denial of United's ability to divert and beneficially use 49,800 acre-feet of Santa Clara River water *is* "the functional equivalent of a 'practical ouster of [United's] possession'" of its property right to put those 49,800 acre-feet to beneficial use. *Katzin*, 908 F.3d at 1361; *see* Gov't Br. at 28.

## III. The Regulatory Takings Precedents Cited by the Government Are Inapposite.

While United's property right appropriated by the Government is a *use* right, that status alone does not make the taking at issue a regulatory taking. There remains the vital distinction between a regulatory taking arising from a government *limitation* on a *property owner's own use* of its property, and a governmental

*appropriation* of a usufructuary right and the associated property (a physical taking—*see International Paper*).

The Government invokes regulatory takings precedents involving a loss of economic value in an otherwise undiminished property interest as analogous to the Government's appropriation of United's right to beneficial use of water (Gov't Br. at 48), but those regulatory takings precedents are readily distinguishable. In none of those cases did the Government *appropriate* the property right at issue in order to put the property to a government use. The timber remained uncut and possessed by the landowner; it was not harvested and claimed by the Government. *Boise Cascade Corp. v. United States*, 296 F.3d 1339 (Fed. Cir. 2002). The coal remained unmined and possessed by the coal company, it was not extracted and claimed by the Government for its own use. *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470 (1987).

In contrast, United's claim involves a governmental *appropriation* of the relevant property interest for the Government's use. The Government has denied United the ability to access and use a quantity of Santa Clara River water that United otherwise had the vested property right to put to beneficial use. The Government did so to appropriate the use of that foregone water for the Government's public purpose of enhancing fish migration, and that foregone beneficial use is lost to United *forever*.

Starting January 1, 2017, United's property right to put its license-authorized quantity of Santa Clara River water to beneficial use has been reduced by the Government's appropriation of a portion of that use right for the benefit of steelhead trout. The Government *appropriated* that portion of United's water right for the public purpose of enhancing fish migration, the very type of government action the Supreme Court has held must be viewed as a *per se* (*i.e.*, physical) taking, no matter that the Government appropriated United's property right under the color of regulatory authority. *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2072 (2021).

## IV. United Has Plausibly Alleged That the NMFS Enforcement Letter Effected a Physical Taking.

The Government further contends that, even within the physical takings context, a taking did not occur here because, as a matter of law, the NMFS Enforcement Letter "does not give rise to any category of Fifth Amendment taking." Gov't Br. at 20-26. United need not address the Government's argument that the NMFS Enforcement Letter does not give rise to a *regulatory* taking, because United has pled only a physical taking, not a regulatory taking. The Government is wrong, however, in contending that United cannot plausibly allege, *as a matter of law*, that the NMFS Enforcement Letter gave rise to a physical taking.[4] *See Ashcroft v. Iqbal*,

[4] The Government's contention that the NMFS Enforcement Letter cannot give rise to a physical taking as a matter of law amounts to an argument that United's Complaint fails to state a claim under Rule 12(b)(6). The Government did not file a 12(b)(6) motion below, so the factual and legal issues posed by such a motion were

556 U.S. 662, 678 (2009) (a complaint need only "contain sufficient factual matter, accepted as true, to state a 'claim to relief that is plausible on its face'") (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

The text of the NMFS Enforcement Letter is in the record before the Court (Appx053-56), and United's Complaint contains factual allegations regarding the context in which it received the letter and how United's compliance with the terms of the letter affected United's right to divert and appropriate Santa Clara River water as authorized in its California water license and permit. Appx030-37 (¶¶ 38-47, 52-59). When assessing whether the letter can give rise to a physical taking of United's beneficial use property right, the Court must accept as true the factual allegations in the Complaint and draw every reasonable inference in favor of United from the text of the letter and United's factual allegations. *E.g.*, *Cary v. United States*, 552 F.3d 1373, 1376 (Fed. Cir. 2009). Those allegations and reasonable inferences plausibly establish that the NMFS Enforcement Letter presented a threat of imminent enforcement action by NMFS under the ESA that coerced United to reduce its

---

not briefed or argued by the parties below, nor decided by the trial court. At argument on its motion to dismiss, the Government expressly disavowed having contested the merits of United's takings claim: "I think it's worth noting that the United States' motion does not directly relate[] to the merits of Plaintiff's claims. It's sort of a step removed from that regarding the subject matter jurisdiction of this Court to hear the claims *at this time*." Hr'g Tr. 35:16-20 (emphasis added), Appx106.

diversion of water at the Freeman Diversion starting January 1, 2017, in compliance with the restrictions set forth in the NMFS Enforcement Letter.

United alleged that the NMFS Enforcement Letter represented a threat by NMFS that it would bring an ESA enforcement action against United, which carries with it potential criminal and civil penalties, if United did not revise its operation of the Freeman Diversion dam, effective December 1, 2016, to conform with the criteria set forth by NMFS in its June 2016 letter. Appx032-33. The Government takes issue with United's description of the import of the text of the letter in its Opening Brief (Br. at 7-10), but United's brief simply presents the facts alleged in the Complaint with reasonable inferences in United's favor—as is required at this stage of the proceedings. Regardless of the headings used in the NMFS letter or the purported framing of certain assertions as "opinions" or "recommendations," the reasonable inference to be drawn from the letter was that it threatened an enforcement action against United under the ESA if United did not reduce its diversion of water to comply with NMFS's 2016 interpretation of Reasonable and Prudent Alternative ("RPA") 2 of the 2008 Biological Opinion ("BiOp").

In the proceedings below, the Government itself effectively conceded the reasonableness of that inference by repeatedly characterizing the NMFS letter as an "Enforcement Letter." The Government attached a copy of the NMFS letter to its motion to dismiss and, in doing so, explicitly identified the letter as "warning of an

enforcement action under the ESA": "on June 9, 2016 the National Marine Fisheries Service's Office for Law Enforcement (the 'OLE') sent United a letter warning of an enforcement action under the ESA if United did not immediately adopt the RPAs. *See* OLE Enforcement Letter, dated June 9, 2016, annexed hereto as Exhibit 'A[.]'" Appx044. Throughout briefing on its motion to dismiss, the Government consistently referred to the NMFS Enforcement Letter as an "*Enforcement* Letter" (emphasis added). *See* Appx044-45 (four times), Appx048-49 (six times), Appx052, Appx090-93 (nine times). The Government also characterized it as "a letter warning of a potential, future enforcement action in the event United declined to comply with the ESA" (Appx047), and "a warning of an anticipated future action that would have required additional hearings." Appx048. In fact, *the Government*, not United, was the first party in this litigation to refer to the June 6, 2016 NMFS Letter in this litigation as an "Enforcement Letter."[5]

The U.S. District Court in the *Wishtoyo* litigation also interpreted the NMFS Enforcement Letter as threatening ESA enforcement action against United: "*Prior to the OLE June 2016 letter* … there were no known letters from law enforcement *threatening legal or environmental action* concerning water flow operations at [the Freeman Diversion]." *Wishtoyo Found. v. United Water Conservation Dist.*, No.

[5] United referred to the letter in its Complaint as the "June 2016 OLE Letter." Appx019.

16-CV-03869-DOC (PLAx), 2018 WL 6265099 at *42 (C.D. Cal. Sept. 23, 2018) (emphases added).

With the Government having conceded below, *repeatedly*, that the June 9, 2016 NMFS letter was in fact an "enforcement letter," and the District Court finding to the same effect, the Court should accord no weight to the Government's revisionist attempt to rebrand the letter in this appeal as a mere "Recommendation Letter." *Compare* Appx044 to Gov't Br. at 2. To state the obvious, the letter was issued by the NMFS Office for Law Enforcement, not the NMFS Office for Recommendations.

This Court has recognized that a government letter threatening legal action can be sufficiently coercive as to support a takings claim. *Yuba Goldfields, Inc. v. United States*, 723 F.2d 884, 889-90 (Fed. Cir. 1983). In *Yuba Goldfields*, the Court rejected a similar attempt by the Government to characterize the letter at issue as merely "expressing an opinion," pointing out that the letter included language stating that certain activities by Yuba were "prohibited" and that Yuba "would be held accountable" if it disregarded the letter. *Id.* at 885-86, 890. The Court observed the uniquely coercive impact of such a letter from a U.S. Government agency: "But the United States is not a private party. It imposes penalties, criminal and civil, the threat of which lurks behind government statements like those here involved, regardless of what the government may have intended." *Id.* at 889.

The Court should also draw inferences favorable to United from the context in which NMFS issued the June 9, 2016 letter. One week earlier, environmental interests initiated the *Wishtoyo* litigation, an ESA citizen suit against United seeking to enforce the ESA against United by alleging that United's operation of the Freeman Diversion dam was resulting in unlawful take of endangered steelhead. Appx004, Appx033-34 (¶ 47). Before they could bring their citizen suit against United under the ESA, the plaintiffs were required to provide sixty days' advance notice to NMFS of their intent to sue. 16 U.S.C. § 1540(g)(2). Thus, the reasonable inference is that NMFS was aware when it issued the NMFS Enforcement Letter to United that the *Wishtoyo* plaintiffs intended to file, and may have already filed, a citizen suit against United under Section 9 of the ESA, adding additional coercive impact to the NMFS letter. As the administering agency that drafted the 2008 BiOp and its RPAs, NMFS was in a uniquely influential position to institute, or at least influence the outcome of, an ESA enforcement action alleging that United was not meeting what the Government referred to in its Answering Brief as United's "independent obligations to comply with the ESA."[6] Gov't Br. at 9 n.5.

---

[6] Federal courts have noted the "powerful coercive effect" NMFS wields under the ESA based on its ability to bring harshly punitive enforcement actions. *See Bennett v. Spear*, 520 U.S. 154, 169-70 (1997). That effect is particularly pronounced when it comes to NMFS's interpretation of the RPAs in one of its BiOps, as those RPAs "define[] the safe harbor from civil and criminal liability." *Dow AgroSciences LLC v. Nat'l Marine Fisheries Serv.*, 637 F.3d 259, 266 (4th Cir. 2011). The NMFS Enforcement Letter defined to United what NMFS considered to be the safe harbor

At this stage in the proceedings, where the Complaint's factual allegations are deemed true and all reasonable inferences must be drawn in United's favor, the Government's attempt to characterize the NMFS Enforcement letter as merely "advisory" and incapable of effecting a physical taking as a matter of law, Gov't Br. at 26, is untenable. The letter contains mandatory language, identifying "measures" that United "*must* commit to implementing" and that "*must* be in place before December 1, 2016." Appx055 (emphases added). By December 1, 2016, United had implemented the measures mandated by NMFS, while making clear that it was doing so involuntarily and under a reservation of rights. Appx032-34 (¶¶ 44-47).[7]

That NMFS did not ultimately file its own ESA enforcement action *reinforces*, rather than undercuts, the coercive effect of the letter. Having successfully obtained the operational restrictions NMFS deemed necessary through the *threat* of litigation, NMFS had no need to proceed to filing its own enforcement action. In *Yuba Goldfields*, the Court recognized that the claimant's decision not to

---

from civil and criminal liability under the ESA for operation of the Freeman Diversion.

[7] Contrary to the Government's assertion (Gov't Br. at 25), United's initial resistance to NMFS's demands in August 2016 does not undermine United's allegation that the NMFS Enforcement Letter identified implementation of these measures as mandatory for United to avoid an ESA enforcement action by NMFS. In recognition that the next steelhead migration season was several months away, the NMFS Enforcement Letter set December 1, 2016 as the deadline for United's compliance, and United complied with the NMFS mandate by that date.

act in defiance of the Government's threat of enforcement does not negate the claimant's ability to argue that the Government threat effected a coercive taking of the claimant's property right: "Yuba should have the opportunity at trial to establish the validity of its argument here that a prudently conducted, publicly owned business corporation cannot be expected to undertake the risks it asserts were present in such defiance. On consideration of the motion, Yuba was entitled to that inference." *Id.* at 887-88. United is entitled to that same inference here—*i.e.*, that a prudent California water district would implement the measures demanded by NMFS rather than risk a threatened ESA enforcement action by the agency empowered to seek civil and criminal sanctions against United and its staff.

Respectfully submitted,

/s/ Frank S. Murray

FRANK S. MURRAY
FOLEY & LARDNER LLP
3000 K Street, N.W., Suite 600
Washington D.C. 20007-5143
Telephone 202.295.4163
Email: fmurray@foley.com
*Counsel for Plaintiff-Appellant*

February 12, 2024

OF COUNSEL:

David T. Ralston, Jr.
FOLEY & LARDNER LLP
3000 K Street, N.W., Suite 600
Washington, D.C. 20007-5143
(202) 295-4097
dralston@foley.com

Michael P. Calabrese
FOLEY & LARDNER LLP
555 South Flower Street, Suite 3300
Los Angeles, CA 90071
(213) 972-4564
mcalabrese@foley.com

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2023-1602

**Short Case Caption:** United Water Conservation District v. US

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 6,978 words.

☐ the filing has been prepared using a monospaced typeface and includes __________ lines of text.

☐ the filing contains __________ pages / __________ words / __________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. __________).

Date: 02/12/2024

Signature: /s/ Frank S. Murray

Name: Frank S. Murray