# United States Court of Appeals for the Federal Circuit

---

**UNITED WATER CONSERVATION DISTRICT,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2023-1602

---

Appeal from the United States Court of Federal Claims in No. 1:22-cv-00542-CFL, Senior Judge Charles F. Lettow.

---

Decided: April 2, 2025

---

FRANK S. MURRAY, Foley & Lardner LLP, Washington, DC, argued for plaintiff-appellant. Also represented by DAVID THOMAS RALSTON, JR.; MICHAEL P. CALABRESE, Los Angeles, CA.

TAMARA N. ROUNTREE, Appellate Section, Environment and Natural Resources Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by TODD KIM.

---

Before LOURIE and HUGHES, *Circuit Judges*, and GILSTRAP, *District Judge*.[1]

LOURIE, *Circuit Judge*.

United Water Conservation District ("United") appeals from a decision of the U.S. Court of Federal Claims ("the Claims Court") dismissing its complaint for lack of subject matter jurisdiction. *United Water Conservation Dist. v. United States*, 164 Fed. Cl. 79 (2023) ("*United Decision*").

United's suit against the United States ("the government") seeks just compensation for an alleged taking under the Fifth Amendment of the U.S. Constitution. The Claims Court dismissed United's complaint because it determined that United's claim should be evaluated as a regulatory taking and, because United had yet to exhaust its administrative remedies, its claim was "not yet viable for adjudication." *United Decision*, at 91. For the following reasons, we affirm.

BACKGROUND

United is a water conservation district, created pursuant to California law to serve as the water management agency for the Santa Clara River and the Oxnard coastal plain. *Id.* at 82. The California State Water Resources Control Board ("the State Board") issued United a license in 1958 and a permit in 1983, providing United the right to appropriate and divert water from the Santa Clara River for United's beneficial use, *i.e.*, to recharge groundwater aquifers, deliver surface water to groundwater users, and

---

[1] Honorable Rodney Gilstrap, District Judge, United States District Court for the Eastern District of Texas, sitting by designation.

stabilize the riverbed.[2] *Id.* at 82–83. In 1987, United's permit was amended to allow for the construction of the Vern Freeman Diversion dam ("Diversion dam"), which diverts water from the Santa Clara River into the Freeman Canal. *Id.* Water that the Diversion dam does not divert into the Freeman Canal remains in the Santa Clara River and flows into the Pacific Ocean. *Id.* at 83.

In 1997, the National Marine Fisheries Service ("NMFS"), an office of the National Oceanic and Atmospheric Administration within the Department of Commerce, designated the Southern California steelhead trout in the Santa Clara River as an "endangered species" under the Endangered Species Act ("ESA"). *Id.*; *see* 16 U.S.C. §§ 1531–44. Section 9 of the ESA prohibits taking species that are designated as endangered or threatened under the Act. *United Decision*, at 83; *see* 16 U.S.C. § 1538(a)(1)(B). The government, however, may allow a taking of steelhead trout otherwise prohibited by the ESA by issuing an incidental-take permit under Section 10 of the ESA, 16 U.S.C. § 1539(a). *United Decision*, at 83. United, as of the time of the Claims Court's decision, had not yet applied for such a permit. *Id.* at 86.

In 2016, NMFS's Office of Legal Enforcement ("OLE") issued a letter ("OLE Letter") notifying United that "a significant issue regarding ongoing take of endangered southern California . . . steelhead [trout] exists at the [Diversion] Dam . . ., which United owns and operates." *Id.* at 85 (quoting J.A. 53) (alteration in original). The letter further states that "United must commit to implementing interim operating measures that are consistent with the

---

[2] The license, permit, and amendment to the permit were not provided to the Claims Court and therefore any reference to the recitals reflect matters drawn from the complaint, the parties' briefing, and other materials included in the Joint Appendix.

operational criteria set forth in the [Reasonable and Prudent Alternatives ("RPAs")] . . . of the 2008 Biological Opinion [("2008 BiOp")]." *Id.* (quoting J.A. 55). According to United's complaint, RPA 2 of the 2008 BiOp requires an increase in bypass flow, *i.e.*, requiring more Santa Clara River water to either remain in the river or to flow through a fish ladder that is also located in the river (collectively, "bypass flow").[3] *Id.* at 88.

United's State Board-issued license and permit provide it with the right to appropriate and divert 144,630 acre-feet of Santa Clara River water per year at the Diversion dam and to put that amount of water to beneficial use. *Id.* at 83. United's complaint therefore alleges that NMFS, by way of OLE's Letter requiring United's implementation of RPA 2, "caused and required United to increase the amount of Santa Clara River water used as bypass flow to the [Diversion dam] fish ladder and/or remaining in the Santa Clara River for the benefit of the endangered fish species." J.A. 35, ¶ 52. It specifically alleges that "compliance with RPA 2 of the BiOp, as interpreted by NMFS, caused United to lose at least 49,800 [acre-feet] of water that it would have been permitted to divert from the Santa Clara River for its beneficial use," resulting in a physical taking. *Id.*, ¶ 53; *see* J.A. 39, ¶ 67 (alleging that "the taking by [the government] constituted a physical taking").

In the Claims Court, the parties disagreed about whether United's claim should be analyzed as a physical or regulatory taking, *United Decision*, at 88, and thus "whether United's claim is ripe for adjudication," because "[f]or a regulatory taking claim to ripen, there must be final agency action," *id.* at 91. United argued that its claim was

---

[3] The 2008 BiOp was not provided to the Claims Court and therefore any reference to the recitals reflect matters drawn from the complaint, the parties' briefing, and other materials included in the Joint Appendix.

ripe because it alleged a physical, not regulatory, taking. *Id.* For its part, the government argued that the claim was not ripe because United alleged a regulatory taking and had not yet applied for and been denied an incidental-take permit under Section 10 of the ESA. *Id.* In addition, as relevant here, United conceded that the Diversion dam is located in the Santa Clara River and any water it diverts to the fish ladder "does not enter the Freeman [ ] Canal." *Id.* at 83 (citing J.A. 24, ¶ 18).

The Claims Court first explained that "a physical taking occurs when the government directly appropriates property or engages in the functional equivalent of a practical ouster of the owner's possession." *United Decision*, at 89 (quoting *Katzin v. United States*, 908 F.3d 1350, 1361 (Fed. Cir. 2018)) (cleaned up). A regulatory taking on the other hand, it explained, "occurs when a regulation restricts the owner's use of their property." *Id.* (citing *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978)). Finally, it explained that "[w]hen determining if a taking was physical or regulatory, a court should focus on the character of the government action." *Id.* (citing *Casitas Mun. Water Dist. v. United States*, 543 F.3d 1276, 1290 (Fed. Cir. 2008) ("*Casitas I*")).

The Claims Court determined that United's claim should be analyzed as a regulatory taking. *United Decision*, at 91. It reasoned that the circumstances of this case distinguished it from those where the Supreme Court and this court had applied the physical takings doctrine to water rights because in those cases the water rights holder "had to return water it had already diverted." *Id.* at 91 (citing *Int'l Paper Co. v. United States*, 282 U.S. 399 (1931), and *Casitas I*, 543 F.3d at1291–92)). And "[b]ecause United does not allege that it had to return water it had already diverted, it has not stated a physical takings claim." *Id.* at 90–91. In light of that determination, the Claims Court concluded that United's complaint was not ripe because United had yet to apply for a Section 10

incidental-take permit under the ESA. *Id.* at 91 (citing *Boise Cascade Corp. v. United States*, 296 F.3d 1339, 1349 (Fed. Cir. 2002) ("[A]bsent denial of the permit, only an extraordinary delay in the permitting process can give rise to a compensable taking.")). The Claims Court therefore dismissed United's complaint for lack of subject matter jurisdiction under Rule 12(b)(1) of the United States Court of Federal Claims. *Id.*

United timely appealed, and we have jurisdiction under 28 U.S.C. § 1491(b)(1).

## DISCUSSION

United argues that the Claims Court improperly dismissed its complaint for lack of subject matter jurisdiction. In United's view, because the alleged taking should be evaluated as a physical, not regulatory, taking, its claim is ripe for adjudication as pleaded. We disagree.

"This court reviews legal conclusions by the Court of Federal Claims *de novo* and factual findings for clear error." *Casitas Mun. Water Dist. v. United States*, 708 F.3d 1340, 1351 (Fed. Cir. 2013) ("*Casitas II*") (citation omitted). "The nature or scope of a compensable property interest in a takings analysis is a question of law." *Id.* (citation omitted). "In addition, whether the Court of Federal Claims properly dismissed a complaint for lack of subject matter jurisdiction also is a question of law," *id.*, with any underlying jurisdictional fact determinations reviewed for clear error, *Stephens v. United States*, 884 F.3d 1151, 1155 (Fed. Cir. 2018). "Finally, the Court of Federal Claims must address ripeness as a threshold consideration before addressing the merits." *Casitas II*, 708 F.3d at 1351 (cleaned up).

The Fifth Amendment provides that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V, cl. 4. To establish a taking under the Fifth Amendment, a party must prove that it had a cognizable property interest at the time of the alleged

taking and that "the government's action amounted to a compensable taking of that interest." *Casitas II*, 708 F.3d at 1348. A taking can either be physical or regulatory in nature. *See Casitas I*, 543 F.3d at 1288–89. A taking that is physical in nature is the "paradigmatic taking" and occurs by "a direct government appropriation or [a] physical invasion of private property." *Id.* at 1288 (quoting *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005)). A "[g]overnment action that physically appropriates property is no less a physical taking because it arises from a regulation." *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 149 (2021).

Regulatory takings differ from physical takings in that, instead of asking "whether the government has physically taken property for itself or someone else—by whatever means," the question is whether the government "has instead restricted a property owner's ability to use his own property." *Id.* (citing *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 321–23 (2002)). "While there is no 'set formula' for evaluating regulatory takings claims, courts typically consider whether the restriction has risen to the level of a compensable taking under the multi-factor balancing test articulated in *Penn Central*, 438 U.S. at 124." *Casitas I*, 543 F.3d at 1289; *see Tahoe-Sierra*, 535 U.S. at 322 n.17 ("When, however, the owner contends a taking has occurred because a law or regulation imposes restrictions so severe that they are tantamount to a condemnation or appropriation, the predicate of a taking is not self-evident, and the analysis is more complex."). The *Penn Central* factors include "[t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations" and also, "the 'character of the governmental action'—for instance whether it . . . merely affects property interests through 'some public program adjusting the benefits and burdens of economic

life to promote the common good.'" *Lingle*, 544 U.S. at 538–39 (quoting *Penn Central*, 438 U.S. at 124).

Moreover, a regulatory takings claim "is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." *Williamson Cnty. Reg'l Plan. Comm'n v. Hamilton Bank*, 473 U.S. 172, 186 (1985), *overruled on other grounds by Knick v. Township of Scott*, 588 U.S. 180 (2019)); *see, e.g.*, *Boise Cascade*, 296 F.3d at 1357 ("Boise cannot make out a ripe takings claim based on the mere imposition of a permitting requirement" under the ESA.).

Here, it is undisputed that United acquired a valid, appropriative property right in the beneficial use of water it diverts to the Freeman Canal. *See United Decision*, at 83. United contends, however, that the Claims Court erred by characterizing its complaint as alleging a taking that is regulatory in nature. It argues that "restrictions imposed by NMFS's [OLE Letter] on United's operation of the [Diversion dam] resulted in a decrease in the volume of water United was able to appropriate and put to beneficial use." United Br. 32. More particularly, it argues that "the government appropriated the beneficial use of [ ] 49,800 acre-feet of Santa Clara River water for the federal public purpose of fish preservation," *id.* at 18, and that that volume of water is now "gone forever," *id.* at 20. Because, as it argues, "United does not have the same amount of water it can put to beneficial use *after* the government action as it would have had *absent* the government action[,] . . . the government action is not a use *restriction* that otherwise leaves United's property right undisturbed, as is the case in a regulatory taking[s] claim." *Id.* at 19 (emphasis in original). We disagree.

California property rights are governed by state law. *Cedar Point*, 594 U.S. at 155 ("As a general matter, it is true that the property rights protected by the Takings

Clause are creatures of state law."). "Under well-established California law, the right of property in water is usufructuary, and consists not so much of the fluid itself as the advantage of its use." *Casitas II*, 708 F.3d at 1353 (internal quotation marks and citation omitted). "[A]lthough a private entity cannot own water itself, the right to use that water is considered private property." *Id.* at 1354; *see Thayer v. Cal. Dev. Co.*, 128 P. 21, 24 (Cal. 1912) ("Under the law of this state as established at the beginning, the water right which a person gains by diversion from a stream for a beneficial use is a private right—a right subject to ownership and disposition by him, as in the case of other private property."). Further, "[u]nder the prior appropriation doctrine, recognized in most of the western states, water rights are acquired by diverting water and applying it for a beneficial purpose." *Colorado v. New Mexico*, 459 U.S. 176, 179 n.4 (1982).

Supreme Court precedent, as well as our own, "involving water rights provides guidance on the demarcation between regulatory and physical takings analysis with respect to these rights." *Casitas I*, 543 F.3d at 1289. *International Paper* and *Casitas I* are illustrative because they involve appropriative water rights. *See Int'l Paper*, 282 U.S. at 404–408; *Casitas I*, 543 F.3d at 1291–95. In both cases, the water rights holder diverted a volume of water from the watercourse (*e.g.*, a river) to a canal for its beneficial use under its relevant contract or license. *Int'l Paper*, 282 U.S. at 404; *Casitas I*, 543 F.3d at 1280.

In *International Paper*, the government ceased the diversion of water to International Paper's mill for a public purpose—supplying power for the war effort. *International Paper*, 282 U.S. at 405–6 ("On December 29, the representative of the Secretary of War wrote to the secretary of the Power Company 'Please note that the requisition order covers also all of the water capable of being diverted through your intake canal. [ ] This is intended to cut off the water being taken by the International Paper

Company . . . .'"). The Supreme Court concluded that this was a direct physical appropriation because International Paper's right to the water was completely cut off. *See Int'l Paper*, 282 U.S. at 407 ("The petitioner's right was to the use of the water; and when all the water that it used was . . . turned elsewhere by government requisition for the production of power it is hard to see what more the Government could do to take the use.").

In *Casitas I*, after the water had been diverted to the canal and into the rights holder's possession, the government subsequently mandated a return of that water for a public purpose—fish preservation. *Casitas I*, 543 F.3d at 1291–92. Because the government caused water that was diverted to be returned—*i.e.*, a direct physical appropriation—we determined that the taking was physical in nature. *See id.* ("[T]he government did not merely require some water to remain in stream, but instead actively caused the physical diversion of water away from the Robles–Casitas Canal—*after the water had left the Ventura River and was in the Robles–Casitas Canal*—and towards the fish ladder, thus reducing Casitas' water supply." (emphasis added)).

United's allegations here are materially different. Unlike the water rights holders in *International Paper* and *Casitas I*, United has not alleged that the government completely cut off its access to the water or caused it to return any volume of water it had previously diverted to its possession in the Freeman Canal. In fact, United alleges that NMFS, at most, required more water to stay in the Santa Clara River. *See* J.A. 20, ¶ 4 ("[T]he BiOp RPAs . . . compelled United to increase the amount of Santa Clara River water (a) flowing to a fish ladder located at United's [Diversion dam], and/or (b) remaining in the Santa Clara River (collectively and commonly referred to as 'bypass flow') to facilitate fish migration."); J.A. 24, ¶ 18 ("Bypass flow water used for the fish ladder or flowing into the roller gate does not enter the Freeman [ ] Canal."). Put simply,

the BiOp RPAs represent a nonpossessory government activity merely requiring that more Santa Clara River water, whether flown through the fish ladder or not, remains in the river.

The RPAs therefore operate as "regulatory restrictions on the use of" a natural resource and "do not constitute physical takings." *Seiber v. United States*, 364 F.3d 1356, 1366 (Fed. Cir. 2004); *see, e.g.*, *Boise Cascade*, 296 F.3d at 1355 ("The government simply imposed a temporary restriction on Boise's exploitation of certain natural resources located on its land unless Boise obtained a permit."). Stated differently, "this case does not present the classic taking in which the government directly appropriates private property for its own use; instead the interference with property rights arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Tahoe-Sierra*, 535 U.S. at324 (cleaned up). United's complaint therefore alleges a taking that is regulatory in nature.

United argues that "[t]here is no legal support" for requiring "that the water at issue must have already entered the property owner's facilities before the governmental appropriation at issue." United Br. 38. It argues that "such a requirement . . . cannot be squared with the Supreme Court's consistent finding of a physical taking of the right to use water whenever the government action at issue prevents the rights holder from accessing water it has the right to use." *Id.* at 38, 42. Specifically, it contends that "the taking of the right to use water constitutes a physical taking, even where the governmental action prevented the water from entering the property owner's facilities in the first instance." *Id.* at 42 (relying on *Int'l Paper*, 282 U.S. 399 (1931), *United States v. Gerlach Live Stock Co.*, 339 U.S. 725 (1950), and *Dugan v. Rank*, 372 U.S. 609 (1963)).

The Supreme Court precedent that United relies upon, however, does not acknowledge any distinction between physical and regulatory takings. That is presumably because it was not until 1978, decades after the decisions in *International Paper*, *Gerlach*, and *Dugan*, that the Court, in *Penn Central*, "clarified [ ] the test for how far was 'too far'" for a regulation to be recognized as a taking. *Horne v. Dep't of Agric.*, 576 U.S. 350, 360 (2015). It may also be because the alleged takings in those cases did not arise from a regulation, as it clearly does here under the ESA. Moreover, *Gerlach* and *Dugan* involve riparian water rights, not appropriative water rights as here. The difference between the two is meaningful in the context of this case because riparian rights exist by virtue of land ownership and, therefore, their acquisition by the landowner does not depend on any physical acts of diversion and beneficial use of water as is required for appropriative water rights. *See Colorado*, 459 U.S. at 179, n.4 ("Appropriative rights do not depend on land ownership and are acquired and maintained by actual use. Riparian rights, in contrast, originate from land ownership and remain vested even if unexercised."). Unlike the riparian-rights holders in *Gerlach* and *Dugan*, therefore, the appropriative-rights holder here needed to have physically diverted water for its property right to vest and thus become subject to a physical taking, as in *Casitas*. For at least those reasons, the Supreme Court precedent and related cases United cites are consistent with our decision here.

A regulatory takings claim, as alleged here, is not ripe until the rights holder obtains a final agency action. *See Schooner Harbor Ventures*, 569 F.3d at 1365; *see, e.g.*, *Boise Cascade*, 296 F.3d at 1355 ("[T]hat the [government] never denied Boise's permit . . . is fatal to Boise's regulatory takings claims, and it remains fatal notwithstanding Boise's attempt to recharacterize those claims as a forced physical [taking]."). Having yet to have been denied an incidental-take permit under Section 10 of the ESA, United has

therefore not pleaded a ripe takings claim, and the district court properly dismissed its complaint for lack of subject matter jurisdiction.

## CONCLUSION

We have considered United's remaining arguments and find them unpersuasive. For the foregoing reasons, we affirm.

**AFFIRMED**